1  BOBBY GHAJAR (198719)
   (bghajar@cooley.com)
2  COLETTE GHAZARIAN (322235)
   (cghazarian@cooley.com)
3  COOLEY LLP
   1333 2nd Street, Suite 400
4  Santa Monica, California 90401
   Telephone:    (310) 883-6400
5  Facsimile:    (310) 883-6500

6  STEPHANIE SCHUYLER (*Pro Hac Vice*)
   (sschuyler@cooley.com)
7  55 Hudson Yards
   New York, NY 10001
8  Telephone:    (212) 479-6000
   Facsimile:    (212) 479-6275

9
   *Counsel for Defendant Meta Platforms, Inc.*
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14

15  METABYTE, INC.,                    Case No. 3:23-cv-04862-VC

16            Plaintiff,               **DEFENDANT META PLATFORMS, INC.'S
                                       (1) NOTICE OF MOTION AND MOTION
17       v.                            FOR SUMMARY JUDGMENT AND FOR
                                       EXCLUSION OF PLAINTIFF'S EXPERTS;
18  META PLATFORMS, INC.,              MEMORANDUM OF POINTS AND
                                       AUTHORITIES; AND (2) OPPOSITION TO
19            Defendant.               METABYTE, INC.'S MOTION FOR
                                       PARTIAL SUMMARY JUDGMENT ON
20                                     LACHES**

21                                     **[BRIEF NO. 2]**

22                                     Hearing Date: August 7, 2025, 10:00 am
                                       United States District Court
23                                     450 Golden Gate Ave
                                       San Francisco, CA 94102
24

25

26

27

28

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | FACTUAL BACKGROUND | | 2 |
| | A. | Plaintiff Is a Company that Provides Outsourced Staffing Services | 2 |
| | B. | Facebook Rebranded to Meta in October 2021 | 4 |
| | C. | Metabyte Expresses No Desire for Meta to Change its Name, But Makes Varying Threats and Demands | 5 |
| | D. | After Learning of Meta's Rebrand, Metabyte Redesigns its Website to Present Itself as Offering VR Products and Services | 6 |
| III. | LEGAL STANDARD GOVERNING SUMMARY JUDGMENT | | 7 |
| IV. | THERE IS NO GENUINE ISSUE AS TO THE LIKELIHOOD OF REVERSE CONFUSION | | 7 |
| V. | PLAINTIFF'S UNSUPPORTED THEORIES OF DAMAGES FAIL AS A MATTER OF LAW | | 17 |
| VI. | METABYTE IS NOT ENTITLED TO DISGORGEMENT OF META'S PROFITS | | 18 |
| VII. | PLAINTIFF'S CLAIM THAT "META" IS GENERIC FAILS AS A MATTER OF LAW | | 19 |
| VIII. | GENUINE ISSUES PRECLUDE SUMMARY JUDGMENT ON META'S LACHES DEFENSE | | 22 |
| IX. | THE COURT SHOULD EXCLUDE ANY OPINIONS FROM PLAINTIFF'S EXPERTS JEREMY SHEFF (DAMAGES) AND STEFAN BOEDEKER (SURVEY AND "IMPACT" REPORT) | | 23 |
| | A. | Legal Standard Governing *Daubert* Motions | 23 |
| | B. | Jeremy Sheff's "Damages" Opinions Should be Excluded | 24 |
| | | 1. Sheff is Unqualified to Provide Any Damages Analysis | 24 |
| | | 2. Sheff's "Valuation" Damages Metric is Unsupported in Law or Fact | 25 |
| | |   a. Sheff's "Market Method" Estimate of $69 Million Based on One Dissimilar Transaction is Contrary to Law and Unreliable | 25 |
| | |   b. Sheff's "Cost Method" Estimate of $988,142.06 Fabricates Costs and is Contrary to Generally Accepted Methods. | 26 |
| | | 3. Sheff's *$128 Billion* Profit Disgorgement Opinion is Contrary to Law and Unsupported by the Record | 27 |
| | C. | Stefan Boedeker's Survey Report and "Economic Impact" Report Should be Excluded | 28 |
| | D. | Boedeker Survey's Methodology and His Faulty Analysis of Its Results Render the Survey Unreliable and Irrelevant | 28 |
| | | 1. Mr. Boedeker Surveyed the Wrong Universe | 29 |
| | | 2. The Boedeker Survey Used Improper Stimuli That Do Not Replicate Marketplace Conditions | 29 |

**TABLE OF CONTENTS**
**(continued)**

Page

3.   Mr. Boedeker Failed to Properly Analyze Survey Results, Leading to Critical Statistical Errors ........................................................................ 31

E.   Mr. Boedeker's Economic Impact Report Is Irrelevant Theory .......................... 32

X.   CONCLUSION ................................................................................................. 33

COOLEY LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979).................................................................................. 7, 8, 16

*Avila v. Willits Env't Remediation Trust*,
    633 F.3d 828 (9th Cir. 2011).................................................................................... 23

*Bennett v. United States*,
    2018 WL 6265092 (C.D. Cal Mar. 22, 2018) ......................................................... 24

*Brookfield Commc'ns, Inc. v. W. Coast Ent't, Corp.*,
    174 F.3d 1036 (9th Cir. 1999)........................................................................ 8, 12, 13

*Caesars World, Inc. v. Milanian*,
    247 F. Supp. 2d 1171 (D. Nev. 2003), *aff'd*, 126 F. App'x. 775 (9th Cir. 2004) ............. 20, 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................... 7, 17

*Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*,
    2018 WL 3407709 (S.D.N.Y. Jan. 12, 2018)........................................................... 13

*Cohn v. Petsmart, Inc.*,
    281 F.3d 837 (9th Cir. 2002).......................................................................... 7, 13, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)................................................................................ 1, 23, 24, 27

*Dep't of Toxic Substances Control v. Technichem, Inc.*,
    No. 12-cv-5845 (N.D. Cal. Mar. 15, 2016), Dkt. No. 160 ...................................... 27

*Dfinity Found. v. Meta Platforms, Inc.*,
    2022 WL 16857036 (N.D. Cal. Nov. 10, 2022)...................................................... 8, 9

*Dreamwerks Prod. Grp. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998)................................................................................. 29

*E-Systems, Inc. v. Monitek, Inc.*,
    720 F.2d 604 (9th Cir. 1983).......................................................................... 1, 22, 23

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*,
    779 F. App'x 471 (9th Cir. 2019) ........................................................................... 23

*Elliott v. Google, Inc.*,
    860 F.3d 1151 (9th Cir. 2017)........................................................................... 20, 21

COOLEY LLP
ATTORNEYS AT LAW

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Entrepreneur Media, Inc. v. Smith*,

4

   279 F. 3d 1135 (9th Cir. 2002) ............................................................................................ 14

5

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*,
   198 F.3d 1143 (1999) ................................................................................................... 20, 21

6

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,

7

   618 F.3d 1025 (9th Cir. 2010) ............................................................................................ 28

8

*Groupion, LLC v. Groupon, Inc.*,
   859 F. Supp. 2d 1067 (N.D. Cal. 2012) ..................................................................... 9, 11, 16

9

10

*iCall, Inc. v. Tribair, Inc.*,
   2012 WL 5878389 (N.D. Cal. Nov. 21, 2012) ................................................................... 12

11

*Icon Enters. Int'l, Inc. v. Am. Prod. Co.*,

12

   2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ...................................................................... 29

13

*Instant Media, Inc. v. Microsoft Corp.*,
   2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) .................................................................. 14

14

15

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
   2 F.4th 1150 (9th Cir. 2021) ......................................................................................... 15, 16

16

17

*J.T. Colby & Co. v. Apple Inc.*,
   2013 WL 1903883 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir.
   2014) ................................................................................................................................... 10

18

19

*JH Kelly, LLC v. AECOM Tech. Servs. Inc.*,
   605 F.Supp. 3d 1295 (N.D. Cal. 2022) .............................................................................. 28

20

*Ketab Corp. v. Mesriani & Assocs., P.C.*,

21

   734 F. App'x 401 (9th Cir. 2018) ......................................................................................... 9

22

*Kournikova v. Gen. Media Commc'ns Inc.*,
   278 F. Supp. 2d. 1111 (C.D. Cal. 2003) ....................................................................... 29, 31

23

*KP Perm. Make-Up v. Lasting Impression I, Inc*,

24

   408 F.3d 596 (9th Cir. 2005) ......................................................................................... 20, 22

25

*Kudos Inc. v. Kudoboard, LLC*,
   2021 WL 5415258 (N.D. Cal. Nov. 20, 2021) ................................................................ 20, 29

26

27

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................................................... 24

28

COOLEY LLP
ATTORNEYS AT LAW

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*Kwan Software Eng'g, Inc. v. Forey Techs., LLC*,

4
    2014 WL 572290 (N.D. Cal. Feb. 11, 2014)............................................................... 29, 30

5

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993)............................................................................... 17

6

7

*Lodestar Anstalt v. Bacardi & Co. Ltd.*,
    31 F.4th 1228 (9th Cir. 2022)............................................................................... 7, 11

8

*M2 Software Inc. v. Madacy Ent.*,
    421 F.3d 1073 (9th Cir. 2005)............................................................................... 9, 30, 32

9

10

*Mach. Head v. Dewey Glob. Holdings, Inc.*,
    2001 WL 174180 (N.D. Cal. Dec. 13, 2001) ..................................................... 16

11

12

*Marketquest Grp., Inc. v. BIC Corp.*,
    862 F.3d 927 (9th Cir. 2017)................................................................................. 15

13

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
    290 F. Supp. 2d 1083 (C.D. Cal. 2003)............................................................. 12

14

15

*MaxLite, Inc. v. ATG Elecs., Inc.*,
    2022 WL 16923391 (C.D. Cal. Aug. 7, 2022) ................................................... 27

16

17

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988)................................................................................. 23

18

*Medical Depot, Inc. v. Med Way US, Inc.*,
    2:22-cv-1272 (E.D.N.Y. Apr. 26, 2024) (Dkt. 62)............................................ 28

19

20

*Medisim Ltd. v. BestMed LLC*,
    861 F. Supp. 2d 158 (S.D.N.Y. 2012).................................................................. 30

21

22

*Mercer Global Advisors v. Hewitt*,
    2024 WL 5423015 (C.D. Cal. Oct. 31, 2024) ................................................... 33

23

*Metabyte, Inc. v. Canal+ Techs., S.A.*,
    2005 WL 6032845 (N.D. Cal. June 17, 2005) .................................................. 13, 26

24

25

*Murray v. CNBC*,
    86 F.3d 858 (9th Cir. 1996).................................................................................. 8, 9

26

27

*Network Automation, Inc. v. Hewlett-Packard Co.*,
    2009 WL 5908719 (C.D. Cal. Sep. 14, 2009)................................................... 12

28

*Network Automation v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011).............................................................................. 11

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Nordstrom, Inc. v. 7525419 Canada Inc.*,
    2012 WL 12507605 (W.D. Wash. Dec. 27, 2012) .................................................................. 13

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
    2015 WL 9028123 (N.D. Cal. Dec. 16, 2015) ...................................................................... 18

*Oculu v. Oculus*,
    2015 WL 3619204 (C.D. Cal. June 8, 2015) ................................................................. 19, 25

*Pinterest, Inc. v. Pintrips, Inc.*,
    140 F. Supp. 3d 997 (N.D. Cal. 2015) ......................................................................... 12, 13

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ........................................................................................... 11

*QS Wholesale, Inc. v. Rox Volleyball, Inc.*,
    2014 WL 12567147 (C.D. Cal. Dec. 31, 2014) .................................................................. 14

*Quia Corp. v. Mattel, Inc.*,
    2011 WL 2749576 (N.D. Cal. July 14, 2011) ............................................................... 17, 18

