1   BOBBY GHAJAR (198719)
    (bghajar@cooley.com)
2   COLETTE GHAZARIAN (322235)
    (cghazarian@cooley.com)
3   COOLEY LLP
    1333 2nd Street, Suite 400
4   Santa Monica, California 90401
    Telephone:    (310) 883-6400
5   Facsimile:    (310) 883-6500

6   STEPHANIE SCHUYLER (*Pro Hac Vice*)
    (sschuyler@cooley.com)
7   55 Hudson Yards
    New York, NY 10001
8   Telephone:    (212) 479-6000
    Facsimile:    (212) 479-6275

9
    *Counsel for Defendant Meta Platforms, Inc.*
10

11              **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13                **SAN FRANCISCO DIVISION**

14

15  METABYTE, INC.,                          Case No. 3:23-cv-04862-VC

16              Plaintiff,                    **DEFENDANT META PLATFORMS, INC.'S
                                              REPLY IN SUPPORT OF MOTION FOR**
17      v.                                    **SUMMARY JUDGMENT**

18  META PLATFORMS, INC.,                     **[Brief #4]**

19              Defendant.                    **Hearing Date**: August 14, 2025, 10:00 am
                                              **Location:** United States District Court
20                                            450 Golden Gate Ave
                                              San Francisco, CA 94102
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  META IS ENTITLED TO SUMMARY JUDGMENT ON METABYTE'S DAMAGES CLAIMS .................................................................................................. 2

  A.  Metabyte Raises No Genuine Dispute as to Actual Damages ............................... 2

  B.  Metabyte Is Not Entitled to Any Profit Disgorgement ........................................... 4

III.  NO REASONABLE JURY COULD FIND A LIKELIHOOD OF CONFUSION ........... 5

  A.  There Is No Likelihood of Confusion Among Relevant Consumers: Businesses that Hire Metabyte for Staffing or Consulting...................................... 6

  B.  People Considering a Job with Metabyte to Provide Staffing to Metabyte's Customers Are Not Relevant Consumers ................................................................ 6

  C.  Each of the *Sleekcraft* Factors Favors Meta ........................................................ 8

    1.  The Similarity of the Marks Factor Weighs in Favor of Meta.................... 8

    2.  The Proximity of Goods and Services Factor Favors Meta ...................... 10

    3.  The Strength of the Marks Factor Favors Meta ....................................... 12

    4.  The Sophistication and Degree of Care Factor Favors Meta ................... 13

    5.  The Lack of Actual Confusion After Four Years Favors Meta ................. 14

    6.  The Marketing Channels Factor Favors Meta........................................... 17

    7.  The Intent Factor Does Not Support a Likelihood of Confusion.............. 18

    8.  The Likelihood of Expansion Factor Favors Meta ................................... 18

IV.  NO REASONABLE JURY COULD FIND THAT THE META MARK IS GENERIC .................................................................................................................. 19

V.  CONCLUSION .......................................................................................................... 20

Cooley LLP
Attorneys at Law

DEFENDANT'S REPLY TO
MTN FOR SUMMARY JUDGMENT
CASE NO. 3:23-CV-04862-VC

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aliign Activation Wear, LLC v. lululemon athletica Canada Inc.*,
   2021 WL 3117239 (C.D. Cal. Jun. 7, 2021) ................................................................... 13

*Analytic Recruiting, Inc. v. Analytic Res., LLC*,
   156 F. Supp. 2d 499 (E.D. Pa. 2001) ............................................................................. 7

*Avery Dennison Corp. v. Acco Brands, Inc.*,
   1999 WL 33117262 (C.D. Cal. Oct. 12, 1999) .............................................................. 15

*Bd. of Regents of the Univ. of Hou. Sys. v. Hou. Coll. of L., Inc.*,
   214 F. Supp. 3d 573 (S.D. Tex. 2016) ......................................................................... 14

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*,
   376 F.3d 8 (1st Cir. 2004) .............................................................................................. 7

*Bridgestone Ams. Tire Operations, LLC v. Fed. Corp.*,
   673 F.3d 1330 (Fed. Cir. 2012) .................................................................................... 12

*Brookfield Commc'ns v. W. Coast Ent. Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ................................................................................. 14, 17

*Canada v. Blain's Helicopters, Inc.*,
   831 F.2d 920 (9th Cir. 1987) .......................................................................................... 6

*Carnival Brand Seafood Co. v. Carnival Brands, Inc.*,
   187 F.3d 1307 (11th Cir. 1999) .................................................................................... 11

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ....................................................................................................... 5

*Elliott v. Google, Inc.*,
   860 F.3d 1151 (9th Cir. 2017) ................................................................................. 19, 20

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) ..................................................................................... 8, 9

*Fancaster, Inc. v. Comcast Corp.*,
   832 F. Supp. 2d 380 (D.N.J. 2011) ................................................................................ 9

*Fortune Dynamic, Inc. v. Victoria's Secret Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ........................................................................................ 5

*FTC v. Publ'g Clearing House, inc.*,
   104 F.3d 1168 (9th Cir. 1997) ..................................................................................... 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Groupion v. Groupon*,
   859 F. Supp. 2d 1067 (N.D. Cal. 2012) ..................................................... 5, 9, 19

*Healix Infusion Therapy, Inc. v. Healix, Inc.*,
   2018 WL 1801149 (S.D. Tex. Apr. 16, 2018) .......................................... 7

*Iglesia Ni Cristo v. Cayabyab*,
   2020 WL 1531349 (N.D. Cal. Mar. 21, 2020) .......................................... 12

*Instructure, Inc. v. Canvas Techs., Inc.*,
   2022 WL 43829 (D. Utah Jan. 5, 2022) .................................................. 7, 8

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
   2 F.4th 1150 (9th Cir. 2021) .................................................................. 5, 18

*J.K. Harris & Co. v. Kassel*,
   253 F. Supp. 2d 1120 (N.D. Cal. 2003) .................................................. 14

*John v. United Air Lines*,
   2018 WL 11392477 (N.D. Cal. Sept. 26, 2018) ..................................... 14

*Kournikova v. Gen. Media Commc'ns Inc.*,
   278 F. Supp. 2d 1111 (C.D. Cal. 2003) .................................................. 16

*Kwan Software Eng'g, Inc. v. Forey Techs., LLC*,
   2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ........................................... 16

*Legator v. Nordstrom, Inc.*,
   2011 WL 13220707 (C.D. Cal. Dec. 29, 2011) ...................................... 11

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
   119 F. 4th 711 (9th Cir. 2024) ............................................................... 14

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993) ............................................................. 2, 4, 5

*M2 Software, Inc. v. Madacy Ent.*,
   421 F.3d 1073 (9th Cir. 2005) ............................................................... 5, 6

*Network Automation v. Advanced Sys. Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ............................................................... 18

*One Indus. LLC v. Jim O'Neal Distrib., Inc.*,
   578 F.3d 1154 (9th Cir. 2009) ............................................................... 5

*Palm Bay Imps., Inc. v. Veuve Cliquot Ponsardin Maison Fondee En 1772*,
   396 F. 3d 1369 (Fed. Cir. 2005) ............................................................ 9

COOLEY LLP
ATTORNEYS AT LAW

iii

DEFENDANT'S REPLY ISO
MTN FOR SUMMARY JUDGMENT
CASE NO. 3:23-CV-04862-VC

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
354 F.3d 1020 (9th Cir. 2004) ................................................................................ 14

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ................................................................................ 18

*PowerFood, Inc. v. Sports Sci. Inst.*,
1993 WL 13681782 (N.D. Cal. Mar. 11, 1993) ...................................................... 10

*QS Wholesale, Inc. v. Rox Volleyball, Inc.*,
2014 WL 12567147 (C.D. Cal. Dec. 31, 2014) ................................................. 15, 17

