Karthik K. Murthy
MURTHY PATENT LAW INC.
3984 Washington blvd.
Suite 324
Fremont, CA 94538
Email: K@murthypatentlaw.com
Telephone: 425-968-5342

*Attorneys for Plaintiff*
*Metabyte, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| METABYTE INC. | Case No. 3:23-cv-04862-VC |
| Plaintiff, | **CORRECTED OPPOSITION TO META, INC'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| META PLATFORMS, INC. | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS. | |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ..................................................................................2

        A.      Metabyte's Background and Trademarks ....................................................2

        B.      Metabyte's Centralization of Its Branding..................................................3

        C.      Promotion of Metabyte's Services ..............................................................4

        D.      Meta's Rebranding and Confusion ..............................................................5

III.    SUMMARY JUDGMENT STANDARD..................................................................6

IV.     THE CONFUSION FACTORS ARE DISPUTED AND FAVOR A FINDING
        OF   LIKELY CONFUSION ..................................................................................8

        A.      Similarity.....................................................................................................8

        B.      Relatedness of Goods................................................................................10

        C.      Strength .....................................................................................................14

        D.      Actual Confusion ......................................................................................16

        E.      Marketing Channels ..................................................................................17

        F.      Deliberate Disregard of Likely Reverse Confusion..................................18

        G.      Likelihood of Expansion...........................................................................18

        H.      Sophistication of Consumers ....................................................................19

V.      META's moTION FOR SUMMARY JUDGMENT OF DAMAGES ALSO
        SHOULD BE DENIED ..........................................................................................21

VI.     The Meta mark is a generic prefix that must be available in The Tech Industry. .........................21

VII.    Metabyte's survey expert should not be excluded..................................................23

        A.      The Survey Population................................................................................24

        B.      The Test Stimulus......................................................................................24

        C.      The Results.................................................................................................25

        D.      The Boedeker Report Regarding The Economic Impact of Meta's
                Attempt to Overrun Meta-formative brands ..............................................25

VIII.    metabyte's damage expert should not be excluded..........................................................25

    A.    Mr. Sheff Is Qualified To Provide A Damages Analysis ....................................26

    B.    Sheff's Valuation Damages Metric Has Support In Law And Fact..................26

        1.    Sheff's Market Method Estimate Of $69 Million Based On The Only Transaction Meta Would Provide Is Reliable..............................26

        2.    Sheff's Cost method estimate of $988,142.06 does not fabricate costs and is in line with Generally Accepted Methods..........................27

        3.    Mr. Sheff's Disgorgement Calculation Is Admissible...........................27

IX.    Metabyte's laches motion should be granted..........................................................27

X.    CONCLUSION......................................................................................................28

iii

# TABLE OF AUTHORITIES

Cases                                                                                          Page(s)

*A & H Sportswear*,
    237 F.3d ...................................................................................................................... 14

*Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*,
    944 F.2d 1446 (9th Cir.1991) .................................................................................... 16

*Am. Int'l Grp., Inc. v. Am. Int'l Bank*,
    926 F.2d 829 (9th Cir. 1991) ..................................................................................... 16

*Ameritech, Inc. v. Am. Info. Techs. Corp.*,
    811 F.2d 960 (6th Cir. 1987) ....................................................................................... 6

*Analytic Recruiting, Inc. v. Analytic Res., LLC*,
    156 F. Supp. 2d 499 (E.D. Pa. 2001) ...................................................................... 13

*Cotton v. City of Eureka, Cal.*, No. C,
    2010 WL 5154945 (N.D. Cal. Dec. 14, 2010) ......................................................... 25

*Attrezzi, LLC*,
    436 F.3d ...................................................................................................................... 14

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
    841 F.2d 486 (2d Cir. 1988) ........................................................................................ 7

*Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of L., Inc.*,
    214 F. Supp. 3d 573 (S.D. Tex. 2016) ..................................................................... 20

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*,
    376 F.3d 8 (1st Cir. 2004) ......................................................................................... 13

*Bellagio Jewelry, Inc. v. Croton Watch Co.*,
    2008 WL 3905895 (C.D. Cal. Aug. 20, 2008) ........................................................ 12

*Bridgestone Americas Tire Operations, LLC v. Fed. Corp.*,
    673 F.3d 1330 (Fed. Cir. 2012) ................................................................................ 11

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ............................................................................ 12, 16

*CES Pub. Corp. v. St. Regis Publications, Inc.*,
    531 F.2d 11 (2 Cir. 1975) ......................................................................................... 21

*Coach, Inc. v. Jay*,

2015 WL 12681378 (C.D. Cal. June 25, 2015) ................................................................ 16

*Cohn v. Petsmart, Inc.*,
   281 F.3d 837 (9th Cir. 2002) ....................................................................................... 12

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*,
   214 F.3d 432 (3d Cir. 2000) ..................................................................................... 6, 19

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 593 (1993) ..................................................................................................... 25

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
   109 F.3d 1394 (9th Cir. 1997) ....................................................................................... 8

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
   142 F.3d 1127 (9th Cir. 1998) ....................................................................................... 6

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
   967 F.2d 1280 (9th Cir. 1992) ..................................................................................... 11

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) ................................................................................... 7, 8

*E-Sys., Inc. v. Monitek, Inc.*,
   720 F.2d 604 (9th Cir. 1983) ....................................................................................... 27

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ................................................................................Passim

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ....................................................................................... 8

*Healix Infusion Therapy, Inc. v. Healix, Inc.*,
   2018 WL 1801149 (S.D. Tex. Apr. 16, 2018) ............................................................. 12

*In re Cordua Rests., Inc.*,
   823 F.3d 594 (Fed. Cir. 2016) ..................................................................................... 22

*Instructure, Inc. v. Canvas Techs., Inc.*,
   2022 WL 43829 (D. Utah Jan. 5, 2022) ..................................................................... 13

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
   559 F.3d 985 (9th Cir. 2009) ....................................................................................... 27

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
   2 F.4th 1150 (9th Cir. 2021) ................................................................................Passim

*J.K. Harris & Co., LLC v. Kassel*,
   253 F. Supp. 2d 1120 (N.D. Cal. 2003) ....................................................................... 20

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) ................................................................................................ 7

*Kournikova v. Gen. Media Commc'ns Inc.*,
   278 F. Supp. 2d 1111 (C.D. Cal. 2003) ................................................................................ 24

*Kumho Tire v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................................... 25

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
   119 F.4th 711 (9th Cir. 2024) ............................................................................................... 20
*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, No. C,
   2008 WL 4614660 (N.D. Cal. Oct. 16, 2008) ...................................................................... 17

*Marketquest Grp., Inc. v. BIC Corp.*,
   862 F.3d 927 (9th Cir. 2017) ............................................................................................ 7, 18

*Mattel Inc. v. Funline Merch. Co.*,
   81 USPQ2d 1372 (TTAB 2006) .............................................................................................. 9

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ............................................................................................... 20

*Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*,
   396 F. 3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005) ............................................................... 9

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
   354 F.3d 1020 (9th Cir. 2004) ......................................................................................... 17, 20

*Playmakers LLC v. ESPN, Inc.*,
   376 F.3d 894 (9th Cir. 2004) ................................................................................................. 11

*Pom Wonderful LLC v. Hubbard*,
   775 F. 3d 1118 (9th Cir. 2014) .............................................................................................. 18

*PowerFood, Inc. v. Sports Sci. Inst.*,
   1993 WL 13681782 (N.D. Cal. Mar. 11, 1993) .................................................................... 15

*Presto Prods., Inc. v. Nice-Pak Prods.*, Inc.,
   9 USPQ2d 1895 (TTAB 1988) ................................................................................................ 9

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) ......................................................................................... 12, 15

*Rexel, Inc. v. Rexel Int'l Trading Corp.*,
   540 F. Supp. 2d 1154 (C.D. Cal. 2008) ................................................................................ 16

*S10 Ent. & Media LLC v. Samsung Elecs. Co.*,
   2023 WL 1936350 (C.D. Cal. Feb. 1, 2023) ........................................................................... 7

*Skydive Arizona, Inc. v. Quattrocchi*,
  673 F.3d 1105 (9th Cir. 2012) ................................................................. 21

*Sports Mktg. Monterrey Grp. LLC v. Socios Servs. US Inc.*,
  2023 WL 2671379 (N.D. Cal. Mar. 27, 2023) ................................... 9, 10, 18

*Stitch Editing Ltd. v. Tiktok Inc.*,
  2022 WL 17348179 (C.D. Cal. Nov. 15, 2022) ................................... 10, 17

*Stone Lion Capital Partners, L.P. v. Lion Capital LLP*,
  746 F.3d 1317 (Fed.Cir.2014) ................................................................. 22

*Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*,
  601 F.2d 1011 (9th Cir. 1979) ................................................................. 21

*Traffix Devices Inc. v. Marketing Displays Inc.*,
  532 U.S. 23, 121 S.Ct. 1255 (2001) ........................................................ 23

*Treemo, Inc. v. Flipboard, Inc.*,
  53 F. Supp. 3d 1342 (W.D. Wash. 2014) ................................................ 15

*Ultrapure Systems, Inc. v. Ham-Let Group*,
  921 F. Supp. 659 (N.D. Cal. 1996) ........................................................ 16

*United States v. Hankey*,
  203 F.3d 1160 (9th Cir.2000) ................................................................. 25

*Viterbo v. Dow Chemical Co.*,
  826 F.2d 420 (5th Cir. 1987) ................................................................. 26

*Walter v. Mattel, Inc.*,
  210 F.3d 1108 (9th Cir. 2000) ................................................................. 14

*World Champ Tech. v. Peloton*,
  2024 WL 665181 (N.D. Cal. Feb. 16, 2024) ....................................... 14, 15

*Wreal, LLC v. Amazon.com, Inc.*,
  38 F.4th 114 (11th Cir. 2022) ............................................................... 6, 10

Statutes

15 U.S.C. § 1052(e)(5) ............................................................................ 21

28 U.S.C §1117 ..................................................................................... 27

28 U.S.C §1117(a) ................................................................................. 27

U.S.C. § 1051(a)(2), (b)(2) ..................................................................... 22

Rules

Fed. R. Evid. 702(c) ...................................................................................................... 26

Regulations

37 C.F.R. §§ 2.32(a)(6), 2.71(a) .................................................................................... 22

Other Authorities

2 McCarthy § 12:23 ....................................................................................................... 22

4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2020) .................................... 6, 18

1  **I.    INTRODUCTION**

2     This case is about willful infringement of an incontestable, federally registered trademark.  One

3  of the biggest corporations in the world, Meta Platforms, Inc. ("Meta") – knowing that many others had

4  for years adopted distinctive trademarks using "META" as a prefix – adopted this prefix as its

5  "exclusive" brand.  Meta branched out from there with a multitude of META-formative marks over

6  which it also claims "exclusive" rights.  Fueled by Meta's obscenely large marketing investment in its

7  new branding, it is no surprise that consumers now believe that META-formative brands, however long

8  they have belonged to others, are part of Meta. Metabyte, Inc. must struggle with reverse confusion to

9  the point where Metabyte's CEO cannot attend an alumni event – alongside Meta's general counsel –

10  without becoming the butt of jokes about his efforts to capitalize on Meta's reputation.