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    590 U.S. 212 (2020) ........................................................................................................... 19

*Rudolph Int'l, Inc. v. Realys, Inc.*,
    482 F.3d 1195 (9th Cir. 2007) ........................................................................................... 20

*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*,
    680 F. Supp. 2d 1107 (N.D. Cal. 2010) ............................................................................ 11

*Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*,
    265 F. Supp. 3d 1013 (N.D. Cal. 2017) ............................................................................ 30

*Scat Enters., Inc. v. FCA US LLC*,
    2017 WL 5896182 (C.D. Cal. June 8, 2017) ..................................................................... 18

*Spin Master, Ltd. v. Zobmondo Ent., LLC*,
    944 F. Supp. 2d 830 (C.D. Cal. 2012) .............................................................................. 18

*Suja Life, LLC v. Pines Int'l, Inc.*,
    2016 WL 8738223 (S.D. Cal. Nov. 18, 2016) ................................................................... 25

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) ..................................................................................... *passim*

*Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*,
    601 F.2d 1011 (9th Cir. 1979) ..................................................................................... 20, 22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Sweats Fashion, Inc. v. Pannill Knitting Co.*,
    833 F.2d 1560 (Fed. Cir. 1987)...................................................................................... 15

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
    473 F. App'x 522 (9th Cir. 2011) ..................................................................................... 7

*Townsend v. Monster Beverage Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018)......................................................................... 31

*United Artists Corp. v. United Artist Studios LLC*,
    2019 WL 8221088 (C.D. Cal. Aug. 2, 2019) ................................................................ 22

*United States v. Marr*,
    2017 WL 1540815 (N.D. Cal. Apr. 28, 2017) .............................................................. 24

*United States v. Scholl*,
    166 F.3d 964 (9th Cir. 1999)......................................................................................... 27

*Unleashed Doggie Day Care, LLC v. PetCo Animal Supplies Stores, Inc.*,
    828 F. Supp. 2d 384 (D. Mass. 2010) .......................................................................... 13

*Wag Hotels, Inc. v. Wag Labs, Inc.*,
    2023 WL 3605977 (N.D. Cal. May 22, 2023) .............................................................. 18

*Walter v. Mattel, Inc.*,
    210 F.3d 1108 (9th Cir. 2000)................................................................................... 8, 16

*World Champ Tech LLC v. Peloton Interactive, Inc.*,
    2024 WL 665181 (N.D. Cal. Feb. 16, 2024).................................................................. 10

**Statutes**

15 U.S.C.
    § 1117(a) ........................................................................................................................ 18

Lanham Act ............................................................................................................... 16, 18

**Other Authorities**

Civil Local Rule 7 ........................................................................................................... 1

Fed. R. Civ. P. 56(a)........................................................................................................ 7

Fed. R. Evid.
    702 ............................................................................................................................ 1, 23
    702(c) ............................................................................................................................ 25
    703 ................................................................................................................................. 1

COOLEY LLP
ATTORNEYS AT LAW

vii

DEFENDANT'S OPP. AND MTN. FOR SUMMARY
JUDGMENT AND UNDER *DAUBERT*
CASE NO. 3:23-CV-04862-VC

1

**TABLE OF AUTHORITIES**
**(continued)**

2
**Page(s)**

3

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:163
    (5th ed. 2024) ................................................................................................................ 30

4

5

*Manual for Complex Litigation, Fourth*, § 11.493 (4th ed. 2004) ......................................... 32, 33

6

Rule 26(a)(1)(iii) ..................................................................................................................... 17

7

Trademark Manual of Examining Procedure
    § 1209.01(c) ....................................................................................................................... 5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW

viii

DEFENDANT'S OPP. AND MTN. FOR SUMMARY
JUDGMENT AND UNDER *DAUBERT*
CASE NO. 3:23-CV-04862-VC

1  **TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

2  **PLEASE TAKE NOTICE** that on August 7, 2025 at 10:00 a.m., or as soon thereafter as

3  the matter can be heard in the above-captioned court, located at 450 Golden Gate Ave., San

4  Francisco, CA 94102, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move the

5  Court to grant summary judgment dismissing all claims by Plaintiff Metabyte, Inc. ("Plaintiff" or

6  "Metabyte"). Summary judgment is appropriate on all of the following claims and issues, which

7  together cover the entirety of Metabyte's complaint:

8  (1) No likelihood of reverse consumer confusion between Metabyte and Meta;

9  (2) Metabyte's claim of any actual damages including lost sales or lost profits;

10  (3) Metabyte's claim for legal or equitable disgorgement of Meta's profits;

11  (4) "Meta" is not "generic" for Meta's accused services.

12  Meta also opposes Metabyte's Motion for Partial Summary Judgment as to Meta's

13  affirmative defense of laches, because there are material factual disputes as to the applicable factors

14  under *E-Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).

15  Separately, Meta also moves to exclude the opinions of Plaintiff's experts Jeremy Sheff and

16  Stefan Boedeker under Federal Rules of Evidence 702 and 703, Civil Local Rule 7, and *Daubert v.*

17  *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

18  The motion is based on this notice and motion; the following memorandum of points and

19  authorities; the concurrently filed Declarations of Colette Ghazarian ("Ghazarian Declaration"),

20  Samantha Halle ("Halle Declaration"), and Scott Minden ("Minden Declaration"); the exhibits filed

21  with those declarations; any judicially noticeable facts; all papers on file with the Court; and such

22  other matters as may be presented at the time of the hearing.

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

This lawsuit was never about protecting consumers from purported confusion. It is about a company trying to misuse trademark law to obtain an unjust windfall.

In October 2021, Facebook – a company known for its social media and messaging services (such as Facebook, Instagram, WhatsApp, and Messenger) and virtual reality products (such as Quest) – adopted the name Meta and a new logo: ∞ Meta    Although its corporate identity changed, its core business did not.  Plaintiff Metabyte's business is nothing like Meta's: it is an outsourced staffing company that works directly with a handful of sophisticated companies (like Abbott Labs) to place workers in temp positions, and for that service, Metabyte earns a fee.

Metabyte sued Meta in late 2023 for trademark infringement under a theory of reverse confusion. When Meta would not agree to Metabyte's outrageous money demands, Metabyte came up with another claim – that "Meta" is generic – in hopes of driving up the value of the case. Yet after close to four years of co-existence, and as confirmed in discovery, Metabyte has no evidence of confusion, loss, or other damages. Not a single customer has stopped doing business with Metabyte due to a mistaken belief that it is affiliated with Meta. The undisputed evidence demonstrates that the parties' marks are different; they offer unrelated products and services; Metabyte's clients are sophisticated and work with it because of long-forged relationships, not impulsive hiring decisions; Metabyte co-exists in a field of hundreds of other trademarks and company names with "Meta" in them; and there is no actual confusion or bad faith.

The undisputed evidence also proves that Plaintiff has not suffered any loss or damage due to actual or likely confusion with Meta. Nor is Metabyte entitled to speculative damages in the form of *Meta's* profits, which have no correlation to Metabyte's staffing business. Metabyte's last-ditch attempt to articulate a "valuation" or other damage theory through Jeremy Sheff, an IP law professor with no economic damages experience, does not create a genuine issue; instead, it confirms that Metabyte lacks evidence of damages and is entitled to none.

The undisputed facts also show that "Meta" is not "generic"—it is not the common name of a product or service offered by Meta. Instead, as Metabyte witnesses and experts admit, and as

the United States Patent and Trademark Office ("PTO") recognized, META functions as a source identifier for Meta's products and services.

Lastly, the opinions of Metabyte's experts Jeremy Sheff and Stefan Boedeker are entitled to no weight and should be excluded as unreliable, unsupported, legally irrelevant, and unhelpful.

The Court should grant summary judgment dismissing Metabyte's entire complaint and exclude its experts. And although that would moot Metabyte's motion regarding Meta's laches defense, genuine issues of fact on the *E-Systems* factors also require denial of Metabyte's motion.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff Is a Company that Provides Outsourced Staffing Services

Founded in 1993, Metabyte paints itself as a company that sells software, has a venture arm, and offers products used by millions of customers daily. In reality, its business over the past five years consists of providing outsourced staffing services to a few pre-existing clients. Metabyte's Google profile describes it as an "employment agency." Ex. 20.[1] █████████████

████████████████████████████████████████████████████████

███████████████████████████████████ Ex. 4 at 45:19-46:10, 47:14-17, 47:2-13. Those jobs vary from freight clerks to billing specialists, Ex. 64, and offer compensation ranging from $12/hour to $125/hour, Ex. 65. Most of these jobs are █████████████████████████

███████ and before a candidate completes the job application, they know ███████████

████████████████████████████████████████████████████████

███████████████████████████ and sign an employment agreement and other paperwork with Metabyte, but ultimately perform ████████████████ Ex. 4 at 149:17-154:22. In the last five years, ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[1] Unless otherwise stated, citations to "¶ __" and "Ex. __" are to the Ghazarian Declaration's paragraphs and exhibits, all emphases are added, and internal citations and quotations are omitted.

1     ████████████████████ Ex. 5 at 13:15-14:22.

2         In the past, Metabyte also offered staffing services through a separate business called

3 Teamanics, a Delaware corporation and non-party. Ex. 7 at 40:18–20. Teamanics (teamanics.com)

4 is described as a "peer network" staffing platform (*id.* 40:16-17), which requires users to create an

5 account and log in to access Ex. 36. ████████████████████████████████

6 ██████████████████████████████████████████████ Ex. 4 at

7 77:22-78:23 ████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████ Ex. 8 at 55:12–56:5, 132:7–18; 241:21–242:1.[2]

12 ████████████████████████████████████████

13 ██████████ *Id.* at 26:7-11. Metabyte has a website ([www.metabyte.com](www.metabyte.com)), but it is not used to

14 attract job seekers; as its CEO testified, "we don't use our website very much right now." Ex. 7 at

15 280:13-14; 281:7-14. ████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████ Ex. 28.

18         Metabyte's revenues and client base have steadily declined since 2018, well before Meta's

19 October 2021 rebrand. Ex. 49 ¶¶ 45-46; Ex. 50 Attach. 6. The COVID-19 pandemic hit Metabyte's

20 staffing business hard and it never recovered. *Id.*; Ex. 4 at 147:2-148:1; Ex. 7 at 135:19-136:9.

21 When asked about the annual drops in revenue from 2018-2023, Metabyte's CEO cited the negative

22 impacts of the pandemic, Metabyte's efforts to pivot its business to launch Teamanics, and its

23 unilateral decision to "pause" that business due to this lawsuit. *Id.* at 239:16-241:1. Those declines

24

---

25 [2] Metabyte used to run a web design and hosting service under the name HotDoodle, but that
business has long been inactive, (Ex. 9 at 138:20-23; Ex. 12 at 176), and generates minimal
26 recurring website hosting fees from old clients, Ex. 9 at 29:22-30:3; Ex. 4 at 99:7-9 (██████████
27 ████████████████████). Neither the Teamanics nor HotDoodle businesses were marketed
under the METABYTE brand until *after* Metabyte sent Meta a demand letter. *See infra* at § II.D.
28 (discussing Metabyte's website changes).

had nothing to do with trademark confusion; indeed, Metabyte conceded in a Court-ordered interrogatory response that it "is unable to identify specific monetary damages caused by confusion" with Meta. Dkt. 62 at 2; Ex. 63. Since 2024, Metabyte's only revenue is ███████████

███████████████████████████████████████████████████████████████

███████████████████████, Ex. 49 ¶¶ 14, 48; Ex. 50 Attachs. 4 and 5; Ex. 9 at 135:18-136:5; Ex. 4 at 47:22-48:7.