*Quia v. Mattel*,
2011 WL 2749576 (N.D. Cal July 14, 2011) ........................................................ 3, 9

*Rearden LLC v. Rearden Commerce, Inc.*,
683 F.3d 1190 (9th Cir. 2012) ........................................................................ 6, 7, 13

*Redmond Prods. Inc. v. MK Int'l Importers*.
1990 WL 10072484 (C.D. Cal. Aug. 17, 1990) ...................................................... 10

*S.D. Comic Convention v. Dan Farr Prods.*,
2017 WL 4227000 (S.D. Cal. Sept. 22, 2017), *aff'd*, 807 F. App'x 674 (9th
Cir. 2020) ................................................................................................................ 20

*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*,
680 F. Supp. 2d 1107 (N.D. Cal. 2010) ................................................................. 14

*Scott v. Harris*,
550 U.S. 372 (2007) ................................................................................................ 12

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) .................................................................................. 16

*Skydive Arizona, Inc. v. Quattrocchi*,
673 F.3d 1105 (9th Cir. 2012) .................................................................................. 3

*Spin Master, Ltd. v. Zobmondo Ent., LLC*,
944 F. Supp. 2d 830 (C.D. Cal. 2012) ..................................................................... 4

*Sports Mktg. Monterrey Grp. LLC v. Socios Servs. US Inc.*,
2023 WL 2671379 (N.D. Cal. Mar. 27, 2023) ........................................................ 12

*Stitch Editing v. TikTok Inc.*,
2022 WL 17348179 (C.D. Cal. Nov. 15, 2022) ...................................................... 12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Surfvivor Media, Inc. v. Survivor Prods.*,
   406 F.3d 625 (9th Cir. 2005) ............................................................................ 6, 9

*Sweats Fashions, Inc. v. Pannill Knitting Co.*,
   833 F.2d 1560 (Fed. Cir. 1987) ............................................................................ 19

*Vital Pharms., Inc. v. Monster Energy Co.*,
   553 F. Supp. 3d 1180 (S.D. Fla. 2021) ................................................................ 17

*Walter v. Mattel, Inc.*,
   210 F.3d 1108 (9th Cir. 2000) ............................................................................... 6

*World Champ Tech v. Peloton Interactive.*,
   2024 WL 665181 (N.D. Cal. Feb. 16, 2024) ...................................................... 13

**Statutes**

15 U.S.C. § 1117 ........................................................................................................ 4

**Other Authorities**

1 MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 11:85 (5th ed.) ........................ 9, 10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

As Metabyte's opposition confirms, this case is not about preventing real-world confusion among Metabyte's customers, remedying real-world harm to Metabyte, or restoring the public's right to use a generic term. It is about Metabyte's attempt to get an undeserved payday.

In its opening brief, Meta presented undisputed evidence that (1) the *Sleekcraft* factors weigh in its favor; (2) Metabyte is not entitled to any damages; and (3) META is not generic. In response, on each issue on which Metabyte bears the burden of proof, its opposition comes up empty: Metabyte ignores the discovery record, including its own admissions and sworn testimony, and resorts to the unsupported opinions of its CEO, unproduced documents lacking foundation or context, and a host of irrelevant arguments. The Court should grant summary judgment to Meta on each of the following:

***No Evidence of Actual Damages.*** Metabyte ignores its admission—made in response to a Court-ordered interrogatory—that it is "unable to identify specific monetary damages caused by confusion" with Meta. Metabyte cannot overcome this admission and raise a triable issue by relying on an unqualified expert who admitted that his theories and calculations were not predicated on any factual analysis or evidence of loss. Metabyte's expert expressly ***did not*** opine on Metabyte's entitlement to damages, and as a matter of law, Metabyte is entitled to none.

***No Entitlement to Equitable Disgorgement of Meta's Profits.*** No economic or legal rationale justifies an award of Meta's profits in this reverse confusion case. There is no evidence that Metabyte could have earned any of Meta's profits, and any disgorgement remedy would be entirely speculative and give Metabyte an impermissible windfall. Moreover, equitable disgorgement is awarded only on sales that are attributable to the infringing conduct. Metabyte does not and cannot identify any evidence that any of Meta's profits are attributable to alleged reverse confusion, and Meta's unrebutted expert establishes that there is no nexus between Meta's profits and alleged confusion with Metabyte.

***No Reverse Confusion Among Relevant Consumers.*** The undisputed record shows that the relevant universe of consumers—sophisticated businesses seeking expensive staffing services—

1   are unlikely to be confused. Metabyte concedes this point; it does not engage in a *Sleekcraft*

2   analysis from the vantage of those consumers even though they account for nearly all of

3   Metabyte's revenues. Metabyte's failure to address—let alone rebut—the evidence of lack of

4   confusion among relevant consumers entitles Meta to summary judgment.

5        ***No Reverse Confusion Among Job Seekers.*** Forced to concede that the relevant consumers

6   are not confused, Metabyte pivots to alleged confusion among "job seekers." This theory is not

7   supported by the facts or the law. Job seekers are not "consumers" of Metabyte's services; they

8   are Metabyte ***employees***. But even if hypothetical job seeker confusion were relevant, Metabyte

9   fails to present evidence that it is ***probable*** that an appreciable number of job seekers are likely to

10  be confused that Metabyte is Meta. On this record, no reasonable jury could find a likelihood of

11  confusion.

12       ***Meta's Trademark Is Not Generic.*** A term is generic if it is the common name of a product

13  or service and fails to function as a source identifier.  The undisputed evidence shows that META

14  is source identifier for Meta's services—***not*** to a nonexistent type of product or service called a

15  "meta." Metabyte ignores the record—including an unrebutted linguistic analysis by Meta's expert

16  and the USPTO's repeated approval and registration of the META trademark (evidencing the

17  USPTO's view that it is not generic)—and argues that "meta" is generic for everything Meta

18  offers. It also resorts to a legally unrecognized theory that META is generic *ab initio*.  This claim,

19  too, is easily dismissed: Meta's use is a quintessential trademark use, not use of a generic term.

20  **II.    META IS ENTITLED TO SUMMARY JUDGMENT ON METABYTE'S DAMAGES CLAIMS**

21       **A.    Metabyte Raises No Genuine Dispute as to Actual Damages**

22       The undisputed evidence demonstrates that Metabyte is not entitled to actual damages as a

23  matter of law. Metabyte has the burden to "prove both the fact and the amount of damage" with

24  "reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).

25  Metabyte cannot possibly meet this burden when it admitted in a Court-ordered interrogatory that

26  ***it "is unable to identify specific monetary damages caused by confusion."*** Dkt. 89-43 at No. 23.

27       Metabyte cannot overcome this admission and raise a triable issue by (1) alluding to "ample

28  evidence" supporting a "variety of damages theories" (Dkt. 85 ("Opp.") at 21); or (2) reply on

Jeremy Sheff's report. The "ample evidence" does not exist; indeed, the only thing Metabyte actually cites in its Opposition is the interrogatory response where it admitted it has no evidence of actual damages. Opp. at 21 (citing Ex. 95 at No. 23). Meanwhile, Mr. Sheff testified that his opinions **assume** Metabyte was injured. Ex.[1] 83 at 176:15–177:3, 177:17–178:7. He did not study Metabyte's business or calculate any loss that it actually suffered. *Id.* at 138:12–139:18. His opinions are thus not evidence of damage to Metabyte; they are theories of speculative monetary damages that presume Metabyte will prove actual injury (which it cannot). Metabyte's and Mr. Sheff's "theories of damages" are supported by no evidence and do not create a genuine issue for trial.[2]

Mr. Sheff's opinions are inadmissible and entitled to no weight for other reasons, too. *See* Mot. at IX.B (detailing flaws in Mr. Sheff's credentials and unfounded theories). In response to Meta's challenges, Metabyte misrepresents Mr. Sheff's credentials—stating that he has "been an expert witness on damages in a number of federal and state trademark cases." Opp. at 26. Not true. He has only served as an expert in "trademark law," and was excluded even in that capacity for offering legal conclusions. Dkt. 79 ("Mot.") at 28; Ex. 45 at 393:18–394:22. Mr. Sheff has **never** offered an expert opinion valuing damages, and lacking any economics training, he is unqualified to do so. Mot. at 24–25. Metabyte also does not address the biggest flaw underlying Mr. Sheff's "valuation"—he assumed that the value of Metabyte's damages is equal to the entire value of its trademark, i.e., that the mark has become worthless as a result of the alleged infringement. Mot. at 25. But there is no factual basis for that assumption, particularly where Metabyte conceded it has no evidence of damages. *See Quia v. Mattel*, 2011 WL 2749576, at *6 (N.D. Cal July 14, 2011) ("Plaintiff still has the burden of presenting evidence as to the foundational *fact* that its mark lost value at all.").