11     The evidence supports strong inferences that every confusion factor will be resolved in

12  Metabyte's favor.  Court after court admonishes that summary judgment on the issue of likely confusion

13  is reserved only for the clearest of cases.  Meta cannot skip the jury, as it tries to do, with a skewed

14  characterization of the evidence that ignores the reasonable conclusions a jury might reach.  Summary

15  judgment motions do not resolve difficult factual disputes. In addition to resolving disputes in its own

16  favor, Meta's motion ignores the import of undisputed facts including the hypocrisy of Meta's utter

17  indifference about prior Meta-formative marks while broadly enforcing its own so-called rights.  Meta's

18  marks also are undisputedly commercially strong (favoring confusion) and Metabyte obviously might

19  naturally add taglines mentioning its trademark to its branding (favoring confusion).

20     Where there has been infringement, there almost certainly has been harm.  Meta attacks

21  Metabyte's damage expert but there is nothing wrong with the expert's credentials.  And even if the

22  expert were excluded, that is no reason at the summary judgment stage to rule out all damages.  When

23  all the facts and applicable legal principles are considered, not only must this motion be denied, but the

24  jury likely will conclude Meta has infringed Metabyte's trademark and should pay damages.

1    **II.    FACTUAL BACKGROUND[1]**

2        **A.    Metabyte's Background and Trademarks**

3        Meta makes its best efforts to paint Metabyte as a fly-by-night enterprise, in business only to sue

4    Meta.  But Metabyte started using its brand in 1993, 32 years ago.  Since it was founded, Metabyte's

5    revenues have surpassed $100 million. Declaration Of Manu Mehta In Support Of Metabyte Inc.'s

6    Opposition To Defendant's Motion For Summary Judgment ("Mehta Dec.") ¶ 5.  Though business is

7    slower at this moment in time, Metabyte's 2024 revenue exceeded a high revenue, sufficient as Meta

8    well knows, to support use of trademarks in commerce.  Id. at ¶ 41.  Unlike META, the METABYTE

9    trademark is a coined term that nods to its founder's name "Mehta."  Id. at ¶ 6.

10       Metabyte owns federal trademark registrations for METABYTE for a number of goods and

11   services.  Id. at ¶¶ 7-9.  These were registered long before Meta changed its name and, in 2020,

12   Metabyte's registration for designing computer software and programming for others, and consulting in

13   IT project management became incontestable.  Id. at ¶ 8.  Metabyte also has a registration covering

14   online business networking services, networking to find employment, and employment hiring,

15   recruiting, placement and career networking services, with use starting in 2018, and for web hosting

16   services, for use starting in 2005.  Id. at ¶ 9.

17       Metabyte has a distinguished history including early work on Unix software, design of operating

18   system interfaces, development of early generation VR goggles and sophisticated technology for Digital

19   Video Recorders or DVRs.  Mehta Dec. ¶ 12 -14.  Metabyte also provided a range of consulting,

20   outsourcing, and staffing services to technology companies such as Intel, Samsung, S3, Mylex (later

21   acquired by IBM), Altera, Racore, Alliance Semiconductor, and Trident Microsystems.  *Id.*

22       Metabyte's work-for-hire services have traditionally included a mix of staffing, consulting,

23   outsourcing, and managed services for large clients such as Abbott Labs, Samsung, and Cisco. Id. at ¶¶

24   18, 24.  In 2018, as an adjunct to its staffing and recruitment, and off-site project business, Metabyte

25   developed a Software as a Service (SaaS) career platform, which it launched under the sub-brand

---

[1] This summary judgment motion is not about Metabyte's business circumstances, its confidential settlement offers (which, in addition to being irrelevant, should not have been misleadingly presented to the Court – see Mehta Dec. ¶¶ 26, 27), trademark applications that have been withdrawn, or the mantra of every reverse confusion defendant that any small trademark owner trying to protect itself from extermination is really just seeking a "windfall."

1  "Teamanics."  This service is based on Metabyte's patented technology that uses peer-based skill ratings

2  of employees to automate hiring for employers and provide growth opportunities for employees. The

3  platform delivers time and labor savings for employers, and cross-industry career opportunities for

4  employees by identifying overlapping skill sets.  Id. at ¶ 16.

5      While the original vision was to spin off the peer networking service into a separate company,

6  Teamanics, the pandemic interfered with fund-raising and Metabyte continues to operate the career

7  platform business within Metabyte. Id. at ¶ 17. All employees and technology have always remained,

8  and continue to remain, within Metabyte. Job postings for customer positions have always been

9  advertised on public job boards, such as Indeed.com, under Metabyte's name, and job seekers informed

10  that they would be employed either by Metabyte or the end-customer. Id. at ¶ 17.

11      In 2008, Metabyte launched a website design, building and hosting platform. It sub-branded this

12  effort as "HotDoodle." Id. at ¶ 15. The business originally was based on patented collaboration

13  technology that allowed non-technical users to create, edit, and manage websites together without any

14  programming skills. The platform enabled everyday users such as students, parents, writers, and

15  photographers — called 'PenPals' —  to create, edit, and manage websites for themselves or others and

16  get paid through the Metabyte HotDoodle marketplace. Id. at ¶ 15.  Metabyte also provided these

17  services using its own employees or independent contractors. The services included cloud editing,

18  secure hosting, search engine optimization, email accounts, domain name purchase, and e-commerce

19  transactions. Id. at ¶ 15. While Metabyte eventually discontinued the "PenPal" concept, it continues to

20  provide support services using its own staff. Hundreds of small businesses, such as chiropractors,

21  lawyers, restaurant owners, retail shops, hypnotherapists, sheet metal shops, and others across the United

22  States continue to use HotDoodle.  Id. at ¶ 15.

23      **B.    Metabyte's Centralization of Its Branding**

24      Because Metabyte had decided to defer its plans to spin off the peer-ratings career platform

25  business as Teamanics, Metabyte took steps to refocus its branding while its career networking services

26  continued operating it as part of its core Metabyte business. Mehta Dec. ¶¶ 30-31.   Graphics were

27  prepared for taglines featuring the main brand, as is natural and customary.  Id. at ¶¶ 30-31. As part of

28  that process, Metabyte updated the tagline to "Metabyte Peer Network," after experimenting with

1    alternatives, and adding "Web Services by Metabyte" to the Hotdoodle site.  Id. at ¶¶ 30-31.

2        Metabyte even previewed these changes to Meta on the theory that, given Meta's denial of any

3    confusion, it must agree that the natural evolution to Metabyte's products branding would not be

4    confusing.  Meta's response was to assert that the changes were designed to cause confusion and that

5    Metabyte was guilty of unclean hands. Id. at ¶ 32.  Far from manufacturing likely confusion, Metabyte

6    has delayed some of its changes and promotion of the peer networking products as a result of Meta's

7    contentions.  It remains Metabyte's plan to implement these changes, though there is little question in

8    view of consumer surveys that there is confusion now and that it will continue after these changes are

9    implemented.  Id.  at ¶ 32.

10        **C.**    **Promotion of Metabyte's Services**

11        The Metabyte Peer Network initially focused on the medical industry—particularly small clinics,

12    doctors' offices, physical therapists, dentists, chiropractors, and similar healthcare providers. Later it

13    diversified into banks, and Metabyte plans to scale it to businesses of all sizes and industries. Mehta

14    Dec.  ¶¶ 20, 33. Metabyte's addresses the entire U.S. as its market, with occasional activity in foreign

15    countries. Metabyte has conducted business in a majority of the U.S. states over the years, and the

16    Metabyte Peer Network is expected to expand it further. Id. at ¶ 34.

17        Metabyte's staffing and peer networking business sells to a two-sided market, serving both

18    businesses and workers/job seekers. On one side, Metabyte's customers include businesses of all sizes—

19    from small enterprises to large corporations.  On the other are workers and job seekers, representing a

20    broad cross-section of the working population. Metabyte's services span roles from warehouse workers

21    and medical receptionists to lab technicians, software developers, bank tellers, and physical therapists—

22    an ever-evolving and diverse mix. Id. at ¶ 33.

23        Metabyte sells to business clients via telephone, emails, networking, and referrals. Metabyte's

24    advertising channels include paid campaigns via Google Ads, online affiliate networks like Groupon,

25    and once even Facebook, to target small businesses for services such as website creation. Mehta Dec. ¶

26    35.