## B.    Facebook Rebranded to Meta in October 2021

Founded in 2004, Meta (formerly Facebook) builds products and services to connect people and foster communities, including social media services, VR/AR technologies, and, more recently, AI products. Halle Decl., ¶¶ 4-5. Most of these products and services, including Facebook, Instagram, WhatsApp, and Quest, were offered under their respective brand names well before Meta's rebrand and have been widely associated with the Defendant for years. *Id.*, ¶¶ 4-8.

On October 28, 2021, Facebook, Inc. changed its corporate name to Meta Platforms, Inc. and adopted the now well-recognized META name and logo: ∞ Meta *Id.*, ¶¶ 31, 33. Meta's rebrand was preceded by a deliberative name selection process that began in April 2021 and involved numerous stakeholders at Meta. *Id.,* ¶ 10-14. The primary goal was to select a brand name that reflected the future of the company. Ex. 42 at 11:3–5. Meta hoped that the new name would help differentiate the company from its products (*i.e.*, Facebook) and clarify the relationship across all of the company's offerings. Halle Decl., ¶ 11.

The rebrand process began by "name storming" hundreds of different names that played on various themes such as light, identity, and beyond what's possible. *Id.,* ¶ 13. Meta ultimately selected "META" for several reasons, including one of the term's Greek translations: "beyond." Halle Decl., ¶ 20-22. The rebrand team wanted the new name to convey the idea that Meta can help people through technology and move beyond what is possible today—beyond screens, beyond boundaries, beyond geography, beyond ability, and beyond time zones. *Id.*, ¶ 21; Ex. 41 at 23:25-24:16. Building the metaverse was part of the company's vision of moving beyond. *Id.* ¶ 23; Ex. 41 at 26:10-27:1, 88:24-89:24. And Meta considered the phonology and orthography of the name; the T in "Meta" has a plosive sound—one formed when an individual's tongue or lips block the

airflow when they're speaking—which made it more likely that assistive technology would recognize the name. *Id.*, ¶ 24-25; Ex. 41 at 41:18-42:18, 82:2-7. "Meta" is also a real word and thus easily pronounced in many languages—an important consideration given Meta's global footprint. *Id.*, ¶¶ 26-27; Ex. 41 at 23:5-23, 45:2-23, 79:21-80:6. The name change had nothing to do with Metabyte, a company no one on Meta's business team handling the rebrand had ever heard of before October 2021. *See infra* at 15; *see also* Ex. 72 at 14:3-15, 33:7-34:7; Halle Decl., ¶¶ 40-42 .

META is primarily the company's corporate brand, used to connect its various products under a single "house" mark. Meta never uses "Meta" combined with another term as a single word. Halle Decl., ¶ 35. In cases where it uses META with another word with a space in between, the second term is the name of the Meta product or a generic term relating to the product, such as META QUEST (a VR goggle) or META AI. *Id.*, ¶ 36. Meta has never used the term "Metabyte" or "Meta Byte" and it does not have a "byte" product. *Id.*, ¶ 39.

As part of the rebrand process, Meta filed various applications with the PTO to register its META mark in various classes of goods and services. Minden Decl., ¶ 12. Today, Meta owns over 70 trademark filings for META and META-formative marks, including over 30 registrations. *Id.*. These include the intent-to-use applications cited in the Complaint (Serial Nos. 97202614 and 97202623, the "Meta Applications"). *Id.*, ¶ 14. The PTO did not reference or cite *any* of Metabyte's trademarks during examination of Meta's trademark filings. *Id.* Nor did the PTO reject any of Meta's trademarks on grounds that they were "generic," *id.*; an issue it was obligated to raise during examination. *See* Trademark Manual of Examining Procedure § 1209.01(c).

### C.    Metabyte Expresses No Desire for Meta to Change its Name, But Makes Varying Threats and Demands

On March 16, 2022, Metabyte reached out to Meta for the first time regarding its rebrand; Metabyte's letter, however, stressed that it was "not threatening any lawsuits or other actions" and did not ask Meta to change its name. Dkt. 75-3. Meta responded to Metabyte's outreach, explaining that Metabyte's rights were in a different mark, limited to the staffing space, and already narrowed by a crowded field of Meta-formative marks; thus, there was no possibility of confusion. Dkts. 75-4, 75-6. After filing this lawsuit, Metabyte threatened to argue that META was "generic" if Meta

did not pay its demands (up to an astounding **$55M**). Ex. 70. Metabyte has since made various unsubstantiated money demands, which Meta did not accept. *See* Exs. 32 and 33; Ex. 7 at 388:3-14, 396:11-399:14, 402:2-403:15.

### D. After Learning of Meta's Rebrand, Metabyte Redesigns its Website to Present Itself as Offering VR Products and Services

Metabyte admits it was immediately aware of Meta's rebrand in October 2021 and was aware of its line of VR products. Ex. 58; Ex. 7 at 165:16-22. Yet in June 2022, Metabyte redesigned its website to present itself as offering "VR products and services," when it had not done so before.[3] It added tabs for "VR Products" and "Virtual Reality Services" atop the homepage. Ex. 3 at 168:13-169:8, 173:3-178:9. Mr. Mehta directed Metabyte's former website designer, Dino Lau, to add new pages displaying a "VR200" virtual reality headset for sale. Ex. 60; Ex. 3 at 165:24-167:7. He instructed his son to order a few VR headsets from a company in China, to which he affixed the "Metabyte" name, as a "demo." Ex. 6 175:21-176:18; 145:17-146:1; 151:1-11; 156:3-157:21; 199:7-12. Metabyte never sold ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and roughly a year later, ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 8 at 275:12-276:5, 292:16-293:3; Ex. 7 at 220:6-221:20; Ex. 60. In June 2022, Metabyte filed new trademark applications for VR products, too, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had been using its mark on VR products for years. Ex. 8 at 274:11-275:10; Exs. 15, 17. To perpetuate the façade, Metabyte submitted to the PTO exemplars of use consisting of "3D" gaming goggles that *it had not sold in over two decades*, and the new VR webpages on its website (some touting the "metaverse" to copy Meta's website) Dkt. 10 at 33, 39-41; Ex. 14; Ex. 15 , and ▮▮▮▮▮▮▮▮▮ VR headsets to "reactivate the trademark." Ex. 8 at 267:22-268:15. Metabyte ultimately deleted the VR-related goods from one application and abandoned the other. Ex. 8 at 291:3-19; Ex. 15.

Metabyte's CEO choreographed other website changes[4] after Meta's rebrand, too. He added

---

[3] Before 2022, Metabyte had never used ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Ex. 8 at 271:18-21. At most, Metabyte offered "3D" gaming goggles (not a VR product) in the late 1990s but stopped selling them around 2000 and has not offered any related products since. Ex. 14; Ex. 3 at 170:14-18.

[4] Metabyte's websites are rife with other uncorrected misstatements. The home page touts that "[o]ver 17 million users daily rely on software and services provided by Metabyte[.]" Not true. Ex.

the METABYTE mark atop the websites of its other businesses, Teamanics and HotDoodle. Ex. 60 at 2; Ex. 61. In 2022, he described to Mr. Lau the idea of making Teamanics a "network where peers help each other," which Mr. Lau understood would make Teamanics appear more like a social network (like Meta), and calling the business a "peer network," yet the "social" functionalities were never implemented. Ex. 7 at 40:16-17; Ex. 3 at 154:24-158:1. As recently as March 2025, Mr. Mehta instructed Mr. Lau to update the Teamanics website to add the phrase "Metabyte **Peer Network**," which was later shortened to "**Meta**PeerNet." Exs. 11; 13; 36; 63; Ex. 8 at 57:8-62:5. Metabyte also registered metapeernetwork.com and metacareernet.net domains ███████ █████████████████████████████████ instead of "Metabyte" that Mr. Mehta purchased), Ex. 8 at 148:5-9, 151:22-25, 163:9-25, 175:12-18, and set up websites at those URLs, which in turn appear in Google search results, Exs. 37; 38; 39.  Mr. Mehta admitted he acquired the URLs █ ██████████ Ex. 8 at 148:1-152:7; 206:22-207:1.

### III.   LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant establishes the absence of any genuine issue of material fact, the burden of production shifts to the non-moving party to show specific facts setting forth a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330–31 (1986). Inferences are only drawn in favor of a non-movant when they are "reasonable" and based on evidence in the record. *Id.* at 330 n.2. The Ninth Circuit routinely affirms grants of summary judgment in trademark cases. *See, e.g., Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) (granting summary judgment although four *Sleekcraft* factors favored plaintiff); *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1261 (9th Cir. 2022); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002); *Tokidoki, LLC v. Fortune Dynamic, Inc.*, 473 F. App'x 522, 524 (9th Cir. 2011).

### IV.   THERE IS NO GENUINE ISSUE AS TO THE LIKELIHOOD OF REVERSE CONFUSION

---

7 at 173:5-184:20. Teamanics advertised "over 100,000 members." ███████ Ex. 8 at 134:7-139:5. Metabyte displays logos of well-known companies like Visa, Wells Fargo, and Johnson & Johnson on its "Our Clients" page of its website. Ex. 35. ████████████████████████████ ████ Ex. 8 at 93:9-115:16.

Metabyte's claims are based on alleged "reverse confusion," which "occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one," *Surfvivor*, 406 F.3d at 630.[5] Under this theory, the relevant consumer universe is the potential purchasers of **Metabyte's** outsourced staffing services. *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110 (9th Cir. 2000). Put another way, are Metabyte's "customers likely to associate its [staffing services] with Meta and thus be confused?" *See Dfinity Found. v. Meta Platforms, Inc.*, 2022 WL 16857036, at *9 (N.D. Cal. Nov. 10, 2022). That "confusion must be probable, not simply a possibility." *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir. 1996). Likelihood of confusion is analyzed under the *Sleekcraft* factors, and the undisputed evidence here shows that each weighs decisively in Meta's favor.[6]

**The Parties' Marks Are Not Similar.** "Similarity of the marks is tested on three levels: sight, sound, and meaning[,]" and "[e]ach must be considered as they are encountered in the marketplace." *Sleekcraft*, 599 F.2d at 351; *see Surfvivor*, 406 F.3d at 633 ("[C]ourts should analyze each mark within the context of other identifying features."). Here, in proper context, the marks are different in terms of sight, sound, and meaning. Although the META and METABYTE marks share the same first four letters, the similarity ends there. Metabyte's name includes the additional word "BYTE" to create an entirely new, coined term that contains twice as many letters and syllables as Meta's mark. Ex. 47 ¶ 96. Metabyte admits that the marks are pronounced differently. Ex. 58; *see also* Ex. 47 ¶¶ 105-112. When used in connection with Meta's products and services, Meta's mark is displayed with the "M" capitalized and the remaining letters in lower case. The META mark typically appears in dark gray lettering alongside Meta's distinctive corporate logo, in blue: . Halle Decl., ¶ 33. By contrast, Metabyte's logo displays the METABYTE mark in all-capitalized red letters and in a distinctive font. The letters are shown under a gray bar and

---

[5] Metabyte does not allege "forward confusion," that Meta's consumers erroneously believe that its products or services came from or were sponsored by Metabyte. *See* Dkt. 11 at ¶17; Dkt. 21 at 2.

[6] Those factors are: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion …." *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). Not all factors hold equal weight and the relative importance of each factor will be case-specific. *Brookfield Commc'ns, Inc. v. W. Coast Ent't, Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

above a tagline: **METABYTE** ® Making Innovation Work  This logo is prominently displayed on Metabyte's website (Ex. 34), in pitch decks (Ex. 10, letterhead (Ex. 67), and email signatures (Ex 68). As they are encountered in the marketplace, these marks look and sound nothing alike. Ex. 48 at ¶ 69b; *Dfinity*, 2022 WL 16857036, at *11 (dismissing lawsuit due to dissimilarities between two looping logos).