Finally, Metabyte offers no substantive response to the flaws in Mr. Sheff's "market method," which—as applied by him—is not a proper measure of trademark damages. Mr. Sheff

---

[1] Citations to "Ex. _" are to the sequentially numbered exhibits to the Ghazarian Declaration (Dkt. 80) and the Ghazarian Reply Declaration. Citations to "¶_" are to the Ghazarian Reply Declaration.
[2] Metabyte's own cited case, *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012), does not help its argument. Unlike here, the plaintiff there introduced "voluminous" evidence of harm in the form of advertising undertaken in response to customer frustration due to confusion.

failed to conduct the requisite quantitative comparison of *multiple* comparable transactions.[3] And Metabyte's assertion that "necessary costs to generate revenue" are "the same thing" as "investments in the brand" such that they were properly included in Mr. Sheff's cost method calculation (Opp. 26-27) is an unsupported assumption contradicted by Metabyte's CEO's own testimony. Ex. 83 at 120:10-123:22; Ex. 8 at 260:12-21; Ex. 64. These damages theories are unrecognized and unsupported, and they are certainly not evidence of the fact of damage to Metabyte. This leaves the undisputed fact that Metabyte "is unable to identify specific monetary damages caused by confusion." Meta is entitled to summary judgment as a result.

### B.    Metabyte Is Not Entitled to Any Profit Disgorgement

Metabyte fails to raise a triable issue on its entitlement to an equitable accounting of Meta's profits. As Meta explained (Mot. at 18–19), equitable disgorgement is inappropriate as a matter of law in a reverse confusion case because there is no evidence that the defendant is "trading off of the plaintiff's relatively obscure name." *Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 848 (C.D. Cal. 2012). Moreover, there is no evidence that Metabyte could have earned any of Meta's revenues from its long-established services. Mot. 18–19. Awarding profits Metabyte could have no hope of ever earning would be contrary to the Lanham Act's requirement that any remedy "shall constitute compensation and not a penalty." *Id.* (citing 15 U.S.C. § 1117). Metabyte does not address, let alone refute, this argument. Meta is entitled to summary judgment as a result.

Metabyte also fails to raise a triable issue as to the amount of profits that could be disgorged. The Ninth Circuit has made clear that an accounting of profits "is intended to award profits only on sales that are ***attributable to the infringing conduct***." *Lindy Pen*, 982 F.2d at 1408. Metabyte bears "the burden of establishing [Meta's] gross profits ***from the infringing activity*** with reasonable certainty." *Id*. Yet Metabyte does not and cannot identify ***any evidence*** that ***any*** of Meta's profits

---

[3] Metabyte blames Meta for Mr. Sheff's methodological failures because Metabyte supposedly asked for and didn't receive information regarding additional transactions. Opp. at 26 (citing Sheff Dep. at 334:8-12). The record belies that argument. Of the 21 trademark assignment transactions Mr. Sheff identifies, (Ex. 57 ¶ 39), four of them were included in the Meta Financial Group transaction Mr. Sheff considered. *See* Ex. 83 at 276:21–280:5. Metabyte identifies only one other transaction about which it requested any information, (Dkt. 89-42 at No. 18), but never argued that information was relevant to damages, *see* Dkt. 65 at 3 (the only relevance asserted is "chain of title and the intent and scope of Meta's rebrand"). The Court denied that motion, Dkt. 68.

1    are attributable to alleged reverse confusion. Although Metabyte points to Mr. Sheff's report, he

2    did not opine that Metabyte is entitled to disgorgement (Ex. 83 at 364:14–366:22), and offered no

3    opinion on an appropriate apportionment (Ex. 83 at 367:1–15, 373:2–378:22). Although Metabyte

4    acknowledges that it "should not, consistent with the principles of equity, recover $128 billion" in

5    profit disgorgement, it offers no alternative, fact-based number. Opp. at 27.

6          Meanwhile, Meta's economic expert, John Hansen, demonstrated through a regression that

7    Meta earned no profits attributable to the rebrand—much less as the result of any alleged confusion

8    with Metabyte. Mot. at 19; Ex. 51 ¶¶ 90–91. Metabyte does not challenge Mr. Hansen's

9    qualifications or his analysis. Therefore, the only competent evidence in the record—Mr. Hansen's

10   unrebutted analysis—demonstrates that as a matter of law, none of Meta's profits could be properly

11   disgorged.

12   **III.    NO REASONABLE JURY COULD FIND A LIKELIHOOD OF CONFUSION**

13         Meta demonstrated the record evidence supported a finding of no likelihood of confusion.

14   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Metabyte was required to respond with

15   "sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely

16   'possible.'" *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005). It did not.

17         The parties agree that the *Sleekcraft* factors govern the Court's analysis. Metabyte argues

18   that those factors require a factual inquiry that precludes summary judgment. Opp. at 7 (citing

19   *Ironhawk Techs. v. Dropbox*, 2 F.4th 1150, 1160 (9th Cir. 2021)).[4] But where, as here "no material

20   issues of fact are raised reflecting confusion between the marks, summary judgment is appropriate."

21   *Groupion v. Groupon*, 859 F. Supp. 2d 1067, 1073 (N.D. Cal. 2012).

22         Indeed, courts routinely grant summary judgment on likelihood of confusion, even where

23   only some *Sleekcraft* factors favor the defendant. *E.g.*, *One Indus. LLC v. Jim O'Neal Distrib., Inc.*,

24   578 F.3d 1154, 1164-65 (9th Cir. 2009) (granting summary judgment to defendant despite

25   proximity of goods and marketing channels factors favoring plaintiff); *M2 Software*, 421 F.3d at

26   _____

27   [4] The two cases Metabyte cites in support of its argument are nothing like this one. *See Ironhawk*,
     2 F.4th at 1160 (reversing summary judgment where companies offered computer software
28   marketed as "SmartSync" and "Smart Sync" to the very same customers); *Fortune Dynamic, Inc.
     v. Victoria's Secret Brand Mgmt., Inc.*, 618 F.3d 1025, 1039 (9th Cir. 2010) (reversing summary
     judgment where both parties sold apparel to the same consumers using the word "Delicious.").

1    1080–82, 1085 (same, despite proximity of goods, strength of marks, and similarity of marks factors

2    favoring plaintiff); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631-34 (9th Cir. 2005)

3    (same, despite strength of marks, marketing channels, and intent factors favoring plaintiff).

4    Metabyte did not meet its burden to create a material issue of fact as to reverse confusion, and Meta

5    is entitled to summary judgment as a result.