27        Metabyte's primary method of selling/recruiting to workers and job seekers has been online

28    advertising, particularly through job boards such as Indeed.com and social platforms like LinkedIn and

1    sometimes telephone. Metabyte has also occasionally used other channels, such as Craigslist. Mehta

2    Dec. ¶ 35. Metabyte employs an efficient advertising strategy by using job postings not only to fill open

3    positions but also to build its broader talent network. Even when applicants are not hired, Metabyte

4    retains their profiles for future outreach and marketing. In addition, applicants are invited to request skill

5    ratings from their peers, some of whom may also join the peer network. Advertising dollars spent on job

6    listings serve a dual purpose — supporting both immediate operational needs and long-term marketing

7    and platform growth. Metabyte signed up over 66,000 users into its peer network. Id. at ¶¶ 39, 42.

8    These are the channels Metabyte plans to use in the future as it scales the Metabyte Peer Network.  Id.

9           Metabyte's SaaS or cloud-based services cater to customers of all sizes. For example, Metabyte's

10   web services platform, HotDoodle, has been providing website design, building and hosting services to

11   small businesses such as chiropractors, lawyers, restaurant owners, retail shops, hypnotherapists, sheet

12   metal shops, and others across the United States since 2008. Id. at  ¶ 15.

13          **D.      Meta's Rebranding and Confusion**

14          Meta ignores the vast reach of its businesses and peer-to-peer social networks when it tries to

15   downplay likely confusion.  Meta devotes specific parts of its business to using its own peer-to-peer

16   networks as the foundation for hiring, recruitment and career networking.  Mehta Dec.¶ 47.  Mehta also

17   promotes its own website hosting and design services. Id. at ¶ 48.  While these appear confined to

18   games, how long can that last given Meta's vast reach?  More to the point, will consumers not assume

19   Meta would expand its web hosting services?

20          While Meta disregards consumer anecdotes of confusion, there have been several such incidents,

21   all corroborated by a consumer survey.  In addition to teasing at alumni events based on the assumption

22   Metabyte was riding Meta's coattails, other confusion has been reported:

23   •   In summer of 2022, a job candidate was considering a position at Abbott Labs that had been

24       advertised by Metabyte. During a phone conversation with Metabyte's Director of Client

25       Services, Aradhana Mehta, the candidate remarked—words to the effect of—"You are not Meta!

26       Then, why have you named yourself Metabyte?"  Metabyte was ultimately unable to close this

27       candidate.

28   •   In Fall of 2022, a job candidate was considering a position at Abbott Labs that had been

1    advertised by Metabyte. During a phone conversation with Ms. Mehta, the candidate remarked—

2    words to the effect of—"Is Metabyte a part of Meta?" Metabyte was ultimately unable to close

3    this candidate.

4  •  In the summer of 2023, Ms. Mehta, visited the Wells Fargo branch located at 46973 Warm

5    Springs Blvd, Fremont, CA 94539. As she spoke with the friendly teller, the conversation turned

6    to work. When Ms. Mehta mentioned that she worked for a company called Metabyte, the teller

7    responded with words to the effect of — "Oh, you work at Meta! Facebook!" Mrs. Mehta

8    clarified that Metabyte was not related to Meta, to which the teller reacted with surprise.

9  Mehta Dec. ¶ 45.

10   **III.    SUMMARY JUDGMENT STANDARD**

11      This case involves reverse confusion.  "[T]he doctrine of reverse confusion is designed to

12   prevent the calamitous situation [where] a larger, more powerful company usurp[s] the business identity

13   of a smaller senior user." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432,

14   445 (3d Cir. 2000).  "[R]everse confusion occurs when a person who knows only of the well-known

15   junior user comes into contact with the lesser-known senior user, and because of the similarity of the

16   marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user.

17   *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998).  This occurs when

18   "the junior user's advertising and promotion so swamps the senior user's reputation in the market that

19   customers are likely to be confused into thinking that the senior user's goods are those of the junior

20   user[.]" 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2020) (citations and

21   footnotes omitted); *Dreamwerks*, 142 F.3d at 1130 n.5.

22      There are multiple hazards faced by the trademark owner whose mark is overrun by a large

23   junior user. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021) ("[T]he result of

24   reverse confusion 'is that the senior user loses the value of the trademark—its product identity, corporate

25   identity, control over its goodwill and reputation,… (citing *Ameritech, Inc. v. Am. Info. Techs. Corp.*,

26   811 F.2d 960, 964 (6th Cir. 1987))).  This concern specifically encompasses the "ability to move into

27   new markets." *Id.*  Consumers who believe a junior user would need to sponsor or approve a senior

28   user's offered services under the mark will view the senior user as an interloper. *Wreal, LLC v.*

6

1  *Amazon.com, Inc.,* 38 F.4th 114, 128 (11th Cir. 2022) ("[C]onsumers may come to believe the smaller,

2  senior user of the mark is itself a trademark infringer."); *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841

3  F.2d 486, 490 (2d Cir. 1988) ("consumers may consider [senior user] an unauthorized infringer, and

4  [junior user's] use of the mark may in that way injure [senior user's] reputation and impair its good

5  will").

6        Meta's summary judgment motion, accordingly, must be measured against these risks of likely

7  reverse confusion, and summary judgment is disfavored in this context. *See JL Beverage Co., LLC v.*

8  *Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016) ("Because the determination is based on a

9  non-exhaustive, multi-factor, fact-intensive inquiry, we have cautioned against granting summary

10  judgment in these cases."); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618

11  F.3d 1025, 1039 (9th Cir. 2010) ("Because of the intensely factual nature of trademark disputes,

12  summary judgment is generally disfavored in the trademark arena."); *S10 Ent. & Media LLC v. Samsung*

13  *Elecs. Co.*, No. 221CV02443CASJPRX, 2023 WL 1936350, at *6 (C.D. Cal. Feb. 1, 2023) (quoting

14  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002)). "When assessing reverse

15  confusion on summary judgment, we ask whether a genuine dispute of material fact exists as to the

16  likelihood of confusion. Specifically, whether a reasonable jury could conclude that consumers would

17  believe [the junior user] is the source of, or a sponsor of, [the senior user's Mark]." *Ironhawk*, 2 F.4th at

18  1160 (citation omitted). "Each of the *Sleekcraft* factors presents a highly factual inquiry that considers

19  competing evidence. So too does balancing these factors to determine, under the totality of the

20  circumstances, whether a likelihood of confusion exists. *Id.* at 1169. The court will "view the evidence

21  in the light most favorable to" Metabyte. *Marketquest Grp., Inc. v. BIC Corp.,* 862 F.3d 927, 931-32

22  (9th Cir. 2017).

23        Referring to this "highly factual inquiry," the *Ironhawk* court reversed summary judgment on a

24  theory of reverse confusion because it found genuine factual issues as to the *Sleekcraft* factors, as well as

25  the relevant market in which those factors must be weighed. 2 F.4th at 1160-68; *see also S10 Ent.,* WL

26  1936350, at *8 ("[B]ecause 'no mechanistic formula or list can set forth in advance the variety of

27  elements that comprise the market context from which the likelihood of confusion must be determined,'

28  the Court cannot rule as a matter of law that this factor could not weigh in favor of likelihood of

1    confusion." (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1404 (9th Cir.

2    1997)).  "Where conflicting facts render it unclear whether a likelihood of confusion exists, summary

3    judgment is inappropriate." *Ironhawk*, 2 F.4th at 1161-62.

4        Applied to this case, Meta cannot simply render it "undisputed" that hundreds of millions of

5    dollars in advertising – spent on a large family of Meta marks, across a wide range of services --  has

6    had no impact on consumers.  "Rebuttal" expert testimony does not establish the absence of actual

7    confusion.  Yet Meta repeatedly bases its arguments on extracts from the record without regard to the

8    countervailing evidence that a jury might credit as more sound.  On summary judgment, the Court's task

9    is to credit Metabyte with all reasonable inferences.

10   **IV.    THE CONFUSION FACTORS ARE DISPUTED AND FAVOR A FINDING OF**
11   **LIKELY CONFUSION**

12       When the full record is considered, it is clear that the likelihood of confusion factors sufficiently

13   favor Metabyte's infringement claims to warrant a jury and denial of the motion.

14   **A.    Similarity**

15       The similarity factor, of course, is important to evaluating likely confusion.  Three general

16   principles govern.  First, "[s]imilarity is best adjudged by appearance, sound, and meaning."

17   *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).  Second, the marks are

18   "considered in their entirety and as they appear in the marketplace."  *GoTo.com, Inc. v. Walt Disney Co.*,

19   202 F.3d 1199, 1206 (9th Cir. 2000).  Third, "similarities are weighed more heavily than differences."

20   *Id.* at 1206 (citation omitted).  The greater the similarity between the two marks at issue, the greater the

21   likelihood of confusion.  *Id.*  Meta cannot credibly argue the marks don't look and sound similar. [2]

22   Although Metabyte is a mash up of generic terms into an arbitrary mark, they start with the same prefix

23   and will be understood to have related meaning.  Meta admits that its mark conveys "technologies that

24   move beyond what is possible today" while Metabyte conveys "involvement with technology."  Dkt. 79

25   at 9.  Does this really make the marks distinct to consumers as a matter of law?

26       Meta argues "[n]o reasonable factfinder" could find that META is similar to METABYTE.

---

[2] For example, Meta's lawyers mixed up Meta and Metabyte in correspondence and deposition questions
in the very setting where they sought to prove the dissimilarity.  Murthy Dec. ¶ 99 (referencing Ex. 113),
¶ 109 (referencing Ex. 123).  Metabyte does not claim this resulted because the lawyers themselves were
confused, but because the marks are similar

1    Dkt. 79 at 3.  In support, it displays two renditions side-by-side including, on one side, Meta's mark with

2    its infinity slogan and Metabyte's mark in its stylized format. *Id.*  This is by no means the exclusive way

3    in which the parties present their marks.  For example: the marks appear in job listings in plain text.