The marks' meanings are also entirely different. *See* Ex. 58. Inspired by the Greek word for "beyond," META is suggestive of Meta's ongoing pursuit to develop technologies that move beyond what is possible today. Halle Decl., ¶ 21-22. METABYTE is a coined term: "Meta" in its mark is a play on the CEO's name "Mehta," and "Byte," which refers to 8 bits of data in computer memory, is intended to convey involvement with technology. Ex. 7 at 100:22–103:5. This factor weighs strongly in Meta's favor.

**The Parties' Products and Services Are Unrelated.** Confusion is unlikely where the parties' goods or services are totally unrelated. *See Murray*, 86 F.3d at 859–60 (dismissing trademark claims on a 12(b)(6) motion); *see also Ketab Corp. v. Mesriani & Assocs., P.C.*, 734 F. App'x 401, 406 (9th Cir. 2018) (affirming dismissal where services "totally unrelated"). "The standard for deciding whether the parties' goods or services are 'related' is whether customers are 'likely to associate' the two product lines." *Surfvivor*, 406 F.3d at 633 (distinct t-shirt brands unrelated); *M2 Software Inc. v. Madacy Ent.*, 421 F.3d 1073, 1082 (9th Cir. 2005) (two music products insufficiently related because, while in the same industry, they were marketed to different consumer genres). "[W]hat is relevant is the substance of the two companies' respective products and services, not the characterizations or labels offered by the parties regarding the products and services." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1080 (N.D. Cal. 2012). Here, consumers are unlikely to associate or confuse the parties based on their distinct offerings. Although Metabyte's website *describes* a variety of services, Metabyte is a staffing company whose primary business (and now essentially all of its revenue) involves finding and hiring workers to fill contract positions for its clients.[7] *Supra* § II.A. Meta has long offered globally renowned social media and messaging services (like Instagram and WhatsApp) and VR products (Quest), which

---

[7] Neither Metabyte's purported VR products introduced (and abandoned) *after* Meta's name change nor the paused "peer network" (Teamanics) nor the defunct web design company (HotDoodle) first offered under a *different* brand and company are relevant to likelihood of confusion.

**DEFENDANT'S OPP. AND MTN. FOR SUMMARY JUDGMENT AND UNDER *DAUBERT* CASE NO. 3:23-CV-04862-VC**

were widely associated with the Defendant under their respective brand names ***before*** its rebrand. Ex. 69 at 7-8. Meta is not a staffing company. Halle Decl., ¶ 9. As marketing expert Peter Golder's unrebutted report makes clear, it is improbable (indeed, it has never happened) that a client looking to enlist Metabyte's services would believe that it is affiliated with Meta, and on that basis decide or decline to retain Metabyte. Ex. 48 § IV. This factor favors Meta.

**Metabyte's Mark Has No Market Recognition and Co-Exists in a Crowded Field.** "In reverse confusion cases, the court compares the conceptual strength of the plaintiff's mark to the commercial strength of the defendant's mark." *World Champ Tech LLC v. Peloton Interactive, Inc.*, 2024 WL 665181, at *9 (N.D. Cal. Feb. 16, 2024).[8] Even so, "[t]he Ninth Circuit has assumed that the plaintiff's mark's commercial strength must meet some minimum bar." *Id.* at *11; *see also J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *16 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir. 2014) (holding that a senior user with low consumer recognition is entitled to less protection). Metabyte's mark is commercially weak and unrecognized—even in its narrow field of staffing services. ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████ Ex. 7 at 66:16-21; Ex. 8 at 36:17-38:10, 250:3-251:4, 251:14-252:22, 252:23-253:25, 254:15-256:6; Ex. 64. Metabyte's website is seldom trafficked and underutilized. *Supra* § II.A. ████████████████████████████████████████████████

████████████ Ex. 50, Attachment 6.1. Like the plaintiff in *World Champ*, whose app "was last updated [two years prior], ha[d] achieved no in-app sales, showed declining (and insubstantial) subscriber numbers, [and] ha[d] been marketed minimally," 2024 WL 665181 at *11 (granting summary judgment to defendant)*, Metabyte's mark is weak.

Separately, Metabyte co-exists with numerous other companies that use "Meta" (alone or with other terms) as trademarks or company names, Ex. 48 ¶ 25 (citing examples), including other "Metabyte" businesses that offer staffing services, Ex. 7 at 224:18- 255:3; Exs. 24-27 (websites of

---

[8] Admittedly, Meta's mark is well-recognized and commercially strong. Ex. 3 56:7-12; Ex. 4 30:9-13; Ex.7 at 260:5-13; Ex. 5 at 37:3–5; Ex. _6 at 9:3–5; Ex. 45 at 367:16-369:11. But that means that when people see the META trademark and logo in connection with its social media, communications, and VR services, they know the company behind it. Ex. 47 at ¶¶ 80–87.

third-party "Metabyte" businesses). *See also*, Ex. 21 (business name search for "Metabyte"); Ex. 22 (Delaware Secretary of State business search for "Metabyte"); Ex. 23 (LinkedIn company search for "Metabyte"). Its own complaint admits that the PTO "database reveals many hundreds of registered trademarks that use "meta" as part of the mark." Dkt. 10 at ¶ 35; *see also* Ex. 71. On the job platform Indeed, there are over 20 different companies revealed by a company search for "Meta." Ex. 43 at 328:1-331:15; Ex. 44 Ex. 61. Metabyte's longstanding co-existence with so many other "Meta" and "Meta" formative businesses, including those ***in its field***, demonstrate that its trademark rights are narrow, and customers easily differentiate among those companies. *Lodestar*, 31 F.4th at 1259 n.11 ("Evidence of third-party use of a similar mark is relevant to the strength of the mark[.]"); *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107, 1119 (N.D. Cal. 2010) ("Where the market is inundated by products" with similar marks, "consumers will not likely be confused[.]"). This factor weighs against the likelihood of confusion.

**The Parties Use Different Marketing Channels.** "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). There is not a single store, retail website, magazine, or other channel that features both parties' products. Ex. 58. And there is unsurprisingly no evidence that consumers have visited Metabyte's website looking for more information on Facebook or Quest VR goggles, or to sign up for Instagram. Ex. 1A. Metabyte's Google Analytics data shows how little traffic it receives – none from those searching for Meta. *Supra* § 11.A.

Metabyte alleges that its marketing channels include "in-person, telephone, websites, and online marketing and advertising," which it asserts are "the same sales channels used by Meta." Dkt. 10, ¶14. The Ninth Circuit has flatly rejected the claim that the "marketing channels" factor favor a plaintiff simply because both parties advertise over the Internet. *Network Automation v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011). Again, Metabyte does no external advertising (*supra* § 11.A), and its CEO conceded that it does not attract business through the metabyte.com website, Ex. 7 at 281:7–14. This factor favors Meta, as well. *Groupion*, 859 F. Supp. 2d at 1077 (finding dissimilar marketing channels).

**Metabyte's Customers Are Sophisticated and Exercise a High Degree of Care.** "In a reverse confusion case, the degree of care exercised by customers is determined with reference to the alleged senior user's customers only." *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1095 (C.D. Cal. 2003). "[T]he question is whether a reasonably prudent consumer would take the time to distinguish between the two product lines." *Surfvivor*, 406 F.3d at 634. Generally, consumers with expertise or those purchasing expensive items are considered more discerning and less likely to be confused. *Brookfield*, 174 F.3d at 1060.

Metabyte's customers are "sophisticated enterprises" seeking staffing. Dkt. 10 at ¶ 22; *supra* § II.A. Historically, Metabyte worked directly with companies like ████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Its only ███ current clients are ████████████████, from which Metabyte has earned ████████████████ ██████ (Ex. 50., Attach. 5)—and who Metabyte admits have never expressed confusion with Meta, *id.*; Exs. 1A; 8 at 41:2–4, 45:19–46:10. ████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████ Ex. 8 at 12:14-13:23; Ex. 5 at 161:2-162:6, 163:5-14, 178:4-182:3; Exs. 17-19. Given this level of contact and sophistication, there is no room for confusion. *See Network Automation, Inc. v. Hewlett-Packard Co*., 2009 WL 5908719, at *9 (C.D. Cal. Sep. 14, 2009) (citing customer sophistication, lengthy sales cycle, and prior purchasing relationship as making confusion unlikely); *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1019 (N.D. Cal. 2015) (describing account sign-up process making confusion unlikely); *iCall, Inc. v. Tribair, Inc.*, 2012 WL 5878389, at *6 (N.D. Cal. Nov. 21, 2012) (although WiCall and iCall offered VoIP calling, "given the likely nature of consumer scrutiny, these differences in products are material.") And Metabyte ***admitted*** that none of its corporate clients have *ever* been confused between it and Meta. Ex. 61; Ex. 8 at 192:9-193:1, 213:17-213:23.

In view of these admissions, Metabyte pivoted to a theory that "job seekers" who might hypothetically encounter both Metabyte's and Meta's job listings on job boards may mistakenly

believe that Metabyte is associated with Meta. This argument does not help Metabyte's case. ***First***, job seekers are not consumers of Metabyte's services; they are ***potential Metabyte employees*** (in service of Metabyte's actual clients). Meta is not aware of any case in this circuit holding that potential employee confusion is relevant. And courts outside the Ninth Circuit have held the opposite. *See, e.g.*, *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, 2018 WL 3407709, at *10 (S.D.N.Y. Jan. 12, 2018) ("Because trademark law protects against confusion in consumers—not prospective employees or vendors—such evidence is not probative of any actual confusion."); *Unleashed Doggie Day Care, LLC v. PetCo Animal Supplies Stores, Inc.*, 828 F. Supp. 2d 384, 395 (D. Mass. 2010) (stating that "[a]ctual confusion must be in the mind of a relevant person," and that "[a] prospective employee is not such a 'relevant person'"). ***Second***, even if "job seekers" were relevant "purchasers," the high degree of care they exercise in applying for jobs posted by Metabyte eliminates any potential for confusion. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Ex. 5 at 96:7–12. Given this lengthy, high-touch process, it is unfathomable that any job seeker would apply for or take a job posted by Metabyte believing it is affiliated with Meta. *See Nordstrom, Inc. v. 7525419 Canada Inc.*, 2012 WL 12507605, at *10 (W.D. Wash. Dec. 27, 2012) (finding high degree of customer care where "a relationship is formed between [the defendant] and its members as a prerequisite to any transaction"); *Pinterest*, 140 F. Supp. 3d at 1019.

**After Nearly Four Years of Coexistence, Metabyte Has Failed to Present Any Evidence of Actual Consumer Confusion.** The lack of any evidence of actual consumer confusion strongly suggests that confusion between the parties' marks is not likely. The Ninth Circuit has stated that it "cannot think of more persuasive evidence that there is no *likelihood* of confusion between two marks than the fact that they have been simultaneously used for [several] years without causing any consumers to be confused as to who makes what." *Brookfield*, 174 F.3d at 1050; *see also Cohn*, 281 F.3d at 842–43 (finding that "some evidence of actual confusion should have become

1    available" after six years of coexistence "if Petsmart's coexisting use had created a genuine

2    likelihood of confusion").  Here, even after almost four years of coexistence, Metabyte has failed

3    to present any evidence of actual consumer confusion. Rather, Plaintiff has repeatedly admitted that

4    it cannot identify a single instance in which (1) a customer or prospective customer of its staffing

5    services indicated that they were confused as to Metabyte's affiliation with Meta (Ex. 1A); (2)

6    Metabyte received any emails, calls, or purchase orders intended for Meta (*id.*); or (3) Metabyte

7    lost any customer or business opportunity due to confusion with Meta (Ex. 2A). Survey evidence

8    submitted by Meta's survey expert Hal Poret ("Poret Survey"), which screened for companies who

9    might evaluate Metabyte for staffing services, indicated a paltry *2%* rate of confusion. Ex. 52 at 19.