6    **A.    There Is No Likelihood of Confusion Among Relevant Consumers: Businesses that Hire Metabyte for Staffing or Consulting**

7

8    In a reverse confusion case, the relevant consumer universe is the potential purchasers of

9    the plaintiff's services. *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110 (9th Cir. 2000). Metabyte

10   concedes that there is no confusion (actual or likely) among Metabyte's ***actual consumers***:

11   sophisticated businesses looking for expensive staffing services. Meta identified detailed evidence

12   demonstrating that these businesses are unlikely to confuse Metabyte with Meta (Mot. at 12-13;

13   Ex. 1A; Ex. 8 at 192:9–193:1, 213:17–23). This evidence includes the unrebutted report of Meta's

14   expert Peter Golder, who describes the high-touch, detailed process through which businesses

15   considering Metabyte make staffing decisions. Ex. 48 § V.B. Metabyte did not address–let alone

16   rebut this evidence.[5] Meta is entitled to summary judgment on Metabyte's trademark claims for

17   this reason alone.

18   **B.    People Considering a Job with Metabyte to Provide Staffing to Metabyte's Customers Are Not Relevant Consumers**

19

20   Instead of addressing likelihood of confusion among the relevant universe of consumers,

21   Metabyte centers its argument on the possibility of confusion among the job seekers it hires ***as***

22   ***employees and then places with clients***. Metabyte does not meaningfully address Meta's cited

23   cases explaining that potential employees' confusion is not relevant. Mot. at 12–13. Metabyte

24   misconstrues the Ninth Circuit's analysis in *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d

25   1190 (9th Cir. 2012), arguing that the court "has expressly acknowledged that 'confusion of

26   _____

[5] Meta objects to the vast majority of the exhibits to the Mehta Declaration (Dkts. 91-6–8) and
Murthy Declaration (Dkts. 88-1–53, 89-1–32, 89-38, 89-44–50, 90-1), which were filed late,
27   because they are unauthenticated documents that lack foundation, and many were not previously
produced. Those documents are not evidence of anything, and the Court should disregard them.
*Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) (documents lacking "proper
28   foundation laid to authenticate them cannot . . . defeat . . . summary judgment").

1    potential employees . . . could be relevant.'" Opp. at 12. To the contrary, the court ruled (in the very

2    footnote Metabyte cites), "We need not—and do not—decide whether . . . confusion on the part of

3    . . . potential employees . . . should be considered." *Rearden*, 683 F.3d at 1214 n.9. *Rearden* stands

4    for the narrow proposition that nonconsumer confusion *could be* relevant only where it "bears a

5    relationship to the existence of confusion on the part of consumers themselves." *Id.* at 1214. That

6    is not the case here. As explained, Metabyte's actual consumers are sophisticated businesses. Mot.

7    at 12. Confusion among relatively less sophisticated job seekers, even if it existed, is not a "proxy"

8    for confusion among those businesses. *See Rearden*, 683 F.3d at 1216 ("[C]onfusion on the part of

9    a non-sophisticated non-consumer may shed little or no light on whether a sophisticated consumer

10   would likewise be confused.").[6] Metabyte does not argue as much, nor could it.

11        Metabyte's job posts themselves, which typically describe Metabyte's clients, highlight the

12   absurdity of Metabyte's theory of job seeker confusion. *E.g.*, Ex. 64 (referring to a freight clerk job

13   for "a global conglomerate of electronics and appliances business"). Those posts attract candidates

14   who fit that description and are interested in the pay, location, and type of job. *Id.* "Metabyte" might

15   appear as having posted the job, but before a candidate completes the application, they know the

16   identity of the client. Ex. 8 at 34:12–35:24. Metabyte, in consultation with its client, then hires that

17   individual as an employee and places them with the client. *Id.* There is no room in this process for

18   a job seeker to mistakenly presume that the job post is for Meta, and such confusion would be

19   inconsistent with the care individuals take when applying for jobs. *See* Ex. 48 § V.C.

20        Metabyte presents no evidence that this job seeker confusion is "probable" among an

21   "appreciable number" of candidates. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th

22   Cir. 2002). It admitted that it is not aware of any evidence from Indeed or other platforms that

---

23

24   [6] Metabyte's remaining authorities (Opp. at 12–13) are out-of-circuit cases decided under different
     likelihood of confusion standards and/or are factually distinguishable, involving either significant
25   actual (not inquiry) confusion, or overlapping services. *See Healix Infusion Therapy, Inc. v. Healix,*
     *Inc.*, 2018 WL 1801149, at *19 (S.D. Tex. Apr. 16, 2018) (confused candidates applied for job with
26   wrong company); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 10,16 (1st Cir. 2004)
     (pervasive actual confusion among consumers *and* nonconsumers caused significant harm to
27   plaintiff); *Analytic Recruiting, Inc. v. Analytic Res., LLC*, 156 F. Supp. 2d 499, 515 (E.D. Pa. 2001)
     (both parties provided staffing services "targeting the same client and candidate pool"); *Instructure,*
28   *Inc. v. Canvas Techs., Inc.*, 2022 WL 43829, at *13 (D. Utah Jan. 5, 2022) (both parties provided
     staffing services, and job seekers were plaintiff's only consumers).

Metabyte's conversion rate for job seekers was affected by confusion with Meta. Ex. 1A at 2, 4. Moreover, it provides no evidence as to how that "confusion," even if it happened, would have any material effect on its business. Metabyte cannot cite a single instance in which it was unable to attract qualified job seekers for a particular position due to perceived confusion with Meta, let alone that it was unable to fill the position. Even for the two purported examples of "confused" job seekers, the Metabyte employee who interacted with them conceded there was no evidence that confusion had any effect on the job seeker's decision or Metabyte's ability to ultimately fill those roles. Ex. 5 at 121:10–122:22. The notion that "job seeker" confusion is actionable here is unsupported.[7]

### C.    Each of the *Sleekcraft* Factors Favors Meta

Metabyte's failure to rebut Meta's evidence as to unlikelihood of confusion by Metabyte's actual consumers (i.e., its business clients) and the impropriety of Metabyte's "job seeker" theory of confusion are alone enough to warrant summary judgment in favor of Meta. Even so, the record demonstrates that there remains no genuine issue of fact with respect to the *Sleekcraft* factors.

### 1.    The Similarity of the Marks Factor Weighs in Favor of Meta

Applying the relevant test, Metabyte does not meaningfully dispute that the marks are different in sight (METABYTE includes the additional term "BYTE"), pronunciation (e.g., METABYTE includes an additional syllable and plosive), and meaning (META is Greek for "beyond," whereas METABYTE is a coined term that is a play on Metabyte's CEO's last name, "Mehta").[8] Dkt. 79-1 ¶ 22; Dkt. 91 ¶ 6. Metabyte also acknowledges that the parties' marks must be "considered in their entirety and as they appear in the marketplace." Opp. at 8. "[C]ourts should analyze each mark within the context of other identifying features," which can include stylization, logos, and other surrounding material. *Surfvivor*, 406 F.3d at 633; *Entrepreneur Media*, 279 F.3d at 1145. Metabyte does not dispute the parties' logos and websites are vastly different. Opp. at 8.

---

[7] Metabyte appears to argue that job seekers ***are*** the consumers (as opposed to potential employees) of its Teamanics business. This is a red herring. The undisputed record shows that Teamanics is a separate company that never generated revenue from job seekers, and its "peer network" is dormant, *see infra* § III.C(2). It also was not promoted under the METABYTE mark until after this dispute arose. *Id.* Hypothetical confusion by "Teamanics" users is not probative, probable, or relevant.

[8] Metabyte cites no competent evidence that Meta's lawyers "mixed up" the names (Opp. at 8 n.2) because they are similar, as opposed to a simple typo, nor any authority for the proposition that attorney typos or mistranscriptions are relevant (Meta is aware of none). *See* Opp. at 8.

1    Instead, it argues that the marks are not *exclusively* displayed in their logo formats, citing use of

2    company names in job listings on platforms like Indeed. Opp. at 9. This is another red herring. Job

3    listings are directed towards prospective employees, not prospective consumers (*supra* § III.B). But

4    even if job listings were relevant, they include contextual details that further distinguish the marks.