4    Mehta Dec. ¶ 36.  The initial part of a mark is typically more dominant in consumer perceptions, and

5    here the "Meta" component is identical in both marks.  Consumers are generally more inclined to focus

6    on the first word, prefix or syllable in any trademark or service mark.  See *Palm Bay Imps., Inc. v. Veuve*

7    *Clicquot Ponsardin Maison Fondee En 1772*, 396 F. 3d 1369, 1372, 73 USPQ2d 1689, 1692 (Fed. Cir.

8    2005); see also *Mattel Inc. v. Funline Merch. Co*., 81 USPQ2d 1372, 1374-75 (TTAB 2006); *Presto*

9    *Prods., Inc. v. Nice-Pak Prods.*, Inc., 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a

10   mark which is most likely to be impressed upon the mind of a purchaser and remembered" when making

11   purchasing decisions).  Meta admits it wanted a "plosive" mark and the memorable part, Meta, sticks

12   out.

13         In addition, Meta's newly minted family of Meta-formative marks increases the likelihood that

14   Meta's mark will be viewed as similar to Metabyte's mark. *Redmond Prods. Inc. v. MK Int'l Importers*,

15   No. CIV. A. 90-716-DT(KX), 1990 WL 10072484, at *4 (C.D. Cal. Aug. 17, 1990) (with regard to the

16   first test, similarity of the marks, Redmond's "AUSSIE" family of marks are similar in sight sound,

17   appearance and overall affective meaning to Defendants' AUSSIE PRO designation.").  Meta has

18   alleged as much in its own enforcement. Declaration Of Karthik K. Murthy In Support Of Metabyte

19   Inc.'s Opposition To Defendant's Motion For Summary Judgment ("Murthy Dec.") ¶¶ 22-68 (describing

20   numerous Meta opposition to numerous Meta-formative trademark applications where Meta asserted

21   that the applied-for trademark is similar to "Meta").

22         In fact, even the renderings of the marks Meta has presented provide support for the conclusion

23   that the similarity factor supports a finding of confusion.  *See Sports Mktg. Monterrey Grp. LLC v.*

24   *Socios Servs. US Inc.,* No. 22-CV-08939-SI, 2023 WL 2671379, at *15 (N.D. Cal. Mar. 27, 2023)

25   (granting preliminary injunction to prevent reverse confusion between SocioMX and Socios, noting

26   "[t]he parties do use different logos, with SocioMX using a soccer ball surrounded by flames or wings

27   and defendants using an "S" shield logo.").  None of the type of the differences Meta alleges here

28   stopped Meta from attacking many trademark applications. Murthy Dec. ¶¶ 22-68.

1    The jury can readily conclude from the evidence that Meta's use of META is sufficiently similar

2    to Metabyte's use of METABYTE to produce likely confusion.

3        **B.    Relatedness of Goods**

4        The question is "whether the products are the kind that the public attributes to a single source,

5    not whether or not the purchasing public can readily distinguish between the products of the respective

6    parties." *Wreal,* 38 F.4th at 132 (citations omitted). *See Stitch Editing Ltd. v. Tiktok Inc.,* No. 2:21-CV-

7    06636-SB-SK, 2022 WL 17348179, at *7 (C.D. Cal. Nov. 15, 2022) (denying summary judgment,

8    stating "although there are differences in the parties' customer bases and the type of editing they

9    provide, both parties offer video editing services that arguably are more similar than the products in

10   *Quia.*" (citing *Quia Corp. v. Mattel, Inc*., 10-CV-1902 JF(HRL), 2010 WL 2486364, at *7 (N.D. Cal.

11   June 15, 2010), which differentiated a handheld device and an online learning program in the general

12   field of children's education, though not on summary judgment).

13       "Goods and services are related when they are complementary, sold to the same class of

14   purchasers, or similar in use or function." *Sports Mktg. Monterrey Grp.*, 2023 WL 2671379 at *16

15   (quoting *Ironhawk Techs.*, 2 F.4th at 1163); see also *Fortune Dynamic, Inc.*, 618 F.3d at 1035.

16       Metabyte and Meta provide services that overlap and are complementary and, given Meta's

17   ubiquitous presence and the tools it offers through its social media networks, are highly likely to be

18   associated by consumers. Meta says it is "not a staffing company." Dkt. 79 at 10. A basic internet

19   search, however, produces recommendations about how to use Meta to apply for jobs and to network

20   about careers:



✦ AI Overview

To effectively use Meta (formerly Facebook) to find a job, you can **leverage their job posting platform, connect with recruiters, and optimize your profile for relevant roles**. Additionally, you can utilize Facebook's job search features and network with people in your field. 🔗

Here's a more detailed breakdown:

**1. Meta's Career Platform:**

**Explore Job Listings:**
Visit the Meta Careers website to browse open positions across various teams and locations. 🔗

**Meta for Business:**
If you're a business owner, you can use Meta for Business to post job openings and manage applications. 🔗

**Application Process:**
Meta's job application process is straightforward, often involving submitting your profile information and answering relevant questions. 🔗

**Referrals:**
If you know someone who works at Meta, consider asking for a referral. Referrals can significantly increase your chances of getting noticed. 🔗

1   Mehta Dec. ¶ 47.

2       In addition to the recruitment, networking and staffing services, Metabyte also provides web

3   design and hosting services.  Meta also provides web hosting services.

4

5   ⬤ **Meta for Developers**
    https://developers.facebook.com › docs › contenthosting ⋮

6   **Web Hosting - Meta for Developers - Facebook**
    It's a new, free, and easy way to **reach millions of players** using the same fast and reliable infrastructure

7   that powers Facebook photos and videos.

8   Id. at ¶ 48.

9       Meta also has adopted Meta-formatives to identify a wide array of Meta's products and services.

10  Among others, these include Meta AI for Meta Blueprint , Meta Boost  for Meta Connect , Meta

11  Horizon  for Meta Open Source,  Meta Platforms  for Meta Quest, and more shown at

12  https://about.meta.com/brand/resources/meta/our-trademarks/.  Murthy Dec. ¶ 75 (referencing Ex. 90).

13  Metabyte's services are already similar to services provided by Meta and, accordingly, consumers are

14  likely to infer an affiliation between Meta and Metabyte – or that Metabyte is a rogue infringer – when it

15  offers services that are natural adjuncts or  to Meta's existing services.  Meta's renown for its Facebook

16  and Instagram peer to peer social networks does not help dispel confusion, but rather adds to the

17  likelihood consumers will believe a dedicated peer to peer career network originates from Meta.   See,

18  e.g., *Bridgestone Americas Tire Operations, LLC v. Fed. Corp*., 673 F.3d 1330, 1333 (Fed. Cir. 2012)

19  ("Although the opposer bears the burden of coming forward with sufficient evidence, a new entrant

20  presenting a new mark for registration has an obligation to avoid confusion with established marks in the

21  same market."); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir. 1992) ("Where

22  goods are related or complementary, the danger of consumer confusion is heightened."); *Sports Mktg.*

23  *Monterrey Grp.*, 2023 WL 2371379 at *16 (noting the Ninth Circuit's "flexible approach" and holding

24  "this factor strongly weighs in favor of SocioMX because the parties' goods and services are at the very

25  least complementary.")

26      Reverse confusion cases focus on the customers of the senior user, not the customers of the

27  infringer. *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897 (9th Cir. 2004) ("The ultimate question in a

28  reverse confusion case is whether consumers doing business with the senior user might mistakenly

11

1 believe they are dealing with the junior user." (internal quotation marks omitted); *Ironhawk Techs., Inc.*

2 *v. Dropbox, Inc.*, 2 F.4th 1150, 1162 (9th Cir. 2021); *Bellagio Jewelry, Inc. v. Croton Watch Co., No.*

3 *CV 06-6672ODWRZX*, 2008 WL 3905895, at *6 (C.D. Cal. Aug. 20, 2008).

4       Meta tries repeatedly to limit the "consumer" of Metabyte's services to the employers who use

5 its placement services. But Metabyte's customers also include the individuals who are seeking

6 employment and career opportunities. Metabyte's business is to sell to a two-sided market where both

7 employees and employers are required to complete the transaction. Mehta Dec. ¶ 33. Its peer-to-peer

8 employee network is built for and is primarily used by employees, and to attract prospective staffing

9 candidates. *Id.* at ¶ 16.

10       Nonetheless, Meta blanketly claims that job candidates and employees should be ignored

11 because job seekers are not "relevant." Dkt. 79 at 12-13. In support, Meta cites to cases out of circuit

12 cases stating that confusion among "prospective employees" is not probative of confusion among

13 consumers, claiming there is no relevant case law in the Ninth Circuit. Dkt. 79 at 13. Those cases,

14 however, do not involve trademark owners who are offering services to prospective employees as well

15 as employers and involve other products such as a TV and digital game-show network , dog-related

16 services, and clothing.[3] The Ninth Circuit, in contrast to Meta's claim – even in cases that do not

17 involve employment and career networking services – has expressly acknowledged that "confusion

18 of…potential employees… and similar groups of non-consumers ***could be relevant***…" *Rearden LLC v.*

19 *Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 n.9 (9th Cir. 2012). And when there is evidence of

20 confusion from job recruiters and prospective candidates, it can be actionable. See, e.g. *Healix Infusion*

21 *Therapy, Inc. v. Healix, Inc.*, No. CV H-17-357, 2018 WL 1801149, at *20 (S.D. Tex. Apr. 16, 2018).

22       The flaw in Meta's argument is that it fails to recognize that job seekers are users of Metabyte's

23 staffing services and peer to peer career network and thus must be relevant to the confusion analysis.

24 "Confusion is relevant when it exists in the minds of persons in a position to influence the purchasing

---

[3] None of Meta's cases are on point of the proper consumer market to consider in a case related to employment, staffing, or career networking services. In *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999), the service in question was an entertainment database; *Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002) involved dog treats; and *QS Wholesale, Inc. v. Rox Volleyball, Inc.*, No. SACV-13-00512 (C.D. Cal. Dec. 31, 2014) focused on consumers for beach and volleyball attire.