10   "Courts reviewing surveys with confusion rates under ten percent have found no confusion." *QS*

11   *Wholesale, Inc. v. Rox Volleyball, Inc.*, 2014 WL 12567147, at *8 (C.D. Cal. Dec. 31, 2014).[9]

12          The only purported confusion Metabyte identified is not actionable as a matter of law.

13   Relevant consumer confusion is "that which affects purchasing decisions, not confusion

14   generally." *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, at *14 (N.D. Cal. Aug. 13,

15   2007). "Inquiries" alone do not indicate confusion, *Cohn*, 281 F.3d at 842 n.7, and "de minimis

16   . . . confusion" is unpersuasive, *Entrepreneur Media, Inc. v. Smith*, 279 F. 3d 1135, 1151 (9th Cir.

17   2002). In response to a Court Order (Dkt. 62), Metabyte identified five instances of so-called

18   "confusion." One was an unnamed attendee at an alumni event who was introduced to "Manu

19   Mehta from Metabyte" and made a quip about the word "Meta" (Ex. 7. at 368:8-377:16); another

20   was an unnamed potential expert in this litigation; and another, an unnamed, friendly teller at

21   Aradhana Mehta's (Metabyte's Client Services Director) bank. Ex. 63. These hearsay examples are

22   irrelevant, as the individuals were not consumers or potential consumers of Metabyte services.

23   *Instant Media*, 2007 WL 2318948, at *14. The remaining two instances supposedly involved "job

24   candidates" for positions that Metabyte had advertised, who are not purchasers of Metabyte's

25   services. Ex. 63; *supra* § 11.A. ███████████████████████████████████████████

26   ██████████████████████████████████████████████████ Ex. 5 at 103:9-122:22. These

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [9] As explained below, *infra* § IX.C, the survey conducted by Plaintiff's expert Stefan Boedeker is
     inadmissible or otherwise entitled to no weight. It therefore fails to create a factual dispute.

examples (even if credited) are legally irrelevant and do not preclude summary judgment. *Cohn*, 281 F.3d at 842 n.7. Overall, the lack of any evidence of actual consumer confusion among Metabyte's paying clients in the nearly four years of coexistence is a strong indication that there is no likelihood of confusion. This factor strongly favors Meta.

**Meta Adopted the META Mark in Good Faith.** In analyzing the intent factor in the reverse confusion context, courts "ask whether there is some evidence that the junior user, when it knew of the senior user, was at fault for not adequately respecting the rights of the senior user." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1167–68 (9th Cir. 2021). There is no evidence that Meta "culpably disregarded the risk of confusion." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934–35 (9th Cir. 2017). To the contrary, Meta underwent a careful and deliberate process in selecting and adopting the META mark. *See supra* § II.B (describing rebranding considerations). Not a single person on Meta's business team handling the corporate rebrand knew about Metabyte or its business. Halle Decl., ¶ 40-42. Meta corroborated that in discovery by conducting a reasonable search (pursuant to the parties' ESI protocol) for "Metabyte" across the files of the custodians most closely involved with the rebrand; there was not a single reference to Plaintiff. Ghazarian Decl., ¶ 75. Similarly, Meta conducted a reasonable search across its customer help channels for any communications that referred to "Metabyte" and found no reference to Plaintiff. Minden Decl. ¶ 9. And Metabyte has *no* evidence that anyone from Meta visited its website, viewed its job posts, or otherwise encountered Metabyte before October 2021.

Metabyte suggests that Meta was aware of Metabyte before the rebrand by pointing to a *5,000* page trademark search report, in which Metabyte's filings were included among a listing of well over 1,000 other "Meta" and "Meta" formative trademarks (Dkt. 76-3, 4). But as a matter of law, the mere appearance of Plaintiff's mark in a voluminous search report does not create a genuine issue as to Meta's good faith. *Sweats Fashion, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1565 (Fed. Cir. 1987) (no bad faith even though plaintiff's marks appeared in a trademark search, stating that "an inference of 'bad faith' requires something more than mere knowledge of a prior similar mark."). This is especially true where, as here, that report hardly shines a light on Metabyte; one would have to get to *page 700* to spot Metabyte's registrations. Minden Decl, Ex. A (full report).

If anything, the report shows the vast co-existence of various Meta and Meta formative trademarks. In that context, and given the distinct products and services offered by Metabyte, it was entirely reasonable for Meta to proceed with the rebrand. Finally, it is illogical that Meta would want to cause confusion with or somehow capitalize on "Metabyte," a different mark owned by a company that operates in a different field. This factor, too, weighs in Meta's favor.

**Likelihood of Expansion.** "[A] strong possibility that either party may expand [its] business to compete with the other will weigh in favor of finding that the present use is infringing." *Ironhawk Techs.*, 2 F.4th at 1168. No such "strong possibility" is supported by the evidence. Meta does not plan to offer outsourced staffing services. Halle Decl. ¶ 9. Meanwhile, Metabyte's staffing business has been ███████████████████████████████ Ex. 49 ¶¶ 44–52. The same is true for its ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ *Id.* 132:7–18. A plaintiff's newly stated expansion efforts and maneuvering (*supra* § II.D) after it files suit are not to be considered. *Groupion*, 859 F. Supp. 2d at 1077 ("Groupion cannot manufacture a likelihood of confusion by expanding into Groupon's business.") (granting summary judgment to defendant); *Mach. Head v. Dewey Glob. Holdings, Inc.*, 2001 WL 174180, at *4–5 (N.D. Cal. Dec. 13, 2001). Moreover, an "expressed interest" that is "mere speculation is not evidence." *Survivor*, 406 F.3d at 634. ███████████████████

███████████████████████████████████████████████████████████

███████████ *Id.* at 301:22–302:9. Metabyte's "complete inability to adduce any concrete evidence of expansion plans tilts this factor" in favor of Meta. *Survivor*, 406 F.3d at 634.

Courts routinely grant summary judgment when the *Sleekcraft* factors favor the defendant.

1    *Supra* at 7 (citing cases); *Groupion*, 859 F. Supp. 2d at 1081. This Court should do the same.[10]

2    **V.    PLAINTIFF'S UNSUPPORTED THEORIES OF DAMAGES FAIL AS A MATTER OF LAW**

3    The plaintiff in a trademark infringement case "must prove both the fact and the amount of

4    damage" with "reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th

5    Cir. 1993). If a plaintiff's evidence does not create a triable issue with respect to the damages,

6    summary judgment is appropriate. *See Celotex*, 477 U.S. at 322. Damages in an action for

7    trademark infringement "are typically measured by any direct injury which a plaintiff can prove, as

8    well any lost profits which the plaintiff would have earned but for infringement." *Lindy Pen,* 982

9    F.2d at 1407. While a plaintiff need not calculate damages with "absolute exactness," it must offer

10   "a reasonable basis for computation" to show that damages are not "remote and speculative." *Id.* at

11   1407-08. Metabyte's damages theories fail on all fronts.

12   Metabyte has pursued a "kitchen sink" approach to damages, arguing that it may seek "a

13   reasonable royalty,[11] diminution of goodwill, lost profits, lost sales, corrective advertising, and any

14   other damages the Court sees fit to grant." Ex. 63. Pressed in discovery, Metabyte admitted that it

15   is not aware of any facts supporting any such claim of harm. Granting Meta's motion to compel

16   (Dkt. 54), Magistrate Judge Illman ordered Metabyte to "identify the type or nature of any such

17   monetary damage, including all facts relating to the basis for Metabyte's contention (e.g., a lost

18   contract or other damage)" and requiring that "if Metabyte is unable to identify any such facts, it

19   must so state," (Dkt. 62). In response, Metabyte admitted in a verified interrogatory that it "**is**

20   **unable to identify specific monetary damages caused by confusion**" and failed to identify any

21   supporting facts underlying any of these damages theories. Ex. 63.

22   ─────────────────────

23   [10] Meta also seeks summary judgment on Counts 2, 4–7 in the Complaint, which are based on the same conduct as the Lanham Act claims and governed by the same analysis. *See Walter*, 210 F.3d at 1111.

24   [11] It is far too late for Metabyte to try to substantiate any corrective advertising or reasonable royalty

25   damages because it failed to disclose any such computation under Rule 26(a)(1)(iii) or through expert testimony. Moreover, Metabyte admitted that it has no evidence of "additional marketing or advertising expenses because of confusion caused by Meta's use of the META mark," Ex. 58; Ex.

26   8 191:22-192:2. Corrective advertising is unavailable absent "non-speculative evidence that goodwill and reputation—that is, the value of the mark—was damaged in some way," of which

27   there is no evidence. *Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *5 (N.D. Cal. July 14, 2011). Nor is a "reasonable royalty" available because Metabyte has never licensed, or even negotiated a

28   license of, its mark. Ex. 7 at 145:3-146:4; Ex.62. Without a licensing history, there is no basis for a reasonable royalty. *See Quia*, 2011 WL 2749576, at *6.

Although this interrogatory response failing to identify supporting facts or evidence of damage should be dispositive of the issue, Metabyte elsewhere admitted its lack of damages. As to lost sales or lost profits, Metabyte **admitted** it is not aware of any clients or potential clients, contracts, business opportunities, revenues, or licensing opportunities that it has lost due to alleged confusion with Meta. Ex. 2A (compiling various admissions). Nor did Metabyte introduce any expert evidence of any lost sales or profits. The only expert opinion on the issue, from Meta's economic expert, ███████████████████████████████████████ ███████████ Ex. 49 ¶¶ 44-77.  Nor is "diminution of goodwill" available here because (a) Metabyte never disclosed any such computation or supporting evidence; (b) its expert did not attempt to quantify any "diminution"; and (c) there is no record evidence that Metabyte's goodwill or trademark value has been diminished by Meta. *See Quia*, 2011 WL 2749576, at *5 (granting summary judgment where plaintiff failed to prove diminution in value of mark); *Wag Hotels, Inc. v. Wag Labs, Inc.*, 2023 WL 3605977, at *9 (N.D. Cal. May 22, 2023) (same).

## VI.    METABYTE IS NOT ENTITLED TO DISGORGEMENT OF META'S PROFITS

Metabyte's operative complaint does not identify disgorgement of profits as a remedy for its trademark claims. (Dkt. 10 ¶¶ 45-52). Nor did Metabyte assert or substantiate any such claim in its Court-ordered damages interrogatory response, Ex. 63. Yet Metabyte, through law professor Mr. Sheff, nonetheless asserts that it is entitled to disgorgement of **all** of Meta's profits. That argument lacks merit and should be rejected. Here, Metabyte's claim for profit disgorgement is *equitable* in nature, **not** *compensatory*. *See*, *supra* § V (citing Ex. 63); Ex. 57 ¶¶ 11, 24-26; Ex. 45 at 160:20-162:6; 163:20-164:1; 359:14-360:11. Whether framed as equitable or legal, any Lanham Act damages "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

Equitable disgorgement of a well-established defendant's profits is not appropriate in reverse confusion cases like this one, where there is no evidence that the defendant is "trading off the mark holder's goodwill," as such a remedy would "amount to a penalty to the infringer and a windfall to the trademark holder." *Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*, 2015 WL 9028123, at *3 (N.D. Cal. Dec. 16, 2015); *id.* at *2 (dismissing claim for profit disgorgement on summary judgment); *see also Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 848-

1   49 (C.D. Cal. 2012) (same); *Scat Enters., Inc. v. FCA US LLC*, 2017 WL 5896182, at *2 (C.D. Cal.

2   June 8, 2017) (same).[12] There is no equitable basis to award a staffing company a portion of profits

3   it would have no chance of earning. *See* Ex. 51 ¶¶ 76-84 (because Meta and Metabyte are not

4   competitors, Meta's profits are not a reasonable measure of Metabyte's harm).