5    *Id.*; Dkt. 91 ¶ 36 (admitting Meta's logo appears in its job listings); *see also* Dkt. 88-11.

6        Moreover, the shared use of "Meta" in both marks—in logo form or not—must be

7    considered within the crowded field of "Meta" and "Meta"-formative marks with which Metabyte

8    coexists. *See infra* p. 13. In this context, consumers would not simply assume that many hundreds

9    of companies that have "Meta" in their names are related. 1 MCCARTHY ON TRADEMARKS AND

10    UNFAIR COMPETITION ("McCarthy") § 11:85 (5th ed.) (in a crowded field, consumers "may have

11    learned to carefully pick out one from the other" through contextual cues). Even Metabyte's own

12    expert conceded that Meta-formative company names are easily distinguished on job board

13    websites. Ex. 43 at 328:12–330:16 (acknowledging that Indeed displays over 20 different

14    companies with "Meta" in their names and readily distinguishing Defendant's Meta among them).

15        Metabyte argues that the marks are similar because "Meta" is the "dominant" portion but

16    cites no evidence that consumers view "Meta" as the "dominant" portion of its name. Opp. at 9.

17    That argument does not move the needle.[9] It is further belied by Metabyte's claim that "Meta" is a

18    generic term, and thus not distinctive enough to function as a trademark. *See Palm Bay Imps., Inc.*

19    *v. Veuve Cliquot Ponsardin Maison Fondee En 1772*, 396 F. 3d 1369, 1373 (Fed. Cir. 2005)

20    (distinguishing cases where common term was generic and no likelihood of confusion was found).

21    ***Metabyte cannot have it both ways.***

22        Metabyte elsewhere argues that Meta's "family of Meta-formative marks" increases the

23    likelihood of confusion (Opp. at 9), but that is unsupported by the evidence. It is undisputed that

24    Meta (unlike Metabyte) never uses META with another term combined as a single word (Dkt. 79-

25    1 ¶ 35), unlike the family of marks in *Redmond Prods. Inc. v. MK Int'l Importers*. 1990 WL

26    10072484, at *1–2 (C.D. Cal. Aug. 17, 1990) (comparing two sets of multi-word marks). As Meta's

---

[9] Numerous courts have found dissimilarity even where the first few letters overlap. *See Groupion*, 859 F. Supp. 2d at 1073–74; *Quia*, 2011 WL 2749576, at *9 (IXL/iXL); *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 411-14 (D.N.J. 2011) (Fancaster/FANCAST).

1   unrebutted linguistics expert explains, the forms of *meta* in each mark are different, and

2   "[d]ifferences in morphological composition condition how readers visually process words." Ex.

3   47 ¶ 102. Where Meta uses META with another word with a space in between, the second term

4   refers to the underlying Meta product or is a generic term relating to the product.[10] *Id.* ¶ 36. Meta

5   does not have a "byte" product *(id.* ¶ 39), nor does "byte" in its generic sense—meaning eight bits

6   of data (Ex. 7 at 100:22–103:5)—refer to a viable product that any company would offer.

7       Finally, Meta's oppositions at the Trademark Trial and Appeal Board ("TTAB"), have no

8   probative value out of context. TTAB oppositions only determine the right to registration and do

9   not evaluate real-world usage of the marks. *See* McCarthy § 20:15. Metabyte does not address the

10  specific facts of those oppositions such as the goods and services at issue (including whether only

11  a subset were opposed), the identity or bad faith of the applicant, or actual confusion. Metabyte had

12  the opportunity to ask the head of Meta's trademark team about them but chose not to. Dkt. 79-2 ¶

13  10. Notably, ***none*** of the opposed applications covered staffing services. *See generally*, Dkts. 88-

14  37–83. Some involved marks that directly overlapped with Meta's. *See, e.g.*, Dkt. 89-26 (opposing

15  META QUEST MEDIA application). Others were dismissed after the applicant narrowed the scope

16  of its application, indicating that Meta can, in fact, coexist with other META-formative marks in

17  different fields. *See*, *e.g.*, Ex. 85 (dismissing opposition against METAJUNGLE after applicant

18  deleted only opposed class). None involved litigation. Metabyte's haphazard collection of

19  oppositions does not create a factual issue as to similarity of the marks.

## 2.    The Proximity of Goods and Services Factor Favors Meta

21      Metabyte and Meta offer unrelated services: Metabyte offers staffing services, and Meta

22  offers well-known social media and messaging services and VR/AR and AI services. Mot. at 9.

23  Rather than address the evidence and case law cited in Meta's motion, Metabyte attempts to

24  manufacture disputes about the parties' respective goods and services through a self-serving and

25  unsupported declaration from its CEO that is inconsistent with the record:

26

---

27  [10] Metabyte cites to a page on Meta's website that lists the company's various trademarks, including
28  META + [TERM] marks, but provides no further evidence showing how those marks are used and
    the contexts in which they appear. Opp. at 11. This page has no probative value. *PowerFood, Inc.
    v. Sports Sci. Inst.,* 1993 WL 13681782, at *5 (N.D. Cal. Mar. 11, 1993).

- He alleges that Metabyte provides gaming glasses and TV recording devices, along with web design services (which were offered under the brand HotDoodle), but *its own witnesses admit* those product and service lines have been defunct for years or even decades. *Compare* Dkt. 91 ¶¶ 13–15, 23 *with* Ex. 14; Ex. 3 at 170:14–18; Ex. 9 at 29:22–30:3, 138:20–23; Ex. 12; Ex. 4 at 99:7-9; Ex. 8 at 285:24–286:2; Ex. 7 at 174:17–176:6; Ex. 80 at 57:16–22.

- He characterizes the Teamanics business as a "peer-to-peer employee network" to make the business sound like Meta's social media services (Opp. at 12), but he testified under oath that the business is "paused" and "dormant" (Ex. 63 at 8; Ex. 8 at 134:11–25, 239:16–241:1), and its interactive functionalities were never implemented (Ex. 3 at 158:2-11), such that it only ever generated revenue from Metabyte's standard staffing model (Ex. 75 at 77:22-80:13; Ex. 77 at 135:17–136:4). As noted above, Teamanics is a separate brand and company (Ex. 7 at 40:18–20), and Metabyte did not add the METABYTE mark atop the Teamanics.com website until *after* its dispute with Meta arose (Ex. 60, No. 11; Ex. 61, Nos. 109, 111, 113).

The relevant goods and services are Metabyte's *current* ones. *See Legator v. Nordstrom, Inc.*, 2011 WL 13220707, at *9 (C.D. Cal. Dec. 29, 2011) (relatedness factor did not favor plaintiff when it "had almost completely stopped selling" the goods at issue before infringement began); *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1311 n.4 (11th Cir. 1999) (likelihood of confusion analyzed "*as of the current time* and *as between the plaintiff's current products*") (emphasis added). As reflected by the undisputed record, the only services Metabyte has offered under the METABYTE mark in the last five years are staffing and consulting (which are the same, Ex. 5 at 13:15–14:22). Mot. at 2-3; Ex. 78 at 193:25–195:12. Any post-dispute maneuvering by Metabyte (e.g., adding METABYTE mark to Teamanics and HotDoodle) is not relevant. *Infra* § III.C(8).