1    decision *or* persons whose confusion presents a significant risk to the sales goodwill, or reputation of the

2    trademark owners." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 10,16 (1st Cir. 2004)

3    (emphasis added). "The fact that the injury is to a company's reputation or goodwill, rather than directly

4    to its sales, does not render the confusion less actionable." *Id.* at 15.

5         Unlike the cases cited by Meta, Metabyte connects job applicants with employers. Both job

6    applicants and employers need to be able to identify the METABYTE mark as the source of Metabyte's

7    employment and career services. A factfinder taking all reasonable inferences in Metabyte's favor could

8    reasonably infer that any likely confusion among job seekers is highly relevant commercially to

9    Metabyte. *See Analytic Recruiting, Inc. v. Analytic Res., LLC*, 156 F. Supp. 2d 499, 513, 514 (E.D. Pa.

10   2001) (finding evidence of confusion among job candidates as relevant even though recruiting firm's

11   clients were corporate clients).

12        For example, in *Instructure, Inc. v. Canvas Techs., Inc*., No. 221CV00454DAKCMR, 2022 WL

13   43829, at *13 (D. Utah Jan. 5, 2022), plaintiff provided a platform under a CANVAS mark used by

14   students to connect with potential employers universities, and defendant offered a platform used by

15   companies to hire applicants. The court found that both parties' services—despite them being offered to

16   different direct users—fell within the same relevant field of services. Likely confusion among

17   consumers of the career and employment services, the people who are engaged to provide the services

18   sold to employers is a necessary, is not "irrelevant." Id. at *13. Likewise, the disputes regarding

19   proximity of goods cannot be resolved on summary judgment. *See also Beacon Mut. Ins.*, 376 F.3d at

20   16 (finding evidence of confusion among non-purchasers of insurance probative even if the insurance

21   agents who were purchasers of party's services were not confused).

22        Meta's own enforcement confirms the proximity of the parties' goods. Meta has enforced

23   against many different categories of products using meta-formative branding. Murthy Dec. ¶¶ 22-68.

24   Meta is not wrong that consumers are likely to perceive those marks – adopted after Meta launched its

25   mark -- as related to Meta. When a huge, diversified, global company extends its tentacles into so many

26   areas, it is more likely that consumers will perceive similar marks as coming from that company and

27   therefore infringing. But Meta came later than Metabyte so the logic is the same, but the outcome is

28   adverse to Meta.

1     Meta's attempt to ignore an important sector of the market for Metabyte's services is ultimately

2    fatal to its motion. Obviously among the hundreds of millions of people who use Meta's services in the

3    United States, including Meta's employment related services, a segment of them are prime candidates to

4    use Metabyte's services.

5       **C.**    **Strength**

6     The courts apply a straightforward approach to analyze the strength of marks in reverse

7    confusion cases.  In a reverse confusion case, the Ninth Circuit expects courts to consider the

8    commercial strength of the alleged infringer's mark and the conceptual strength of the trademark

9    owner's mark in assessing whether the strength of the mark supports likely confusion.  *Ironhawk Techs.,*

10   *Inc. v. Dropbox, Inc*., 2 F.4th 1150, 1162 (9th Cir. 2021) ("*Ironhawk Techs.*").  "The important question

11   in a reverse confusion case is 'whether the junior mark is so [commercially] strong as to overtake the

12   senior mark."  *Id.* at 1162-63 (emphasis added) (quoting *Walter v. Mattel, Inc*., 210 F.3d 1108, 1111 n.2

13   (9th Cir. 2000)); *see Attrezzi, LLC* at 436 F.3d at 40 ("Maytag showed large national expenditures to

14   promote Jenn–Air Attrezzi; yet in a reverse confusion case, the relatively greater strength of a junior

15   user like Maytag may hurt, rather than help, its defense") (citing *A & H Sportswear,* 237 F.3d at 230–

16   31).  When a "plaintiff's weaker mark is pitted against a defendant with a far stronger mark," a reverse

17   confusion plaintiff with a weaker mark is "particularly" likely to prevail.  *Ironhawk Techs*., 2 F. 4th at

18   1163.

19     Meta shows its cards when it tries to dodge this rule of reverse confusion.  It fails altogether to

20   address its advertising blitz for META.  It pretends, instead, that it is Metabyte's commercial strength

21   that matters.  Dkt. 79 at 10.  It cites *World Champ Tech. v. Peloton* 2024 WL 665181 (N.D. Cal. Feb. 16,

22   2024) for the proposition that Metabyte's mark is weak because it is "commercially weak" and

23   "unrecognized."  First, *World Champ Tech* confined its analysis of the trademark owner's commercial

24   strength in a reverse confusion case to the rare cases involving marks that are "descriptive as a matter of

25   law." *World Champ Tech. v. Peloton*, 2024 WL 665181 at *10 (N.D. Cal. Feb. 16, 2024).  Meta argues

26   its own mark is "suggestive" (or inherently distinctive) (Dkt. 79 at 9) and so "Metabyte" (a mash up of

27   terms into a nonsensical term) must be arbitrary.  Second, the case is on appeal on this point and is

28   awaiting decision from the Ninth Circuit. World Champ Tech, LLC v. Peloton Interactive, Inc., 24-

1    2266. .  Nothing in *World Champ Tech* or any of the other cases Meta invokes undermine the Ninth

2    Circuit's rule in *Ironhawk Techs*. about how to assess mark strength when evaluating likely confusion.

3    *Ironhawk Techs*., 2 F. 4th at 1163.

4     Meta also misdirected its arguments about "crowded fields" and third party uses.  Meta focuses

5    on how these uses affect *Metabyte's* commercial strength.  But this is not the proper comparison that

6    must, instead, focus on *Meta's* commercial strength. Id.[4]  The party asserting a crowded field must show

7    the extent of others' uses.  *PowerFood, Inc. v. Sports Sci. Inst.,* No. C-93-0259 MHP, 1993 WL

8    13681782, at *5 (N.D. Cal. Mar. 11, 1993) ("*[A]ctual* widespread usage" must be shown, "that is more

9    substantial than a mere printout of trademark registrations and applications.") (emphasis in original).

10    Meta has not shown the scope of any of these uses.  Instead, Meta has only provided a 5,031 page search

11    report that its attorneys didn't read.  Murthy Dec. Ex. 91 at 18.4-18.8; Ex. 92  at 28.20-29.4.)

12     Meta's crowded field arguments area also inconsistent with Meta's arguments that Metabyte's

13    services under the METABYTE mark are not related to Meta's META mark.  To affect strength, third-

14    party use must be of a similar mark in a similar field.  *Treemo, Inc. v. Flipboard, Inc*., 53 F. Supp. 3d

15    1342, 1355 (W.D. Wash. 2014) ("Many of the marks … are used in unrelated industries or relate to

16    dissimilar products, and therefore do[] not diminish the strength of Flipboard's marks.").  Arguing that a

17    list of third party marks – if they were used in a meaningful way – affect the commercial strength of

18    Meta's mark concedes, accordingly, that these services are proximate to Metabyte's services.

19      Meta shows no evidence of such extensive and meaningful third party use that survived its

20    acquisition and enforcement spree and would blunt Meta's advertising barrage on the market.  See

21    *Rearden LLC v. Rearden Commerce, Inc.,* 683 F.3d 1190, 1209 (9th Cir. 2012) (840 companies used

22    'Rearden' but only four were technology firms, all small).  Meta now dominates in any conceivable

23    channel where consumers or prospective employees are likely to encounter Meta's mark or any

24    supposed third party use. Certainly the third-party use Meta offers would not compel a jury to find that

25    Meta's mark is commercially *weak.*  In fact, while disregarding the reverse confusion standard that

26    requires consideration of the strength of its mark, Meta admits: "It is beyond dispute that the META

---

[4]    Meta also ignores that its third-party use evidence includes a raft of uses that sprung up in an apparent attempt to take advantage of Meta's rebranding.  For example, Meta cites relatively new unregistered Metabyte brands that, though there is no evidence about the scope of use

1    mark is strong and valuable." Dkt. 79 at 23.

2    **D.    Actual Confusion**

3    Meta tries to discount Metabyte's evidence of actual confusion. Dkt. 79 at 13-15. There is no

4    basis to disregard actual reports of consumer confusion, particularly when the evidence of confusion

5    comes from multiple sources (Mehta Dec. ¶¶ 43-45) and, here, is corroborated by a survey.  E.g.

6    *Ultrapure Systems, Inc. v. Ham-Let Group,* 921 F. Supp. 659, 663 (N.D. Cal. 1996).    But actual

7    confusion evidence, particularly for a small company after its presence has been overrun, is hard to find

8    and, even if there were *none*, it would not weigh much against a finding of likely confusion.  *Am. Int'l*

9    *Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) ("Actual confusion is not necessary to a

10    finding of likelihood of confusion under the Lanham Trade Mark Act."); *Coach, Inc. v. Jay*, No. CV-14-

11    04283-DSF(PLAx), 2015 WL 12681378, at *1 (C.D. Cal. June 25, 2015) ("Coach need not produce

12    evidence of actual confusion in order to survive summary judgment."); *Rexel, Inc. v. Rexel Int'l Trading*

13    *Corp*., 540 F. Supp. 2d 1154, 1171 (C.D. Cal. 2008) (granting summary judgment for plaintiff on

14    infringement claims despite absence of actual confusion evidence) (citing *Acad. of Motion Picture Arts*

15    *& Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir.1991)) ("[I]n this circuit,

16    actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.");

17    *Brookfield Commc'ns., Inc.*, 174 F.3d at 1047 ("The failure to prove instances of actual confusion is not

18    dispositive against a trademark plaintiff, because actual confusion is hard to prove.")).