5           Indeed, a successful plaintiff may recover only "profits" from the sale of goods or services

6   that are ***attributable to the infringement***. *See Oculu v. Oculus*, 2015 WL 3619204, at *20 (C.D.

7   Cal. June 8, 2015). Without any analysis, Mr. Sheff suggests that Metabyte may be entitled to **$128**

8   **billion**, equal to all of Meta's U.S. ad sales from 2022-24 less certain costs. Ex. 57 ¶¶ 11, 59-71.

9   He made no effort to determine what, ████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████ As Meta's expert

13  demonstrated in his unrebutted regression analysis, "there is no indication that Meta earned

14  additional revenue attributable to the rebrand from Facebook to Meta," and thus none of Meta's US

15  advertising revenue can be attributed to Meta's use of the META mark. *Id*. ¶¶ 90-91; Figure 5. The

16  only evidence in the record supports a finding that Meta's revenue is not attributable to any alleged

17  infringement, and an award of profits is not appropriate.

18          Without evidence of any actual harm to Metabyte's business caused by Meta; without any

19  nexus between any alleged confusion and Meta's profits; and without any evidence that any

20  customers or potential customers were confused, disgorgement of any amount of Meta's profits

21  here would be speculative and amount to an impermissible windfall for Metabyte.

22  **VII.    PLAINTIFF'S CLAIM THAT "META" IS GENERIC FAILS AS A MATTER OF LAW**

23          Summary judgment is also appropriate as to Metabyte's genericness claim. To begin, Meta

24  addresses the absurdity of Metabyte's inconsistent positions. On the one hand, Metabyte complains

25  that Meta's use of META is causing reverse confusion: that companies might believe Metabyte is

26  _____

27  [12] Metabyte's damages expert, Mr. Sheff, improperly offers a legal opinion that the Supreme
    Court's decision in *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212 (2020), abrogated Ninth
    Circuit case law holding that profit disgorgement is not available in reverse confusion cases. That
28  assertion is incorrect. *Romag* did not address reverse confusion at all, but rather whether *willfulness*
    is a prerequisite for an award of profit disgorgement. *Id*. at 219.

affiliated with Meta because both have "Meta" in their names. On the other hand, Metabyte argues that "meta" is generic—a name anybody is free to use that is by definition non-infringing. Indeed, common sense dictates that META is not "generic" for Meta's goods and services. There is no such product or service called a "meta." Metabyte's witnesses testified that the META trademark is ***famous*** and points to Defendant Meta; that is, ***META functions as a source identifier for Meta's services***. Ex. 3 56:7-12; Ex. 4 at 30:9-13; Ex.7 at 260:5-13; Ex. 5 at 37:3–5; Ex. 6 at 9:3–5; Ex. 45 at 367:16-369:11.

To determine whether a term is generic, courts in the Ninth Circuit "look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves." *KP Permanent Make-Up v. Lasting Impression I, Inc*, 408 F.3d 596, 604 (9th Cir. 2005). If the former, the term is not generic. *Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1016 (9th Cir. 1979). The Ninth Circuit employs the "primary significance test." *Caesars World, Inc. v. Milanian*, 247 F. Supp. 2d 1171, 1194–95, (D. Nev. 2003), *aff'd*, 126 F. App'x. 775 (9th Cir. 2004). "If the primary significance of the trademark . . . describe[s] the *type of product* rather than the *producer*, [it] is a generic term and [cannot be] a valid trademark." *Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999). This is also referred to as the "who-are-you/what-are-you" test. *Elliott v. Google, Inc.*, 860 F.3d 1151, 1156 (9th Cir. 2017). "[A] valid trademark answers the former question, whereas a generic product name or adjective answers the latter." *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007).

Metabyte argues, incorrectly, that "meta" is generic because it is a "commonly-used term," but that is not the standard, and courts have rejected that same argument. *Kudos Inc. v. Kudoboard, LLC*, 2021 WL 5415258, *6–7 (N.D. Cal. Nov. 20, 2021) (rejecting argument that "Kudos" was generic because it is a "common and widely used noun" used by third parties "generically," without any reference to the plaintiff). In *Kudos*, the court held that "[m]erely establishing that 'kudos' is generic for *something*—in this case, the term's own dictionary meaning—does not establish that 'kudos' is generic for the relevant class of goods," as is required under the standard. *Id.* at *8; *see also Caesar's World*, 247 F. Supp. 2d at 1194 ("[A] mark is not generic merely because it has some

1    significance to the public as an indication of the nature or class of an article.”). The fact that “meta”

2    may be commonly used in different contexts does not make it generic for Meta’s “class” of services.

3        Metabyte cannot identify any particular *type of product* the word “Meta” calls to mind.

4    *Filipino Yellow Pages*, 198 F.3d at 1147. This is unsurprising given that one of the reasons Meta

5    decided to adopt a new name was to *differentiate* the company from its products. Halle Decl, ¶ 11.

6    At the extreme, Metabyte alleges that “meta” is “generic for almost ***every genus of services*** that

7    [Meta] has listed” in the Meta Applications (which include hundreds of services Metabyte

8    characterizes as being “in the software and internet industries”) simply because “meta” also appears

9    in terms like “metadata” and “metatag.” Ex. 59; Dkt. 10, ¶ 34 and Exs. 3, 4. However, the “software

10   and internet industries” are not a class of goods or services. Under the “who-are-you/what-are-you”

11   test, Metabyte falls far short of establishing genericness *Filipino Yellow Pages*, 198 F.3d at 1147.

12       Even accepting the absurd notion that the relevant class of services includes nearly all of

13   Meta’s services “in the software and internet industries,” the evidence establishes that META is

14   ***not*** generic for any of those services, let alone all of them. ***First***, it is undisputed that Meta uses

15   META as a trademark. Courts often look at how the party asserting trademark rights uses the term

16   at issue to determine whether that term is functioning as a trademark or a generic term. *See, e.g.*,

17   *Elliott*, 860 F.3d at 1162 (analyzing Google’s use of “GOOGLE” to determine whether the mark is

18   generic). Meta uses META as its house mark under which the company’s various products are sold.

19   Some of these products, such as Facebook and Instagram, are sold under their own brands with a

20   “From Meta” endorsement. Ex. 41 57:16–58:13. Others, such as Meta Quest, use the META brand

21   with another term to connect the underlying product—in this example, the pre-existing Quest

22   virtual reality headsets—to Meta. *Id.* at 59:2–6; 78:8–16. META, as a standalone mark, is not the

23   name of any product or service put out by Meta. Indeed, Meta does not call any of its products “a

24   meta.” Halle Decl. ¶ 39.

25       ***Second***, the PTO has determined that META is not generic. “Courts should give deference

26   to the opinion of the Examining Attorney.” *Caesars World*, 247 F. Supp. 2d at 1195 (considering

27   significant that PTO did not refuse registration of COLOSSEUM as generic, although application

28   was still pending). Meta owns numerous federal trademark filings for the META mark, and ***none***

were refused registration by the PTO on the grounds that the mark was descriptive or generic. Minden Decl., ¶ 14. Moreover, although the two Meta Applications have not registered, Meta's many *other* federal registrations for the META mark (Minden Decl. ¶ 12) entitle the mark to a "strong presumption of non-genericness." *United Artists Corp. v. United Artist Studios LLC*, 2019 WL 8221088, at *4 (C.D. Cal. Aug. 2, 2019) (citing *KP Permanent*, 408 F.3d at 604).

*Third*, dictionaries show that "meta" is not generic for Meta's services. The Ninth Circuit has explained that dictionary definitions "are relevant and often persuasive in determining how a term is understood by the consuming public." *Surgicenters of Am.*, 601 F.2d at 1015 n.11. As Meta's (unrebutted) linguistics expert Phillip Carter explained, both contemporary and historical dictionaries show that "meta" is not generic in the domains of software or the internet. In contemporary dictionaries, "meta" usually means "cleverly self-referential," or acts as a prefix with a wide range of meanings. Ex. 47 (Carter (Linguist) Rep.) ¶¶ 36, 39-42. Evidence from historical dictionaries shows that "meta" has a long and stable history as a prefix that did not change with the advent of computing. *Id.* ¶¶ 47–51. Accordingly, dictionary evidence does not show that "meta" is generic for Meta's goods and services.

*Fourth*, the media uses META to refer to Meta. An analysis of the results from a search for "meta" on a database of English-language news publications, filtered for the U.S., reveals that in the news, "meta" is used with specific reference to Meta, alongside terms such as "platform," "Facebook," "Zuckerberg," and "Instagram." *Id.* ¶¶ 80–86. The results do not show that "meta" is used generically for "internet" or "software" services. *Id.* ¶ 87. As a matter of law, Meta's META mark is not generic, thus requiring dismissal of Metabyte's third claim.

## VIII.    GENUINE ISSUES PRECLUDE SUMMARY JUDGMENT ON META'S LACHES DEFENSE

Metabyte's motion for partial summary judgment on laches does not even mention the applicable *E-Systems* test or discuss its factors, essentially all of which favor Meta and on which Metabyte put in no evidence.[13]

---

[13] Those factors are: "(1) strength and value of trademark rights asserted; (2) plaintiff's diligence in enforcing its mark; (3) harm to senior user if relief denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by junior user because of senior user's delay." *E-Systems*, 720 F.2d at 607.

1    It is beyond dispute that the META mark is strong and valuable, so the first factor weighs

2    in favor of laches. *See E-Sys.*, 720 F.2d at 607. The third (harm to senior user), fourth (good faith),

3    and fifth (competition between parties) factors all favor application of laches for the reasons

4    explained above. *Supra*, §§ IV and V.

5    The second prong (reasonableness of delay) and sixth prong (prejudice to Meta) are the only

6    issues addressed in Metabyte's brief, and issues of fact preclude summary judgment on those as

7    well. Metabyte's delay was unreasonable because (1) Metabyte was aware that one of the world's

8    most prominent technology companies adopted the META mark on October 28, 2021, yet it waited

9    two years to sue (*supra* § II.D); (2) Metabyte never asked Meta in its letters to stop using the name,

10   and Meta was clear in response that it rejected Metabyte's position (*supra* § II.C); *see also Eat*

11   *Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 779 F. App'x 471, 473 (9th Cir. 2019) (affirming

12   defense summary judgment on laches, ruling that "settlement efforts only justify delay where those

13   efforts have 'a fair chance of success'"); and (3) Metabyte took advantage of its delay to update its

14   website to purport to offer products it had never offered, create a veneer of similarity with Meta,

15   and file dubious trademark applications (*supra* § II.D). And as Metabyte is seeking to disgorge all

16   of Meta's profits and a company-wide injunction (both baseless), it would be extremely prejudicial

17   that it waited so long to make that claim. Nonetheless, Meta does not engage further with

18   Metabyte's argument because the Court need not reach the issue of laches, as Metabyte's claims

19   all fail as a matter of law for the reasons explained above.

20   ## IX.    THE COURT SHOULD EXCLUDE ANY OPINIONS FROM PLAINTIFF'S EXPERTS JEREMY
21   SHEFF (DAMAGES) AND STEFAN BOEDEKER (SURVEY AND "IMPACT" REPORT)

22   ### A.    Legal Standard Governing *Daubert* Motions

23   Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

24   509 U.S. 579 (1993), the proponent of expert testimony has the burden of proving admissibility.

25   ***First***, its expert must possess the requisite qualifications. *See Avila v. Willits Env't Remediation*

26   *Trust*, 633 F.3d 828, 839 (9th Cir. 2011). ***Second***, its expert's testimony must be reliable, not based

27   on "unsupported assumptions and unsound extrapolation," *McGlinchy v. Shell Chem. Co*., 845 F.2d

28   802, 807 (9th Cir. 1988). This includes consideration of (1) whether it can be tested; (2) whether it

has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of controls; and (5) whether it has been generally accepted in the scientific community. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999). ***Third***, the opinion must be relevant and helpful to the factfinder by having a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591–92.