Metabyte continues to grasp unsuccessfully by pointing to two screenshots produced for the first time in its brief. Opp. at 10. The first is of an unauthenticated Gemini AI overview of an undisclosed Google search run by Mr. Mehta, which Metabyte argues is evidence that Meta's consumers "use Meta to apply for jobs and to network about careers." Dkt. 91 ¶ 47. This screenshot is not helpful or admissible evidence of *anything*. *Iglesia Ni Cristo v. Cayabyab*, 2020 WL 1531349, *5 (N.D. Cal. Mar. 21, 2020) (unauthenticated screenshots not admissible on summary judgment). Even so, a closer look at the links that the Gemini AI overview appears to cite are *for Meta's hiring employees at Meta* (not to apply for a job at a third party). Hiring employees for its own business does not make Meta a staffing company. Dkt. 79-1 ¶ 9 (Meta "does not offer staffing services"). The second screenshot is an unauthenticated Google search result for another undisclosed search entitled "Meta for Developers," which Metabyte argues is evidence that Meta

"provides web hosting services" that overlap with HotDoodle's. Opp. at 11; Dkt. 91 ¶ 48. Setting aside that HotDoodle is not a relevant point of comparison, *supra* p. 11, the linked page lists tools for software developers to **host games** on "Games on Facebook." Ex. 73. The page does not reference "website design" and bears no resemblance to the defunct HotDoodle. *Compare id. with* Ex. 76. There is no evidence to suggest consumers of HotDoodle (which has not had a new client in years) would believe it is associated with Meta. Ex. 9 at 29:22-30:3.

The proper point of comparison is Metabyte's business at the time of Meta's rebrand. On that, the record is undisputed: Metabyte offers specialized staffing services, and Meta does not. Metabyte fails to rebut the evidence Meta submitted on this factor and cannot now create an issue of fact about irrelevant services with an unsupported declaration contradicted by the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (assertion that is "blatantly contradicted by the record, so that no reasonable jury could believe it" will not create a genuine issue of material fact).[11]

### 3.   The Strength of the Marks Factor Favors Meta

Metabyte has no answer to the lack of recognition and commercial weakness of its METABYTE mark, which is relevant to this factor. Although Meta does not dispute the relevance of its trademark's commercial strength, as courts have held, the **senior user's** commercial strength is "highly relevant" in reverse confusion cases. *Aliign Activation Wear, LLC v. lululemon athletica Canada Inc.*, 2021 WL 3117239, at *11 (C.D. Cal. Jun. 7, 2021) (granting summary judgment for defendants in reverse confusion case and finding that the minimal sales of plaintiff's products meant no reasonable juror could find that an appreciable number of consumers are likely to be confused); *see also World Champ Tech LLC v. Peloton Interactive, Inc.*, 2024 WL 665181, at *11 (N.D. Cal. Feb. 16, 2024). This is common sense: for the goodwill in a mark to be threatened, it must have public recognition. Metabyte failed to establish that it does. It describes itself as a "small company" (Opp. at 16) and does not meaningfully dispute that it has done little advertising or that its revenues

---

[11] Although Metabyte argues that the parties' services are "complementary," a cursory review of Metabyte's cases shows that Meta and Metabyte's services are apples and oranges in comparison. *See Stitch Editing v. TikTok Inc.*, 2022 WL 17348179, at *7 (C.D. Cal. Nov. 15, 2022) (both parties sold "video editing services" under name "Stitch"); *Bridgestone Ams. Tire Operations, LLC v. Fed. Corp.*, 673 F.3d 1330, 1332-33 (Fed. Cir. 2012) (both parties sold tires); *Sports Mktg. Monterrey Grp. LLC v. Socios Servs. US Inc.*, 2023 WL 2671379, at *16 (N.D. Cal. Mar. 27, 2023) (both services connected soccer fans with games and related experiences).

1   and client base have decreased annually since 2019. Mot. at 10.[12]

2          Also important to this factor (and undisputed by Metabyte) is that Metabyte coexists among

3   a crowded field of META-formative marks. Dkt. 10 ¶ 35. The evidence submitted by Meta shows

4   the extent of third-party uses, in addition to the numerous META and META-formative names and

5   marks registered at the USPTO and secretaries of state. Meta submitted website screenshots for

6   companies using METABYTE and other META-formative names in connection with staffing-

7   related services, along with Metabyte's admissions as to their use in commerce: Ex. 24 (Metabyte

8   Solutions); Ex. 25 (Metatalent.AI); Ex. 26 (MetaSense, Inc.); Ex. 61 at 9–41, 48–51 (citing third-

9   party uses of META and METASYS). An Indeed company search shows uses of "Meta IT" and

10  "Meta Solutions" for IT support services, and "Meta Business Group" for business consulting. Ex.

11  44. And the 5,000+ page Search Report that was part of Meta's trademark diligence includes web

12  screenshots showing use by Meta-formative businesses Dkt. 79-4 at 2122 (Meta Computers), 2143

13  (Metaconnections), 2356 (MetaLearn), 2428 (Meta Training OU), among many others. These

14  examples, along with the hundreds of registrations for META and META-formative marks *in the*

15  *same classes as Metabyte's registrations* (Ex. 71), are a far cry from the four small technology and

16  engineering companies among hundreds in unrelated fields in *Rearden*, 683 F.3d at 1211. The

17  existence of so many co-existing companies and marks that begin with "Meta" necessarily means

18  ***Metabyte's rights are narrow***. *See Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F.

19  Supp. 2d 1107, 1119 (N.D. Cal. 2010) ("Where the market is inundated by products" with similar

20  marks, "consumers will not likely be confused."). This factor weighs in Meta's favor.

21          **4.    The Sophistication and Degree of Care Factor Favors Meta**

22          Metabyte does not dispute that Metabyte's business customers are sophisticated and that

23  the hiring process for job seekers is lengthy and involved. *See* Mot. at 12–13. Metabyte instead

24  relies on a theory of job seeker "initial interest" confusion (Opp. at 20) that is unsupported and

25  inapplicable, particularly in a reverse confusion case. "[I]nitial interest confusion . . . occurs when

26

27  _____
    [12] Metabyte's argument that a senior user's commercial strength is only relevant when it is
28  descriptive (Opp. at 14) has no merit. In *Aliign*, the court considered widespread third-party use of
    similar marks, as here, without finding ALIIGN was descriptive. 2021 WL 3117239, at *4.

an alleged infringer uses a competitor's mark to direct consumer attention to its product." *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F. 4th 711, 718 (9th Cir. 2024); *see also J.K. Harris & Co. v. Kassel*, 253 F. Supp. 2d 1120, 1124 (N.D. Cal. 2003)). That theory has no footing here:[13] Meta has never used the METABYTE mark, let alone used it to direct consumers to its products. Dkt. 79-1 ¶ 39. Metabyte speculates with no evidence that prospective consumers might assume that *Metabyte's* job posts or HotDoodle-branded web design services come from Meta, and, as a result, choose *not* to apply or enlist those services. Opp. at 20. That is not "initial interest"—it sounds like "initial disinterest," which is not a supported theory. Nor is there any evidence this has ever occurred or is likely to occur, especially given Metabyte's co-existence with hundreds of other "Meta" companies (*supra* p. 13), including dozens on Indeed. Ex. 44.

Finally, focusing again on the wrong demographic instead of its actual customers (*see* § III.B), Metabyte argues that job applicants are "hasty" with their applications. It has no evidence of this, other than to point to Mr. Mehta's declaration, which speculates without foundation about job applicants' mindsets. Metabyte cannot manufacture an issue of fact with this conclusory, unsupported declaration. *John v. United Air Lines*, 2018 WL 11392477, at *1 (N.D. Cal. Sept. 26, 2018) (Chhabria, J.) (granting summary judgment, noting that plaintiff's rebuttal declaration was "too conclusory to create a genuine issue of material fact"). As Professor Golder's unrebutted report explains, given the long-term financial and social implications of employment, "job seekers are motivated to carefully consider and select employment." Ex. 48 ¶ 65. There is no genuine issue in dispute on this factor.