19    In any event, the Ninth Circuit has recognized that "[b]ecause of the difficulty in garnering

20    [actual confusion] evidence,…[s]urvey evidence may establish actual confusion." *Fortune Dynamic,*

21    *Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1035 (9th Cir. 2010) (citations

22    omitted).  In *Fortune Dynamic,* the Ninth Circuit reversed a grant of summary judgment because the

23    district court did not consider a survey showing a net confusion rate of 11%. Id. at 1037.  Although the

24    survey had a "number of shortcomings," the court held that "these criticisms, valid as they may be, go to

25    'issues of methodology, survey design, reliability, ... [and] critique of conclusions,' and therefore 'go to

26    the weight of the survey rather than its admissibility.'" Id. at 1037-38 (citation omitted).

27    The Ninth Circuit was dismayed at the district court's "glaring … failure to mention even one of

28    the numerous cases … which … held that survey evidence should be admitted 'as long as [it is]

1    conducted according to accepted principles and [is] relevant.'"  Id.  See also *Playboy Enters., Inc. v.*

2    *Netscape Commc'ns Corp.,* 354 F.3d 1020, 1027 (9th Cir. 2004) ("The presence of Dr. Ford's criticized

3    (but uncontradicted) report, with its strong conclusions that a high likelihood of initial interest confusion

4    exists among consumers, thus generates a genuine issue of material fact on the actual confusion issue.");

5    *Stitch Editing Ltd*., 2022 WL 17348179, at *6 ("Surveys indicating a likelihood of confusion are strong

6    evidence that may suffice to preclude summary judgment.").

7          Metabyte offered Mr. Stefan Boedeker 's expert report.  Mr. Boedeker has a Master of Science

8    degree in Statistics from the University of Dortmund/Germany and a a Master of Arts degree in

9    Economics from the University of California, San Diego.  He has spent 30 years working on the

10   application of economic, statistical, and financial models.  Murthy Dec. Ex. 88 at ¶¶1-3.  Mr. Boedeker

11   's survey raises at least a significant factual dispute whether Meta's use of META causes actual reverse

12   consumer confusion.  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, No. C 07-03752 JSW,

13   2008 WL 4614660, at *15 (N.D. Cal. Oct. 16, 2008) ("[C]ompeting surveys raise genuine issues of

14   disputed fact on the element of actual confusion.").

15         Meta criticizes Mr. Boedeker 's survey (discussed below), but the Court must fully credit the

16   survey for purposes of summary judgment even if Meta identifies issues with the survey it wants to

17   point out at trial.

18   **E.    Marketing Channels**

19         Meta's advertising encompasses all channels Metabyte occupies, including Indeed, the internet

20   and all channels available to an online or social media user, advertiser, web developer, job seeker, or

21   consumer.   The path to likely confusion is not subtle.  Meta has swamped all channels with META

22   advertising and has inserted Meta-formative trademarks in broad swaths of them.  Murthy Dec. Ex. 35;

23   Dkt 75 at 1. When consumers navigate in these channels, Meta's META mark and its connection to

24   Meta-formative marks is constantly reinforced.  Id.

25         Meta claims that "[t]here is not a single store, retail website, magazine, or other channel that

26   features both parties' products.'  Dkt. 79 at 11.  It is not clear why either of the parties' products would

27   be featured in "stores," a "*retail* website" (a clever qualification), or a "magazine."  But it is wrong

28   when it claims no overlap in "any other channel.  Deposition exhibits include job postings on

1    Indeed.com, Metabyte's primary channel for employees, where Meta also seeks applicants.  Mehta Dec.

2    ¶ 36.   There is little question that Metabyte's customers looking for jobs are likely to encounter or be

3    familiar with Meta since its presence is so ubiquitous.  See *Pom Wonderful LLC v. Hubbard*, 775 F. 3d

4    1118, 1130 (9th Cir. 2014) ("in assessing marketing channel convergence, courts consider *whether the*

5    *parties' customer bases overlap* and how the parties advertise and market their products") (emphasis

6    added) (cited by Meta at Dkt. 79 at 11).  This parameter also favors Metabyte.

7        **F.**    **Deliberate Disregard of Likely Reverse Confusion**

8        Meta talks past the standard in arguing that it adopted the mark in good faith. Dkt. 79 at 15,

9    citing *Marketquest Grp., Inc.,* 862 F.3d at 934–35 (relevant evidence includes that "the defendant knew

10   of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a

11   reasonably adequate trademark search, ***or*** otherwise culpably disregarded the risk of reverse

12   confusion."); *Ironhawk Techs.,* 2 F.4th at 1167-68 ("[W]e 'ask whether there is ***some evidence*** that the

13   junior user, when it knew of the senior user, was at fault for not adequately respecting the rights of the

14   senior user.'") (quoting 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2020); *see*

15   *also Sports Mktg. Monterrey Grp*., 2023 WL 2671379, at *20 ("[D]efendants were careless by not

16   conducting a trademark search when launching Socios.com in the U.S.").

17       Apparently recognizing that an organization its size would have little luck explaining away its

18   failure to search the trademark register, it now tries on the argument that disregarding it because it was

19   long is somehow different or better. It was inescapable that others in the 5000 page report were due at

20   least consideration by Meta, not just the bank that was paid $60 million for its mark. Murthy Dec. Ex. 86

21   at ¶ 37. Meta was not merely "careless."  It searched for conflicting marks and found Metabyte's

22   registrations.  Dkt. 79 at 15.  It conducted this search *after* its founder made the rebranding decision.

23   And its business and marketing executives did not bother to read or consider the search report.  Murthy

24   Dec. Ex. 91 at18.4-18.8; 93 at 179:21-180:7. In fact, Meta's lawyers did not even read it.  Murthy Dec.

25   Ex. 92 at 28.20-29.4. Meta, its leaders already having decided, just plowed ahead in complete disregard

26   of Metabyte, and no doubt other trademark owners.

27       **G.**    **Likelihood of Expansion**

28       This factor also favors Metabyte.  Metabyte's natural expansion must include, at the least, the

1    centralization of the services that it already is providing under the brand it has owned for 30 years.  Meta

2    itself has done the same.  It admittedly has put Facebook, Instagram, Oculus and a host of other brands

3    under its META brand umbrella.  *Ironhawk Techs.*, 2 F.4th at 1160 ("Reverse confusion can foreclose

4    the senior user from expanding into related fields and could place the senior company's goodwill in the

5    hands of the junior user.")  Certainly, revamping decades of trademark use to centralize branding of

6    ***existing*** goods and services, not to mention occasional tweaks to the logo, is within a parties' natural

7    expansion.[5]

8        Meta's argues, in effect that – because Meta decided to overwhelm the marketplace with its Meta

9    and Meta formative brands that Metabyte was obliged to freeze in place lest its natural changes tread

10   into the massive footprint Meta has claimed for itself.  It cites cases that newly stated expansion efforts

11   and "maneuvering" after litigation has been filed are "not to be considered," even if Metabyte merely is

12   making changes to its branding that are sensible, foreseeable, and necessary to carry on its business.

13   Mehta Dec. ¶ 29. Meta goes so far as to claim that Metabyte is guilt of unclean hands and causing likely

14   confusion by determining that it should focus primarily on its 30-year-old brand.  Dkt. 11 p. 9-10

15   (Second affirmative defense in Meta's answer); Dkt. 79 at 28.

16       Meta is just as cavalier with the facts about expansion that consumers would ascribe to Meta.

17   The question is not, as Meta suggests, whether Meta has actual plans to become a "staffing agency."

18   The question is whether consumers would apprehend that services, adjacent to Meta's services, are

19   likely to originate from, or are authorized by Meta, or from a company that is deliberately riding on

20   Meta's coattails rather than promoting a thirty-year-old brand. *Com. Nat. Ins. Servs., Inc. v. Com. Ins.*

21   *Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

22       **H.    Sophistication of Consumers**

23       Meta repeats its ploy on this factor: it focuses on highly sophisticated employers and ignores the

24   consumers most likely to be confused.  Dkt. 79 at 12-13.  Meta briefly turns to the confusion prospective

25   employees might experience, but assumes again that only the potential confusion that employees might

---

[5] Meta complains that Metabyte might use Metapeernet.com with its employee peer to peer career network.  Dkt. 79 at 7.  Metabyte is not asserting any trademark rights in Metapeernet against Meta so this issue is a red herring.  But if Meta believes this use is confusing, then it speaks to reasons for the motion to be denied, not granted.  Metabyte must be, after 30 years, allowed ordinary expansion and extensions of its branding.

1    experience, after a long hiring process, may matter.

2        Initial interest confusion, however, may be likely before any "lengthy high-touch" processes

3    occur. "[I]nitial interest confusion . . . occurs when an alleged infringer uses a competitor's mark to

4    direct consumer attention to its product." *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119

5    F.4th 711, 718 (9th Cir. 2024). "Although dispelled before an actual sale occurs, initial interest

6    confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable

7    trademark infringement." *Playboy*, 354 F.3d at 1025. "Such a claim applies, however, only to

8    'misleading and deceptive' uses of a mark, not to 'legitimate comparative and contextual advertising.'"

9    *Lerner & Rowe*, 119 F.4th at 718-19 (*quoting Network Automation, Inc. v. Advanced Systems Concepts,*

10   *Inc.*, 638 F.3d 1137, 1148 (9th Cir. 2011).

11       For example, in *Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of L., Inc.*, 214 F.

12   Supp. 3d 573 (S.D. Tex. 2016), the court addressed the likelihood that prospective law students who –

13   once they made their decisions to invest heavily in a legal career – were likely to become sophisticated

14   about their choice of school. But they would not be expected to be steeped in such awareness when

15   choosing where to apply. Id at 598 ("there exists a period of time in every prospective law student's

16   career where, not only is he unsophisticated, he knows practically nothing about the industry and is

17   particularly susceptible to confusion.") For job applicants, considering where to apply, the process is

18   also hasty as applicants scroll through job listings and posts about potential careers and, no offense to

19   Meta, may decide in an instant that they have no interest in applying for a job with Meta, or a company

20   they assume is run by Meta, or a company that is affiliated with Meta or is engaged in filling Meta's

21   staffing needs, or are disinterested in continuing with an application  to a company they come to believe

22   is misappropriating Meta's goodwill. This is enormously disruptive to Metabyte. Mehta Dec. ¶¶ <u>35 -</u>

23   <u>37</u>.