**B.    Jeremy Sheff's "Damages" Opinions Should be Excluded**

As explained above, Metabyte has no facts to support any entitlement to actual damages or equitable relief. Meta also moves to exclude all of Mr. Sheff's damages opinions because he is unqualified and offers opinions that are contrary to the law, the record, and economic methods.

**1.    Sheff is Unqualified to Provide Any Damages Analysis**

Mr. Sheff is a law professor, not a damages expert, and he has no expertise in the calculation of economic damages. Mr. Sheff admitted he has no formal education in the valuation of intellectual property or companies. Ex. 45 29:6-13; 43:3-11. He has no professional experience offering accounting services, *id.* at 12:7-22; 13:5-9, has never published any books or articles in a peer-reviewed journal in accounting, economics, finance, or valuation, *id.* at 13:1-4; 44:10-45:15, and has never taught an accounting or finance course, *id.* at 13:10-15; 43:12-14. The sum total of Mr. Sheff's "education" in the relevant fields is his two-year representation of an accounting firm 20 years ago as a law firm associate, a two-day course in econometric techniques for lawyers hosted by George Mason Law School "at least ten years ago," and an "accounting for lawyers" course at Harvard Law School nearly 25 years ago. *Id.* at 10:7-13; 50:20-52:20; 53:16-54:4. He has never been qualified by a US court as a damages expert, *id.* at 96:1-19, retained as an expert to calculate economic damages in a litigation, *id.* at 48:7-10, or to conduct the market- and cost-based valuation methods on which he offers opinions in this case, *id.* at 49:14-50:10. Indeed, Mr. Sheff believes the bar to testify on trademark damages is so low that *any law student who can perform arithmetic* could provide one. *Id.* at 20:11-22.

That is a far cry from the expert qualifications required by *Daubert*. *See United States v. Marr*, 2017 WL 1540815, at *6 (N.D. Cal. Apr. 28, 2017) (excluding damages expert who has "experience in business management, marketing and IP, but is not an economic expert, and does

not have specialized knowledge in economics"); *Bennett v. United States*, 2018 WL 6265092, at

*4-5 (C.D. Cal Mar. 22, 2018) (same). On this ground alone, his opinions should be excluded.

### 2. Sheff's "Valuation" Damages Metric is Unsupported in Law or Fact

Because Metabyte conceded it could not identify any harm suffered from Meta's alleged

infringement and failed to disclose the factual predicate to any of its damages claims in its Court-

ordered interrogatory response, there was and is no factual basis for Mr. Sheff's opinions.

Undeterred, Mr. Sheff came up with a measure of Metabyte's "damages" equal to the ***entire*** alleged

"value" of its trademark. Meta is unaware of any case law accepting the notion that the alleged,

current value of a plaintiff's mark is a measure of ***its trademark damages***. The law instead requires

evidence of damage to Plaintiff's goodwill and reputation, which does not exist here—and which

Mr. Sheff concedes he did not evaluate. *Supra* § V; Ex. 45 at 189:5-10; 195:22-196:7. Mr. Sheff

made up his methodology as he went along. His two resulting calculations are unreliable, not based

on peer-tested methodology, unhelpful, contrary to law, and must be excluded.

#### a. Sheff's "Market Method" Estimate of $69 Million Based on One Dissimilar Transaction is Contrary to Law and Unreliable

Mr. Sheff's first "method" is no method at all: He simply asserts that a hypothetical ***sale*** by

Metabyte to Meta of the METABYTE mark would be equal to the price paid by a Meta affiliate

Beige Key to a publicly traded bank, Meta Financial Group, for, among other assets, domain names

and a registration for the precise META mark that Meta adopted. Ex. 57 ¶¶ 37-47; Ex. 51 § III.A.

Mr. Sheff's conclusory analysis must be excluded for several reasons. ***First***, the value of an asset

owned by the defendant in a trademark case (here, the acquired assets from Meta Financial) is "not

recognized as a viable theory of damages." *Suja Life, LLC v. Pines Int'l, Inc.*, 2016 WL 8738223,

at *1 (S.D. Cal. Nov. 18, 2016) (citing *Oculu*, 2015 WL 3619204, at *23). ***Second,*** there is no

measure of damages in trademark law that imagines a hypothetical sale of a plaintiff's entire

trademark to a defendant. ***Third***, this method does not follow or apply "reliable principles and

methods." Fed. R. Evid. 702(c). Mr. Sheff did not even reliably apply the economic literature cited

in his report, which requires "at least a few comparable arm's length transactions . . . to arrive at a

workable figure." Ex. 45 at 238:18-239:16; 240:5-15. Mr. Sheff concluded that Metabyte's

trademark is worth **$69 million**—without considering Metabyte's revenue history, success, and trajectory—and instead based on a ***single*** transaction that he conceded was distinct in at least ***seven*** significant ways, without making any quantitative adjustments to account for those differences (such as apply a multiple). *Id.* at 292:19-22; 317:7-318:9; Ex. 51 ¶ 26). Alarmingly, he did not evaluate Metabyte's financials or conduct a valuation of the ***company***, which would have at least provided a ceiling for the value of the METABYTE mark, which Mr. Sheff conceded must be less than the company. Ex. 45 at 224:9-226:8. He simply assumed the transaction price of a hypothetical deal between Meta and Metabyte would be the same as the Meta Financial transaction, adjusted for inflation. Ex. 57 ¶ 47.

As Meta's expert explained, Mr. Sheff's methodology, which makes no adjustments for quantitative differences between transactions—would produce the absurd result that a $69M ***valuation would be the same for any plaintiff with any "Meta formative mark,"*** regardless of their business, advertising, success, or any other recognized metric of brand value. Ex. 46 at 150:14-151:8. Mr. Sheff's unreliable valuation must be excluded. In *Metabyte, Inc. v. Canal+ Techs., S.A.*, 2005 WL 6032845 (N.D. Cal. June 17, 2005), another case involving Metabyte, the court excluded its market-based valuation based on a single comparable, noting that "[t]he differences between [the comparable] and [Metabyte] are so significant that [the expert's] utilization of the ratio between the market capitalizations of the two companies for calculating [Metabyte's] value renders [his] analysis unreliable." *Id.* at *4. Mr. Sheff's failures here are far more egregious, as he did not even bother to apply a ratio to account for the numerous differences between Metabyte and Meta Financial Group. His "market method" fails to meet valuation standards and must be excluded.

> **b.  Sheff's "Cost Method" Estimate of $988,142.06 Fabricates Costs and is Contrary to Generally Accepted Methods.**

Mr. Sheff's second "valuation" is based on Metabyte's alleged "investment" in its trademark, which he used as a proxy for its alleged value. Ex. 57 ¶ 48-49. As Meta's expert explained, ███████████████████ ignores the financial reality of ███████████ ████████████ Ex. 51 ¶¶ 56-72. As a gating issue, there is no recognized theory of trademark damages based on the alleged "value" of a plaintiff's trademark at a single point of time and nothing

1   more. Next, Mr. Sheff included in his calculation—without any basis in the economic valuation

2   literature—half of Metabyte's job posting expenses. Ex. 45 at 111:8-116:19. But these are not

3   "investments" in the brand; Metabyte's CEO conceded they are ███████████████████

4   ███████ Ex. 7 at 122:6-123:4; 120:10-123:22; Ex. 8at 260:12-21; Ex. 64.  Then, Mr. Sheff made

5   up data for the fifteen years (1993-2008) where there were no documented expenses, simply

6   doubling the 2009-2023 expenses to reach what he himself characterized as a "very rough

7   estimate." Ex. 45 at. 58:19-61:11; 62:3-67:12; 69:2-72:19; 73:12-19; 74:15-77:15; 346:21-347:9.

8   Damages opinions "based on factual assumptions that are unsupported in the record" do not meet

9   the *Daubert* standard for admissibility. Order re Summ. J. Mots., *Dep't of Toxic Substances Control

10  v. Technichem, Inc.*, No. 12-cv-5845 (N.D. Cal. Mar. 15, 2016), Dkt. No. 160, at 1 (excluding

11  expert opinion "based on speculation," "regurgitate[d] information . . . including self-serving

12  assertions" by the party that retained him, and "cursory and unscientific" investigation); *MaxLite,

13  Inc. v. ATG Elecs., Inc.*, 2022 WL 16923391, at *5 (C.D. Cal. Aug. 7, 2022) (excluding damages

14  opinion resting on "unsupported assumptions" and thus "not based on sufficient facts or data").

15  Here, Mr. Sheff's calculation is based on nothing *but* assumptions, and his fabricated methodology

16  must be excluded as unreliable.

17          **3.    Sheff's *$128 Billion* Profit Disgorgement Opinion is Contrary to Law
18                  and Unsupported by the Record**

19          Mr. Sheff's report is a legal brief in disguise. He spends much of it advancing an inaccurate

20  interpretation of the law that would permit Metabyte—despite no evidence of any lost sales or

21  financial harm—to recover potentially billions of dollars of Meta profits. "It is well settled that the

22  judge instructs the jury [o]n the law. Experts interpret and analyze factual evidence. They do not

23  testify about the law[.]" *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999). Mr. Sheff's take

24  on the state of the law of damages in reverse confusion cases is inadmissible. Ex. 57 ¶¶13-26; Ex.

25  45 at 160:20-162:6; 163:20-164:1; 359:14-360:11. He conceded that equitable considerations such

26  as unjust enrichment are properly "a matter for the Court to decide . . . , particularly where there's

27  not really any strong argument that there's been diversion of sales." Ex. 45 at 365:8-12.

28  Nonetheless, he opined on them: he found that disgorgement of Meta's profits from "infringing

sales" is **$128.793 billion**, which represents his calculation of ***all of Meta's profits from U.S. advertising sales***. Ex. 57 ¶ 70. He did not consider whether Meta made those profits because of its name, let alone due to name confusion; or how Meta was "unjustly enriched" when Metabyte has conceded lack of financial harm. *See also* Ex. 45 at 177:4-8; 373:2-380:13. John Hansen's unrebutted regression analysis shows ███████████████████████████████████████ ███ Ex. 51, ¶ 90.

Mr. Sheff's opinions invade the province of the Court, something he has a history of doing. In *Medical Depot, Inc. v. Med Way US, Inc.*, the court excluded Mr. Sheff's opinions on trademark law as legal conclusions about "straightforward matters of the law." No. 2:22-cv-1272 (E.D.N.Y. Apr. 26, 2024), Dkt. No. 62, at 7; Ex. 45 393:18-394:22). Similarly here, Mr. Sheff's opinions about the availability and amount of profit disgorgement (which simply parroted Meta's profits, and nothing more) (Ex. 57 ¶¶ 9, 11, 13-26, 59-71) and punitive damages (*id*. ¶¶ 12, 27-30, 72) under the case law are "at bottom attorney argument dressed up as expert opinion" and must be excluded. *JH Kelly, LLC v. AECOM Tech. Servs. Inc.*, 605 F.Supp. 3d 1295, 1316 (N.D. Cal. 2022).

### C.    Stefan Boedeker's Survey Report and "Economic Impact" Report Should be Excluded

Metabyte "rushed" Stefan Boedeker, an economic expert, to complete a likelihood of confusion survey ("Boedeker Survey") and report entitled the "Economic Impact of Monopolization of the term 'Meta'" ("Impact Report"). Exs. 54 and 56; Ex. 43 at 83:17–21, 96:7–20. Mr. Boedeker has never served as an expert in a trademark infringement case (Ex. 43 at 32:9-11) and made several fatal errors that render his survey unhelpful and unreliable. As detailed by Mr. Poret's rebuttal (Ex. 53), Mr. Boedeker surveyed the wrong population, showed them made-up websites that they'd never see in the real world, and did not properly analyze the survey results. He admits that his "Impact Report" is just a theoretical discussion rather than a "full blown report" and it, too, rests on incorrect assumptions and makes no attempt to apply the facts of this case. *Id.* at 95:13-21. Both reports should be excluded.