### 5. The Lack of Actual Confusion After Four Years Favors Meta

Given Meta's public rebrand, there were ample opportunities over the past four years for actual confusion to occur if it were likely. *Brookfield Commc'ns v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999). Metabyte admitted there is *none* among Metabyte's actual or prospective clients. Ex. 63, Nos. 6, 16; Ex. 1A. Consistent with the lack of actual confusion, Meta's

---

[13] The other cases cited by Metabyte are also inapposite. Both were brought by established senior users against the use of identical or nearly identical marks, which allegedly drew consumers' attention because they erroneously believed the plaintiffs were behind the use. *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) (involving plaintiff's identical marks); *Bd. of Regents of the Univ. of Hou. Sys. v. Hou. Coll. of L., Inc.*, 214 F. Supp. 3d 573, 587-88 (S.D. Tex. 2016) (Univ. of Houston Law Center and Houston College of Law).

survey of those who would hire a company like Metabyte yielded only 2% confusion. Ex. 52 at 3; Mot. at 14. An analysis of those respondents in *Metabyte's* survey who might be involved in hiring decisions and who viewed part of Metabyte's website indicated a mere 4% confusion. Mot. at 31; Dkt. 80 ¶ 59. These miniscule percentages are strong evidence of ***no*** likelihood of confusion. *See QS Wholesale, Inc. v. Rox Volleyball, Inc.*, 2014 WL 12567147, at *8 (C.D. Cal. Dec. 31, 2014).

With no evidence of confusion among its actual consumers, Metabyte relies on two uncorroborated instances where job seekers (not consumers) allegedly inquired about Meta,[14] and the fatally flawed Boedeker Survey. Neither creates a factual issue as to confusion. To begin, job seekers are not "consumers." *Supra* § III.B. The alleged accounts of unidentified job seekers are also inadmissible hearsay. Opp. at 5-6; Ex. 5 at 103:9–122:22 (describing unnamed job seekers); *see Avery Dennison*, 1999 WL 33117262, at *17–18 (evidence of allegedly confused callers inadmissible hearsay). Even if these two instances were probative or admissible, they would not create a genuine issue to survive summary judgment. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 843, n. 7 (9th Cir. 2002) (inquiry confusion not actual confusion). Metabyte is thus left with the Boedeker Survey, which is so fundamentally flawed at every level, it must be excluded. In any event, it does not create a factual dispute on actual confusion. Mot. § IX.D; Ex. 53. To summarize:

***Survey Universe Problems***. The survey's screeners disproportionately favored alleged "job seeker" respondents over relevant respondents who might actually enlist Metabyte's staffing services. The survey asked respondents to indicate their highest level of education, but it did not exclude the ***319*** (or 18% of) respondents who had only a high school degree, making those respondents unlikely Metabyte job seekers. Ex. 55B; Ex. 82 at 178:20–23; Appendix A at 1. The survey also excluded respondents who indicated that they worked for a company providing "Staffing/Recruiting/Human Resources"—i.e., the people *most likely* to hire Metabyte. Appendix A at 2; Ex. 8 at 41:5–14 (Metabyte staffs Abbott through Manpower, which consolidates staffing

---

[14] Metabyte also aggrandizes its CEO's account of "confusion" at an alumni event (Opp. at 1, 5–6), where an unidentified person, who he concedes was not a Metabyte consumer, commented on "meta" being a "hot" word, which Mr. Mehta never asked him to clarify and which does not indicate confusion. Ex. 86 at 367:8–377:16. Metabyte makes a similar claim about an unidentified bank teller (Opp. at 6), but again, the bank teller was not a Metabyte consumer; Metabyte was a client of the bank. Ex. 77 at 123:1–125:9. Such "confusion" (even if it existed), is not admissible or actionable. *Avery Dennison Corp. v. Acco Brands, Inc.*, 1999 WL 33117262, at *17-18 (C.D. Cal. Oct. 12, 1999).

suppliers); Ex. 75 at 71:9–12 (Samsung point of contact is "staffing coordinator"). Assuming they were not excluded based on the above, respondents were asked about their involvement in hiring decisions *after* indicating they were not looking for a job, such that only 13.6% of respondents said they were involved in "hiring decisions" in their current roles. Mot. at 29.

*Misleading Questions and Stimuli.* Meta discussed the problems with both Mr. Boedeker's framing of Metabyte's business as a "software and innovation company," and his use of an incomplete screenshot of metabyte.com—stripped of its URL (Stimuli 2). Mot. at 29–31. Metabyte ignores or does not meaningfully contend with these arguments.[15] *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (improper to show respondents only part of a package in a false advertising case, noting relevant issue is consumer "reaction to the advertisement as a whole and in context"). As to the problems with Stimuli 1 and 3 (the fabricated webpages based on the inactive teamanics.com website (Mot. at 30-31)), Metabyte defends them by saying they reflect "future branding." Opp. at 24. There is no evidence that these contrived websites or the blue Metabyte logo that appears on them were based on any actual planned website. They do not replicate actual marketplace conditions, as they were supposed to do. *See Kwan Software Eng'g, Inc. v. Forey Techs., LLC*, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014); *see also Vital Pharms., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1272 (S.D. Fla. 2021) (rejecting persuasiveness of survey that used computer-generated images that "departed from real-market conditions in a way that was both biased and misleading"); *see also* Appendix A at 4–8. Finally, while much of Metabyte's opposition focuses on alleged confusion *on job board websites* (Opp. at 17-18), the Boedeker Survey did not test for such confusion.

*Flawed Tabulations of "Confusion."* Beyond the failure to survey the right people or use real-world stimuli, Mr. Boedeker's improper counting of responses significantly inflated the confusion rate. Meta explained that he counted as confused any respondent that mentioned "Meta" or "Facebook," without considering the context. Mot. at 31-32; Appendix A at 10–11. He could not

---

[15] Instead, Metabyte attempts to defend this flaw by arguing that in *Kournikova*, the survey did not show respondents the photos at issue. However, the false endorsement claim in that case was based, in part, on the claims on the magazine's cover, which *was* shown to respondents. *Kournikova v. Gen. Media Commc'ns Inc.*, 278 F. Supp. 2d 1111, 1125 (C.D. Cal. 2003).

say whether he was certain that when respondents mentioned "Meta," they did not mean **other** companies that share that name. [16] Ex. 43 at 335:19–340:11. He could have asked respondents what other services the companies offered to confirm they meant Meta; he did not. Metabyte did not address this error. Discounting the 27 such instances identified by Meta's survey expert, and setting aside all the other problems, the confusion rate for respondents who viewed Stimulus 2 would drop to **less than** 10%. *See* Ex. 53 at 24; Dkt. 80 ¶ 59. *See QS Wholesale*, 2014 WL 12567147, at *8 ("Courts reviewing surveys with confusion rates under ten percent have found no confusion.").

That leaves only the unrebutted survey report of Hal Poret, whose 2% rate of confusion is evidence of **un**likelihood of confusion by Metabyte consumers. *Id.* Also unrebutted is Meta's calculation of "confusion" using Boedeker's own data, showing that even with its biased questioning and incomplete metabyte.com stimuli, of people who identified themselves as involved in hiring, only 4% were arguably confused. Mot. at 31. The lack of evidence of confusion after four years weighs in Meta's favor. *Brookfield*, 174 F.3d at 1050; *Cohn*, 281 F.3d at 842–43.

### 6.    The Marketing Channels Factor Favors Meta

Metabyte does not dispute that the marketing channels it uses to reach its **business customers** do not overlap with Meta's. Metabyte instead points to potential overlap on job websites (where companies post job listings), which Metabyte claims are its primary "marketing channel" to job seekers. Opp. at 17–18; Dkt. 91 ¶ 35; Ex. 58 at No. 61 (conceding that no store, retail website, magazine, or retail outlet features both parties' products). In assessing this factor, "courts consider whether the parties' customer bases overlap **and how the parties advertise and market their products**." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) (emphasis added). Metabyte presents no evidence that job seekers also comprise Meta's customer base, or that Meta offers staffing as a *service* (instead of hiring its own employees). *See supra* § III.B. Metabyte's job postings also are not traditional advertising: it admitted that posting open positions on job boards is necessary to run its business. Opp. at 5; Ex. 83 at 120:10–123:22; Ex. 8 at 260:12–21; Ex.