24       Consumers of web hosting and design services may be slightly more sophisticated at the start but

25   whatever the means by which they encounter Metabyte, consumers may assume that Meta is involved

26   and is too expensive, too impersonal, or too automated to meet the needs of a small business. E.g. *J.K.*

27   *Harris & Co., LLC v. Kassel*, 253 F. Supp. 2d 1120, 1125 (N.D. Cal. 2003).

1 **V.   META'S MOTION FOR SUMMARY JUDGMENT OF DAMAGES ALSO SHOULD BE**
2 **DENIED**

3         Meta has tried to exclude Metabyte's expert damages witness.  That is discussed below.

4 Obviously, if the expert testifies, Meta's motion on damages should be denied.  But Metabyte outlined a

5 variety of damages theories about which there is ample evidence. Murthy Dec. Ex. 95 at No. 23. Meta's

6 motion depends on excluding *all* damages and should be denied if the jury can infer any damages were

7 suffered.  The evidence more than establishes that Meta's presence will require compensation in an

8 amount the jury believes is appropriate.  Experts are not required.  *Skydive Arizona, Inc. v. Quattrocchi,*

9 673 F.3d 1105, 1113 (9th Cir. 2012) ("Section 1117 demands neither empirical quantification nor expert

10 testimony to support a monetary award of actual damages; many sources can provide the requisite

11 information upon which a reasonable jury may calculate damages.")

12
13 **VI.   THE META MARK IS A GENERIC PREFIX THAT MUST BE AVAILABLE IN THE**
14 **TECH INDUSTRY.**

15         Although Meta denies confusion with Metabyte, it simultaneously suggests that any evolution in

16 Metabyte's service offerings—even for preexisting services—will be used against it to assert confusion.

17 Dkt. 11 at 9-10; Dkt. 79 at 28.  Meta also has tried to prevent a large number of Meta-formative marks

18 from being registered.  Murthy Dec. Ex. 22-68.  These actions reasonably give rise to a credible threat of

19 enforcement, justifying Metabyte's request for declaratory relief.

20          META is both a generic and functional term—and therefore unprotectable. 15 U.S.C. § 1127;

21 15 U.S.C. § 1125(a), 15 U.S.C. § 1052(e)(5).  A generic, functional linguistic component in the software

22 and internet industries cannot be monopolized, particularly in a broad swath of all technologies.  "The

23 reason is plain enough. To allow trademark protection for generic terms, i.e., names which describe the

24 genus of goods being sold, even when these have become identified with a first user, would grant the

25 owner of the mark a monopoly, since a competitor could not describe his goods as what they are." *CES*

26 *Pub. Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2 Cir. 1975). *Surgicenters of America, Inc. v.*

27 *Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1016 (9th Cir. 1979).

28         META was selected to represent the metaverse—a widely used term describing a virtual,

29 interconnected digital world (Mehta Dec. ¶ 49)—making it generic for the very category of products and

30 services Meta aims to offer. Meta's own internal documents confirm that "Meta" was adopted to denote

1 moving "beyond" boundaries. Murthy Dec., Ex. 93 at 70:11-14, 112 & 114. Meta executives confirm

2 that "Meta" was chosen because it means "beyond." Murthy Dec., Ex. 109 at 7.

3   Meta's own internal presentations show that "meta" already had entrenched technical meanings

4 in HTML meta tags, metadata schemas, and platform infrastructure. These are not brand elements, but

5 essential technical vocabulary—linguistic building blocks—used across the industry. Meta itself uses the

6 term 'meta' in almost all its products. For example, the home page of the websites of each of Meta's

7 services uses meta tags. Mehta Dec., ¶ 50. Meta's user manuals use metadata. Murthy Dec, Ex. 116 at

8 76-92.

9   Meta cannot selectively define its services to avoid a finding of genericness. It has filed

10 trademark applications covering hundreds of goods and services across numerous classes —spanning

11 cloud computing, advertising, AI, education, and defense. Murthy Dec. Ex. 16–34, 37–83 & 96–103.

12 Meta markets this broad range under a single umbrella brand—'Meta'—presenting itself as the brand for

13 everything.

14   Externally, Meta now promotes a vast portfolio of ventures—from virtual reality and AI to

15 defense tech and human-machine integration—far beyond traditional social networking. Publications

16 note Meta's "frightening foray into military technology" (MSNBC) and $14.3 billion investment in AI

17 to "kick-start a superintelligence lab" (New York Times). Murthy Decl., Ex. 96-103.

18   While *Meta* may not be generic in every submarket, it is generic in many—and Meta cannot

19 obscure that reality by invoking a narrow, genus-by-genus interpretation of the Lanham Act to secure

20 trademark rights in select categories, while simultaneously promoting a ubiquitous brand that

21 indiscriminately spans the population—that is, all genera."[B]y expanding or contracting the definition

22 of a 'genus' of products, a court can substantially affect the final determination of whether a term is

23 'generic.'" 2 McCarthy § 12:23. It is up to the applicant to identify the genus of goods or services for

24 which it seeks protection. See15 U.S.C. § 1051(a)(2), (b)(2); 37 C.F.R. §§ 2.32(a)(6), 2.71(a); TMEP §

25 1402.01; see also *Stone Lion Capital Partners, L.P. v. Lion Capital LLP*,746 F.3d 1317, 1324

26 (Fed.Cir.2014) ("Parties that choose to recite services in their trademark application that exceed their

27 actual services will be held to the broader scope of the application."). *In re Cordua Rests., Inc.*, 823 F.3d

28 594, 605-606 (Fed. Cir. 2016) ("By seeking broad protection for its mark, Cordua obliged the PTO to

1    direct its genericness inquiry to the broad category of restaurants generally.")

2        'Meta' is a functional prefix that is widely used as a linguistic tool in the technology industries,

3    specifically software, internet, and media industries to coin terms such as metadata, metatags, meta

4    analysis, metaverse, meta-learning, and meta-frameworks—all of which are used to describe

5    fundamental concepts.  As the Supreme Court notes: "Discussing trademarks, we have said " '[i]n

6    general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the

7    use or purpose of the article or if it affects the cost or quality of the article.' "… Expanding upon the

8    meaning of this phrase, we have observed that a functional feature is one the "exclusive use of [which]

9    would put competitors at a significant non-reputation-related disadvantage." *Traffix Devices Inc. v.*

10   *Marketing Displays Inc.*, 532 U.S. 23, 121 S.Ct. 1255 (2001) (citations omitted).  'Meta' is part of the

11   functional language developers and tech companies use to describe data systems, digital content, social

12   media, websites, and emerging technologies such as artificial intelligence (AI). Mehta Dec. ¶ 51. It is a

13   linguistic component in the software, internet, and media industries. Id. at ¶ 52.

14       Meta's ubiquitous marketing and promotional activities create the impression that anything-

15   meta, whether branded like Metabyte or generic like meta tag, comes from the company called Meta.

16   The problem is worsened when Meta introduces proprietary names like Meta AI and Meta Pay, which

17   echo generic tech terms such as metadata, meta tags, meta title, and others — a well established and

18   constantly evolving technical vocabulary. Id. at ¶ 53. This blurs the line between Meta's branding and

19   widely-used terminology, increasing confusion and suggesting an association in an attempt to

20   monopolize language that is generic or functional—contrary to the Lanham Act.

21       The Lanham Act does not permit any party to privatize a functional linguistic tool of innovation.

22   'Meta' is both generic and functional—and therefore unprotectable on either ground.

23   **VII.    METABYTE'S SURVEY EXPERT SHOULD NOT BE EXCLUDED**

24       Meta tries to avoid the evidence that nullifies its motion by excluding Stefan Boedeker's

25   consumer survey.  Mr. Boedeker conducted three *Eveready* style surveys (a survey that does not prompt

26   the respondent with the more well-known mark) that show high levels of actual confusion.  He used

27   three separate test stimuli, modified to test reverse confusion (showing Metabyte's mark rather than

28   Meta's) and controlling for guesses.  Murthy Dec. Ex. 87 at 46:19 – 49:16.  Murthy Ex. 88 at ¶¶ 52-62.

1    Meta focuses its challenge in three areas, none of which warrants exclusion of Mr. Boedeker's surveys.[6]

2    **A.    The Survey Population**

3    Meta repeats its argument that job seekers or prospects should not be considered among the

4    potentially confused population.  This is not a proper criticism because job seekers are among the

5    consumers of Metabyte's services, as discussed earlier.

6    **B.    The Test Stimulus**

7    In two of the surveys, Mr. Boedeker anticipated Metabyte's branding changes.  Accordingly, he

8    tested the real-life website but instead of "Teamanics, a Metabyte Peer Network," he showed "Metabyte

9    Peer Network."  Mehta Dec. ¶ 39.  For the other challenged survey, Mr. Boedeker simply inserted

10   "Metabyte" without the reference to peer networking.  These were not manipulations to conjure

11   confusion that is not likely or reflect unforeseeable or unnatural changes to the branding.  Mehta Dec. ¶

12   19.

13   Even if these surveys of future branding (showing 28% and 29.7%) only show "likely" rather

14   than "actual" confusion (because they test natural brand expansion or changes), this does not render the

15   surveys inadmissible. Murthy Dec. ¶ 110.  The third survey, which tested Metabyte's home page as it

16   exists reflects over 16% actual confusion as Meta admits.