### D.    Boedeker Survey's Methodology and His Faulty Analysis of Its Results Render the Survey Unreliable and Irrelevant

"Survey evidence should be admitted as long as it is conducted according to accepted

principles and is relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). However, "serious flaws in a survey will make any reliance on that survey unreasonable." *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, 2004 WL 5644805, at *22 (C.D. Cal. Oct. 7, 2004). Due to serious flaws in the Boedeker Survey, it is not probative or admissible on the issue of consumer confusion among relevant purchasers.  *See also* Ex. 53.

### 1. Mr. Boedeker Surveyed the Wrong Universe

The Boedeker Survey surveyed the wrong universe of respondents, which, for a reverse confusion case, should focus on the senior mark's likely or actual consumers. *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998). Failure to test the correct universe is grounds for inadmissibility. *See Kudos*, 2021 WL 5415258, at *12 (excluding survey for failing to capture representative sample of likely purchasers of defendant's products); *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) (same). Metabyte's consumers are the businesses to which it offers and sells staffing services. *Supra* at 2, 13-14. Unlike the Poret Survey (Ex. 52), the Boedeker Survey did not target these entities. Instead, he focused on individual "job seekers" (Ex. 54 at 5-6:18), but they are not relevant consumers (*supra* at 13-14).

A small number of respondents (13.6%) qualified to take his survey by saying they "make or lead hiring decisions" or collaborate with others for hiring. Those respondents first had to answer that they were (1) employed, (2) not currently seeking a new job, and (3) did not intend to look for new job opportunities within the next 12 months. Ex. 43 at 185:5–187:1; Ex. 55A at column Q11.[14] These people might comprise a partner at a law firm or an auto body manager. They are ***not*** – and Mr. Boedeker failed to screen for – people at companies that would consider engaging a staffing company like Metabyte. Ex. 53 at 5-6, 11. Mr. Boedeker's universe did not reflect a representative sample of ***relevant*** purchasers. *Kournikova v. Gen. Media Commc'ns Inc.*, 278 F. Supp. 2d. 1111, 1125 (C.D. Cal. 2003) (excluding survey capturing less than 10% of relevant universe).

### 2. The Boedeker Survey Used Improper Stimuli That Do Not Replicate Marketplace Conditions

"[T]he purpose of a likelihood of confusion survey is to determine whether there is any

---

[14] Oddly, before reaching these questions, Mr. Boedeker terminated respondents who indicated that they worked within the staffing, recruiting, or human resources industries. *Id.* at 179:22–180:3.

confusion in the marketplace as it exists." *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1027 (N.D. Cal. 2017). "The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility." *Kwan*, 2014 WL 572290, at *4 (quoting *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 166 (S.D.N.Y. 2012)). The Boedeker Survey did not replicate marketplace conditions. ***First***, it primed respondents by instructing them that the websites belonged to a "software and innovation services company." Ex. 54 at ¶ 42. As Meta's survey expert explains, the characterization of the stimuli as websites for a "software and innovation services company" in the instructions was highly misleading: it "likely primed respondents to expect to see the website of a company providing different services than Plaintiff actually provides – services that are, at least superficially, more related to Meta's than Plaintiff's actual business." Ex. 53 at 9.

***Second***, the survey relied on fabricated or distorted websites. Two of the stimuli shown to respondents (Stimuli 1 and 3) feature webpages and logo designs that were manipulated and ***do not exist in real world***. Ex. 54 at ¶¶ 34, 38; Ex. 56 at 134:25–135:3. Specifically, Mr. Boedeker doctored the dormant ***Teamanics.com*** website to replace that name with "Metabyte Peer Network" and "Metabyte" in blue, sans-serif typeface with only the "M" in "Metabyte" capitalized – neither of which have ***ever*** been used by Metabyte. Ex. 43 (at 286:23–287:14); Ex. 54 at ¶ 38. In other words, Boedeker showed respondents a radical distortion of marketplace reality, contrary to accepted principles of survey design. J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32:163 (5th ed. 2024); *M2 Software,* 421 F.3d at 1087. The use of this fake stimuli led to irrelevant guessing: numerous respondents identified "Meta" or "Facebook" as the source of the webpages ***because of*** the fabricated logos, citing "the white and blue color; because of the colors; the color palette is similar; similar coloring / style; the color scheme" (Ex. 53 at 14); notably, a white and blue color scheme and sans-serif, lowercase font are features of Meta's FACEBOOK logo (www.facebook.com).

The remaining stimulus shown to respondents (Stimulus 2) comes closer to reality, but it was an incomplete screenshot of the metabyte.com website. It left out important details a real-world visitor would see, including the URL, browser window header, and the bottom half of the webpage describing Metabyte's full business and copyright information. Ex. 53 at 16. Unlike the Poret

Survey, Mr. Boedeker confined the respondents to a single cropped screenshot, providing no additional pages from Metabyte's website that describe its business. Those missing, additional pages not only identify Metabyte as the website's source, they also provide relevant context about its business, as Mr. Boedeker conceded. Ex. 43 at 287:19-22. Without this context, respondents viewing Stimulus 2 were not shown enough content to understand what Metabyte actually does, such that they "could not possibly provide realistic responses that would reflect the likelihood that genuine prospective consumers of Plaintiff would mistakenly connect Plaintiff's website to Meta." Ex. 53 at 16; *see also Kournikova*, 278 F. Supp. 2d at 1125.[15]  Finally, if Mr. Boedeker wanted to see how job seekers might perceive a "Metabyte" job posting, he would have shown them Metabyte's ***actual*** job listings on Indeed (Ex. 4 at 47:2-13), not a cropped screenshot from Metabyte's website – ***one that is not targeted to job seekers*** – or two other made-up websites.

### 3.    Mr. Boedeker Failed to Properly Analyze Survey Results, Leading to Critical Statistical Errors

Mr. Boedeker failed to properly analyze and check the quality of responses to his survey. First, his total net confusion rate of 24.8% ignores the survey's significant departures from accepted principles of consumer confusion survey design. The alleged confusion rate was inflated by much higher rates of confusion among respondents who saw Stimuli 1 and 3, which do not exist anywhere in the real world. Excluding respondents who saw the made-up blue-and-white Metabyte logo, reduces the net confusion rate to 16.7%, not accounting for the survey's various other flaws. Ex. 53 at 21. When one limits the results to <14% of respondents who indicated that they were involved in hiring decisions, *the net confusion drops to 4%.* Ghazarian Decl., ¶ 59.

The way Mr. Boedeker tallied "confused" respondents was unreliable, too. He admitted that he relied entirely on a software program that tagged every mention of "meta" or "facebook" as

---

[15] Mr. Boedeker knew better than to show "materially different" stimuli than what exists in the marketplace. In *Townsend v. Monster Beverage Corp.*, the court excluded his advertising survey as "unreliable and irrelevant" for that very reason. 303 F. Supp. 3d 1010, 1020 (C.D. Cal. 2018). In *Townsend*, he defended his changes to the stimuli as a means to reduce "distraction" saying, "[i]f these boxes get too big and there's too much wording in there then, yeah, distract almost like the participants." *Id*. at 1021. He did the same here, defending his decision to crop the metabyte.com home page because he did not want respondents to be "overwhelmed by too many stimuli" (i.e. references on Metabyte's website) and cited "space limitations." Ex. 43 at 252:21-25; 306:12–14. Those excuses didn't work in *Townsend* and should not here.

1   consumer confusion, regardless of the context. Ex. 43 at 337:9-14, 338:16-19; Ex. 53 at 23. His

2   reliance on word-match software to measure confusion led to several erroneous results. While some

3   responses named "meta" or "facebook," there is ambiguity as to whether they are referring to the

4   Defendant Meta.[16] As Mr. Boedeker conceded, there are a number of other companies named

5   "Meta." *Supra* at 11. One respondent that was counted as confused thought the source of the

6   webpage was "Meta critics," (likely a reference to Metacritic, a different company). Ex. 53 at 23.

7   Another answered that the source of the webpage was "[a] company like Twitter or Facebook,"

8   implying that the respondent thought the company behind the webpage was similar to – not the

9   same as – Meta. *Id.* at 24. Meta's survey expert identified 27 such ambiguous responses in

10  Boedeker's survey. *Id.* During his deposition, Mr. Boedeker himself could not say whether or not

11  they should be counted as confused. *See*, *e.g.* Ex. 43 at 335:19–340:11.[17] Excluding these responses

12  reduces the total confusion rate *even further.* In sum, Mr. Boedeker's data collection violates

13  accepted principles of survey methodology. *Manual for Complex Litigation, Fourth*, § 11.493, at

14  103 (4th ed. 2004) ("Relevant factors include whether… the data gathered were accurately reported;

15  and the data were analyzed in accordance with accepted statistical principles"). These errors,

16  compounded by Boedeker's surveying anyone looking for any job of any type at any pay, and

17  showing them severely manipulated stimuli for a company described as a "software and technology

18  company," are not mere criticisms going to weight. They are fundamental defects that eviscerate

19  the survey's reliability. The survey tells us nothing about the likelihood of real-world confusion

20  among Metabyte's consumers and should be excluded. *See M2 Software*, 421 F.3d at 1087.

21          **E.    Mr. Boedeker's Economic Impact Report Is Irrelevant Theory**

22          Mr. Boedeker's Impact Report relies on the unestablished linguistic premise that "meta" is

23  generic (and he is not a linguist, Ex. 43 at 120:23-121:3), and that Meta is trying to "monopolize"

24  the term ("monopolization" is not at issue in this case). Mr. Boedeker himself admits that this report,

25  which he did not have enough time to fully complete, is not empirical but "theoretical" and lacks

---

[16] This ambiguity is due in part to the Boedeker Survey's failure to include adequate follow-up questions to confirm whether respondents were in fact referring to Defendant Meta. *See* Ex. 53 at 21–22.

[17] Demonstrating the haphazard approach he took, when asked about the "Meta critics" example, Mr. Boedeker said that he would ***not*** count that respondent as confused. Ex. 43 at 342:19–343:1.

1    quantitative analysis. *Id*. at 96:3-9, 14:7-9, 95:18-19. He theorizes on the supposed economic

2    impact of Meta's "monopolization" of the term "meta" without analyzing whether monopolization

3    is occurring. Ex. 56 at ¶ 18-29. He testified that perhaps monopolization may one day occur. Ex.

4    43 at 95:13-25. None of this is reliable, helpful, or tied to the facts of the case. *Mercer Glob.*

5    *Advisors, Inc. v. Hewitt*, 2024 WL 5423015, at *7 (C.D. Cal. Oct. 31, 2024) (expert's "opinion is

6    based on far too many unreliable assumptions to clear *Daubert*'s gatekeeping standard"). And in

7    fact, there is no "monopolization": the parties coexist in the marketplace with many companies that

8    use "Meta" in their names (*supra* at 10-11), which Mr. Boedeker conceded. Ex. 43 at 331:11-15,

9    329:18-20. The Impact Report, which is not based on sufficient facts or any peer-reviewed

10   methodology, should be excluded. *Mercer Glob. Advisors*, 2024 WL 5423015, at *7.

11   **X.    CONCLUSION**

12       The Court should grant Meta's motion for summary judgment as to all Metabyte claims,

13   deny Metabyte's motion as to laches, and exclude all opinions of Metabyte's experts.

14   Dated:   July 7, 2025                              COOLEY LLP

15

16                                                     _____
                                                       Bobby Ghajar
17                                                     Stephanie Schuyler
                                                       Colette Ghazarian
18
                                                       Attorneys for Defendant
19                                                     META PLATFORMS, INC.

20

21

22

23

24

25

26

27

28