---

[16] When asking respondents about the source of the websites, the survey asked, "what company or business do you believe **created or runs** this website." Ex. 54, ¶ 43 (Figure 8). Even Mr. Boedeker conceded that this unusual language was overbroad and could suggest a company other than the source of the goods or services offered on the websites. Ex. 82 at 333:21–334:22.

64. Finally, companies' common use of Indeed is no different than having a website, which is not evidence of overlap. *See Network Automation v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011). This factor strongly favors Meta.

### 7.    The Intent Factor Does Not Support a Likelihood of Confusion

There is no evidence that Meta adopted its new corporate identity in bad faith. Meta provided evidence explaining why the company chose the name "Meta" as its new corporate brand. Mot. § II.B. Instead of rebutting that evidence, Metabyte mischaracterizes Meta's diligence in selecting and adopting the META mark. Opp. at 18. As Meta's Brand Director testified, Meta's rebrand was preceded by a deliberative process that involved many stakeholders with different roles. Dkt. 79-1 ¶¶ 10–32. This process included trademark diligence under the purview of Meta's legal team, who worked with outside counsel on trademark clearance and ordered the search report that consisted of approximately 5,000 pages. Ex. 81 at 23:14–18; Dkt. 79-2 ¶¶ 4-8.

The record does not support a finding that Meta "disregarded" Metabyte's rights. Meta witnesses testified that they were not aware of Metabyte or its business until well after the rebrand. Dkt. 79-1 ¶¶ 40–42. That evidence is unrebutted. The evidence also demonstrates a crowded field of co-existing META and META-formative marks. *Supra* p. 13. In that context, the presence of Metabyte's registrations on page 700 of a 5,000+-page report, among nearly 1,600 other marks, is hardly evidence of "bad faith," and Metabyte cites no authority otherwise. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1565 (Fed. Cir. 1987) (no bad faith where plaintiff's marks appeared in a trademark search, as "an inference of 'bad faith' requires something more than mere knowledge of a prior similar mark").

### 8.    The Likelihood of Expansion Factor Favors Meta

The record makes clear there is no '"strong possibility' that either party may expand [its] business to compete with the other," *Ironhawk*, 2 F.4th at 1168. Although a declaration from Metabyte's CEO suggests aspirational plans for Metabyte to scale its peer network, increase its advertising, and expand its business, these self-serving statements do not overcome the lack of any record evidence of such plans. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *see also* Mot. at 16 (describing Metabyte's steady decline since 2019, lack of investment

leads, and lack of any defined expansion plan). Regardless, Metabyte's purported "expansion" does not change the nature of the services it provides or the fact that they bear no proximity to Meta's offerings. Before the business was paused, Teamanics was a staffing and job placement platform. Dkt. 91 ¶ 16. The interactive functionalities of the platform were never implemented (Ex. 3 at 154:24–158:1), and Metabyte has presented no evidence showing how users interacted with the platform or how it compares to Meta's offerings. Whether Metabyte re-starts a "peer network" under the METABYTE mark, there will be no impending overlap with Meta's products.

Trying to avoid the implications of its litigation-motivated manipulation of its websites (Mot., § II.D), Metabyte argues it was merely "centraliz[ing]" the services it was already providing under the METABYTE mark, suggesting this was part of the company's natural evolution. Opp. at 18-19. However, the Teamanics "peer network" was launched under the TEAMANICS mark, not a sub-brand, through a separate entity. Ex. 7 at 40:18–20; Ex. 61 at 5, 46; Ex. 79. The HotDoodle service was also offered under the HOTDOODLE mark for over a decade prior to this dispute. Ex. 61 at 5, 46. Metabyte's decision to add the METABYTE mark to Teamanics' and HotDoodle's websites, add "MetaPeerNet" to Teamanics' website, and purchase meta-formative domains such as metapeernetwork.com (Mot. at 7) **after** this dispute arose, exposes Metabyte's activities as precisely the type of newly stated expansion efforts and maneuvering that should not be considered. *Groupion*, 859 F. Supp. 2d at 1077 n.6.

## IV.   NO REASONABLE JURY COULD FIND THAT THE META MARK IS GENERIC

A trademark is generic if it primarily describes a type of product or service rather than the producer. *Elliott v. Google, Inc.*, 860 F.3d 1151, 1155 (9th Cir. 2017). The undisputed evidence shows that consumers understand META to refer to a producer—Meta Platforms—not to nonexistent type of product or service called a "meta." Mot. at 21–22. Meta's unrebutted linguistics expert explained that "meta" is not generic in the domains of software and the internet, pointing to contemporary and historical dictionary definitions (Ex. 47, ¶¶ 36, 39–42, 47–51) and how the term is treated in the media (*id.*, ¶¶ 80–87). As Metabyte recognizes, Meta uses META as a trademark (Mot. at 21) and that the PTO has never refused Meta's META applications as generic (Mot. at 21; Dkt. 79-2 ¶ 14.   In opposition, Metabyte does not raise a genuine issue of material fact.  It does not

and cannot identify any genus of goods or services for which META is generic; it only vaguely refers to the "technology industries, specifically software, internet, and media industries." Opp. at 22. These are not goods or services, or even a category of goods or services.[17]

Nor can Metabyte manufacture a factual dispute through Mr. Mehta's declaration. Opp. at 21–22. Mr. Mehta is not an expert in linguistics or any other field relevant to the issue of genericness. He baldly asserts that "meta" is "part of the functional language developers and tech companies use" and that "meta" is a "linguistic component in the software, internet, and media industries." Dkt. 91 ¶¶ 51–52. Although ambiguous, Metabyte's theory is, apparently, that "meta" is generic *ab initio*. That theory is unrecognized by the Ninth Circuit. *See S.D. Comic Convention v. Dan Farr Prods.*, 2017 WL 4227000, at *4, *9 (S.D. Cal. Sept. 22, 2017), *aff'd*, 807 F. App'x 674 (9th Cir. 2020) ("[t]he Ninth Circuit has not recognized a genericness *ab initio* theory" which alleges mark is generic "before a producer began using it"). Courts have rejected the notion that a term is generic simply because it is a commonly used term. Mot. at 20 (citing cases).

Metabyte also claims that that Meta uses "metadata" and "metatags" (words with different meanings than "meta") and points to a lengthy design exploration deck (without any context), Mr. Mehta's unsupported allegations, and a purported "user manual" (not reflected in the cited exhibit). Opp. at 21–22. These arguments take it nowhere. There is no product or service called a "meta," which is the term at issue. If anything, Metabyte's argument that "Meta's ubiquitous marketing and promotional activities create the impression that anything-meta. . . comes from the company called Meta" (Opp. at 23) proves that META is ***not generic***. *Elliott*, 860 F.3d at 1155 (a generic term, by definition, "do[es] not identify the source of a product.").

## V.    CONCLUSION

Meta respectfully requests that the Court grant its motion for summary judgment as to all of Metabyte's claims, deny Metabyte's motion as to laches, and exclude or limit the opinions of Metabyte's experts.

---

[17] Metabyte also accuses Meta of "selectively defin[ing] its services to avoid a finding of genericness." *Id.* But in pointing out that Metabyte has not identified any type of product for which "meta" is generic, Meta is not "avoiding" anything; it is merely stating the standard for generic terms. *See Elliott*, 860 F.3d at 1155.

1    Dated:   July 24, 2025                          COOLEY LLP

2

3                                                    _____
                                                     Bobby Ghajar
4                                                    Stephanie Schuyler
                                                     Colette Ghazarian
5
                                                     Attorneys for Defendant
6                                                    META PLATFORMS, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28