17   Meta likens Mr. Boedeker's survey to one done in a case involving unauthorized nude photos of

18   Anna Kournikova, the tennis star.  The issue was whether Ms. Kournikova would be understood by

19   consumers to have sponsored the photos, but (among other flaws) the survey respondents "were not

20   allowed to examine the photos or the magazine article." *Kournikova v. Gen. Media Commc'ns Inc.*, 278

21   F. Supp. 2d 1111, 1125 (C.D. Cal. 2003).  The import of the photos to whether they were authorized is a

22   far cry from Meta's complaints about how much of the website respondents were shown.  See *Fortune*

23   *Dynamic, Inc*. 618 F.3d at 1037–38 (refusing to exclude the survey or grant summary judgment even

24   though "the Marylander survey has a number of shortcomings, including the fact that it was conducted

25   over the internet (thereby failing to replicate real world conditions), may have been suggestive, and quite

26   possibly produced counterintuitive results").

---

[6] Meta takes unjustified potshots and Mr. Boedeker's qualifications, despite 25-30 confusion surveys and expertise generally in conducting and assessing results from consumer research.  Compare Murthy Dec. Ex. 87 (33:19-23); Ex. 88 at Ex. A-6 with Dkt. 79 at 28.

1        **C.      The Results**

2        Meta tries once again to import its limitation of Metabyte's market to employers or respondents

3   responsible for hiring.  Dkt. 79 at 31.  Meta tries to construct its own results from Mr. Boedeker's data

4   by filtering it for respondents who indicated hiring responsibilities.  *Id.*  For the same reasons as stated

5   earlier, this effort was improper.  Then, Meta starts flyspecking – in a *Daubert* motion – a small

6   percentage of the confusion results (approximately 3% (27/900) of the respondents) that it says may

7   have been coded improperly.  Dkt. 79 at 32. It does not engage in this analysis in the control sample to

8   see if this also suppressed the confusion results.  How individual responses should be counted, of course,

9   should be left for cross-examination, particularly when the remaining confusion is still ample to defeat

10  the motion.

11       **D.      The Boedeker Report Regarding The Economic Impact of Meta's Attempt to**
12       **Overrun Meta-formative brands**

13       Mr. Boedeker also analyzed the economic harm a firm like Meta can cause by monopolizing the

14  META mark.  Murthy Ex. 89.  This testimony does not relate primarily to this motion as Meta admits its

15  mark has enormous strength in the confusion analysis, but this is not a reason to exclude it.

16
17  **VIII.   METABYTE'S DAMAGE EXPERT SHOULD NOT BE EXCLUDED**

18       While trial courts may look to the factors outlined in *Daubert v. Merrell Dow Pharm., Inc.*, (509

19  U.S. 593-94 (1993)), they are not forced "to mechanically apply the *Daubert* factors— or something like

20  them—to both scientific and non-scientific testimony, *Kumho Tire*[7] heavily emphasizes that judges are

21  entitled to broad discretion when discharging their gatekeeping function." *United States v. Hankey*, 203

22  F.3d 1160, 1168 (9th Cir.2000). "Where non-scientific expert testimony is at issue, the reliability of the

23  expert's opinion focuses on his or her knowledge and experience." *Cotton v. City of Eureka, Cal.*, No. C

24  08-04386 SBA, 2010 WL 5154945, at *14 (N.D. Cal. Dec. 14, 2010).

25       Exclusion of expert testimony should never be the first step for a court—instead, vigorous cross-

26  examination of expert witnesses and presentation of contrary evidence should take the place of

27  exclusion. Courts often note that, as *Daubert* itself recognizes, "[v]igorous cross-examination,

28  presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

---

[7] *Kumho Tire v. Carmichael*, 526 U.S. 137, 152–53 (1999)

1    appropriate means of attacking shaky but admissible evidence." *Fortune Dynamic, Inc.*, 618 F.3d at

2    1038 ("vigorous cross examination is to be preferred to pretrial exclusion of expert testimony. . . . [I]f

3    there is any serious doubt regarding the facts or data relied upon by an expert, then the resolution of that

4    doubt should be left to the [trier of fact].").

5    **A.    Mr. Sheff Is Qualified To Provide A Damages Analysis**

6    Mr. Sheff has sufficient expertise to help the jury and has been an expert witness on damages in

7    a number of federal and state trademark law cases.  Murthy <u>Dec.</u> Ex. ~~50~~86 at ¶ 4; Murthy <u>Dec.</u> Ex. ~~49~~85

8    at 10:7-13; 50:20-52:20; 53:16-54:4. He has professional experience teaching accounting. Id. at 13:12-

9    14:20.  He has published on brand equity, a measure of brand value predominant in the marketing and

10   brand valuation literature.  Murthy <u>Dec.</u> Ex. 86~~50~~ at ¶ 4.

11   **B.    Sheff's Valuation Damages Metric Has Support In Law And Fact**

12   Damages assume, as alleged, that Metabyte's brand has been infringed.  Metabyte has provided

13   evidence of its goodwill and reputation.  Mr. Sheff followed commonly practiced methodology to

14   calculate trademark infringement damages.

15   1.    <u>Sheff's Market Method Estimate Of $69 Million Based On The Only Transaction</u>
16        <u>Meta Would Provide Is Reliable</u>

17   Meta only produced one transaction regarding its payments or licensing of the "Meta" trademark,

18   and therefore Mr. Sheff only had one directly related transaction to analyze.  Murthy Dec. Ex. 94

19   (Meta's responses to Metabyte's first amended interrogatories, amended interrogatory 18, p. 21-22).

20   Meta refused to provide any more transactions even though Metabyte asked for them.  *Id.*

21   As Mr. Sheff point out in his deposition, "which is it? Is it that the information is not relevant?

22   Or that my report is faulty because I didn't include information that you said in earlier litigation is not

23   relevant. I think it's unfair."  Murthy Dec. Ex. 85 at 334:8-12. Meta has produced no evidence that Mr.

24   Sheff's procedure does not follow "reliable principles and methods." Fed. R. Evid. 702(c).

25   "[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be

26   assigned to that opinion rather than its admissibility." *Viterbo v. Dow Chemical Co*., 826 F.2d 420, 422

27   (5th Cir. 1987). Meta, to the extent it is consistent with its arguments that other transactions were

28   irrelevant, can argue at trial that other transactions or values should have been considered, or that greater

29   adjustments should have been made.  But Mr. Sheff's market method estimate of $69 million should not

1   be excluded.

2              2.   <u>Sheff's Cost method estimate of $988,142.06 does not fabricate costs and is in
3                  line with Generally Accepted Methods</u>

4       Meta tries to make a distinction between "investments in the brand" and "necessary costs to

5   generate revenue" Dkt. 79 at 27.  However, these are the same thing, because costs to generate revenue

6   are investments in the brand. Mehta Dec. ¶ 42.

7       Mr. Sheff does not ignore the financial reality of Metabyte's business and valuation standards.  It

8   is acceptable to include expenses in an analysis of valuation and factual disputes about expenses are not

9   unusual.  Murthy Dec. Ex. 86 at ¶ 16.  Expenses for certain years are a reasonable way to estimate

10   expenses in previous years, and are supported by the record.  Murthy Ex. 86 at ¶ 55.

11              3.   <u>Mr. Sheff's Disgorgement Calculation Is Admissible</u>

12       The plaintiff in a trademark infringement action has a featherweight burden to show revenues

13   arising from the infringement. 28 U.S.C §1117(a) ("the plaintiff shall be required to prove defendant's

14   sale only; defendant must prove all elements of cost or deduction claimed.") This is what Ms. Sheff has

15   done.  The alleged infringements include operation of peer-to-peer networks and other online computer

16   services that comprise most or all of this revenue.  If Meta believes that costs should be deducted or

17   wants to challenge the pertinence of some revenues, it should have had its experts do so.  Or it should do

18   so at trial consistent with its obligations to produce disclosures and discovery on the point.  Metabyte

19   can readily agree that it should not, consistent with the principles of equity, recover $128 billion.  The

20   Court exercises equitable oversight is to ensure that infringement is not profitable.  28 U.S.C §1117.

21   There is no reason to exclude altogether the calculation that starts this inquiry.

22
23   **IX.**    **METABYTE'S LACHES MOTION SHOULD BE GRANTED**

24       Meta claims no evidence was put in on any factors identified in *E-Sys., Inc. v. Monitek, Inc*., 720

25   F.2d 604, 607 (9th Cir. 1983).  Dkt. 79 at 22.  First, this is false; Metabyte put in evidence that Meta

26   knew about Metabyte when it rebranded, suffered no prejudice because it was rebranding no matter

27   what, that Metabyte did not unreasonably delay and initiated a dialogue almost immediately with Meta

28   and, sued within the presumed interval during which no laches would apply.  All of these are factors that

29   *E-Systems* addresses.

30       But, the issues of prejudice and unreasonable delay are foundational to laches.  If they were not a

1  prerequisite, laches would always apply when "one of the world's most prominent technology

2  companies" adopts an infringing mark.  E.g. *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.,*

3  *Inc.,* 559 F.3d 985, 991 (9th Cir. 2009) ("MDE must still satisfy the second prong of the laches test:

4  prejudice resulting from Internet Specialties' unreasonable delay in bringing suit.").

5      Meta bears the burden to prove laches, and therefore prejudice. No one at Meta says anything

6  about steps it took under the purported misapprehension Metabyte would not sue.  It does not even say it

7  was under any such misapprehension.

8
9  **X.    CONCLUSION**

10     Meta cannot support its theories if inferences from the evidence are drawn in Metabyte's favor.

11  So, it tries to exclude the evidence and an important consumer base.  Factual disputes abound or clearly

12  favor Metabyte on each of the confusion factors and damages.  The motion should be denied.

13

Dated: July 25, 2025

Respectfully Submitted:

/s/ Karthik Murthy
Karthik Murthy

Counsel for Metabyte, Inc.
Plaintiff

28